# 17-2607-cv(L)

## 17-2764-cv(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



IN RE
SUBPOENAS ISSUED TO JAMS, INC.
and CAROL A. WITTENBERG.

_____

*On Appeal from the United States District Court*
*for the Southern District of New York (New York City)*

## JOINT APPENDIX

SANFORD HEISLER SHARP, LLP
*Attorneys for Plaintiff-Appellant-*
*Cross-Appellee Jane Doe*
1666 Connecticut Avenue, NW
Suite 300
Washington, D.C. 20009
202-499-5200

CAPITAL LEGAL GROUP (US) PLLC
*Attorneys for Non-Party Respondents-*
*Appellees-Cross-Appellants*
*JAMS, Inc. and Carol A. Wittenberg*
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
202-559-9185

## **Table of Contents**

**Page**

District Court Docket Entries ................................................................ A1

Motion by Non-Parties JAMS, Inc. and Neutral Mediator
    Carol A. Wittenberg (collectively, "Non-Parties") to Quash
    Subpoenas Served on Non-Parties, dated June 15, 2017 ................. A5

Memorandum of Law by Non-Parties in Support of Motion,
    dated June 15, 2017 .......................................................... A8

        Exhibit A to Memorandum of Law -
        Subpoenas in *Jane Doe v. Proskauer Rose LLP*
        ("DC Action") to Produce Documents, Information,
        or Objects or to Permit Inspection of Premises in a
        Civil Action, dated May 18, 2017 ............................................ A36

        Exhibit C to Memorandum of Law -
        JAMS Mediation Agreement in DC Action,
        dated March 23, 2017 ............................................................. A40

        Exhibit E to Memorandum of Law -
        Memorandum of Points and Authorities in Support
        of Plaintiff's Emergency Motion in DC Action for
        Preservation Order to Preserve Critical Evidence
        from Imminent Destruction, dated May 18, 2017 ................... A43

        Exhibit F to Memorandum of Law -
        Complaint in DC Action, dated May 12, 2017 ....................... A56

        Exhibit G to Memorandum of Law -
        Local Civil Rule 83.9. Alternative Dispute Resolution
        (Southern District Only), with Procedures of
        the Mediation Program and Sample Mediation
        Confidentiality Agreement ....................................................... A84

Opposition by Plaintiff to Motion to Quash Subpoenas,
    dated July 14, 2017 ................................................................. A90

Declaration of Jane Doe, Plaintiff, in Opposition to
    Motion to Quash Subpoenas, dated July 14, 2017 ....................... A116

**Table of Contents**
**(Continued)**

**Page**

Declaration of David Sanford, for Plaintiff, in Opposition
to Motion to Quash Subpoena, dated July 14, 2017 ..................... A118

Exhibit A to Sanford Declaration -
Notice of Electronic Filing of Minute Order in DC Action,
dated May 18, 2017 ................................................................. A120

Exhibit B to Sanford Declaration -
Email from Elizabeth Carter to Counsel,
dated May 19, 2017 ................................................................. A121

Transcript of Argument held before the
Honorable Denise Cote on July 28, 2017 .................................... A122

Order of the Honorable Denise Cote,
dated July 28, 2017, Appealed From .......................................... A131

Notice of Appeal by Plaintiff, dated August 22, 2017 ....................... A132

Notice of Cross-Appeal by Non-Parties, dated September 5, 2017 ..... A134

CLOSED,APPEAL,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:17-mc-00207-P1

In re Subpoenas Issued to JAMS, Inc. and Carol A.        Date Filed: 06/16/2017
Wittenberg                                              Date Terminated: 07/28/2017
Assigned to: Judge Part One
Cause: M 08-85 Motion to Quash

**In Re**

| | | |
|---|---|---|
| **In re Subpoenas Issued to JAMS, Inc. and Carol A. Wittenberg** | represented by | **William Earl Wallace , III**<br>Capital Legal Group PLLC<br>1717 Pennsylvania Ave., NW #1025<br>Washington, DC 20006<br>(202) 559-9185<br>Fax: (202) 644-5227<br>Email: wwallace@caplegal.us<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Jane Doe** | represented by | **Jane Doe**<br>PRO SE |

V.

**Movant**

| | | |
|---|---|---|
| **JAM, Inc** | represented by | **JAM, Inc**<br>PRO SE |

**Movant**

| | | |
|---|---|---|
| **Carol A Wittenberg** | represented by | **Carol A Wittenberg**<br>PRO SE |

**ADR Provider**
**Carol A. Wittenberg**

**ADR Provider**
**Jams, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/16/2017 | 1 | MOTION to Quash Subpoenas of JAMS, Inc. and Carol A. Wittenberg. Other |

| | | |
|---|---|---|
| | | Court Name: USDC-DC. Other Court Case Number: 1:17-cv-00901-ABJ. (Filing Fee $ 47.00, Receipt Number 465401183684) Document filed by In re Subpoenas Issued to JAMS, Inc. and Carol A. Wittenberg. Return Date set for 7/11/2017 at 11:00 AM. (jc) (jc). (Entered: 06/19/2017) |
| 06/16/2017 | 2 | MEMORANDUM OF LAW in Support re: 1 MOTION to Quash Subpoenas of JAMS, Inc. and Carol A. Wittenberg. Other Court Name: USDC-DC. Other Court Case Number: 1:17-cv-00901-ABJ. (Filing Fee $ 47.00, Receipt Number 465401183684). Document filed by William E. Wallace III. (jc) (Additional attachment(s) added on 6/27/2017: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (jc). (Entered: 06/19/2017) |
| 06/16/2017 | | Case Designated ECF. (jc) (Entered: 06/19/2017) |
| 06/26/2017 | 3 | NOTICE OF CHANGE OF ADDRESS by William Earl Wallace, III on behalf of In re Subpoenas Issued to JAMS, Inc. and Carol A. Wittenberg. New Address: Capital Legal Group (US) PLLC, 1717 Pennsylvania Ave., NW, Suite 1025, Washington, DC, USA 20006, (202) 559-9185. (Wallace, William) (Entered: 06/26/2017) |
| 06/30/2017 | 4 | NOTICE OF APPEARANCE by Andrew C Melzer on behalf of In re Subpoenas Issued to JAMS, Inc. and Carol A. Wittenberg. (Melzer, Andrew) (Entered: 06/30/2017) |
| 06/30/2017 | 5 | JOINT LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Ronnie Abrams from Andrew Melzer dated June 30, 2017. Document filed by In re Subpoenas Issued to JAMS, Inc. and Carol A. Wittenberg. (Attachments: # 1 Text of Proposed Order Stipulation & Proposed Order)(Melzer, Andrew) (Entered: 06/30/2017) |
| 07/07/2017 | 6 | STIPULATION AND ORDER. IT IS HEREBY STIPULATED AND AGREED by and between the undersigned attorneys for the parties as follows: 1. The deadline for Plaintiff to respond to the Motion to Quash Subpoenas Served on Non-Parties JAMS, Inc. and Neutral Mediator Carol A. Wittenberg ("Motion to Quash") shall be July 14, 2017. 2. The deadline for Non-Parties JAMS, Inc. and Neutral Mediator Carol A. Wittenberg to reply to Plaintiff's opposition to the Motion to Quash shall be July 21, 2017. 3. The return date for the motion shall be July 28, 2017 before Judge Denise L. Cote at 2:30 p.m. So ordered. (Responses due by 7/14/2017. Replies due by 7/21/2017.) (Oral Argument set for 7/28/2017 at 02:30 PM before Judge Part One.) Motions terminated: 5 JOINT LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Ronnie Abrams from Andrew Melzer dated June 30, 2017. Document filed by In re Subpoenas Issued to JAMS, Inc. and Carol A. Wittenberg. (Signed by Judge P. Kevin Castel in Part I on 7/6/2017) (rjm) (Entered: 07/07/2017) |
| 07/14/2017 | 7 | MEMORANDUM OF LAW in Opposition re: 1 MOTION to Quash Subpoenas of JAMS, Inc. and Carol A. Wittenberg. Other Court Name: USDC-DC. Other Court Case Number: 1:17-cv-00901-ABJ. (Filing Fee $ 47.00, Receipt Number 465401183684) . Document filed by Jane Doe. (Sanford, David) (Entered: |

| | | |
|---|---|---|
| | | 07/14/2017) |
| 07/14/2017 | 8 | DECLARATION of Jane Doe in Opposition re: 1 MOTION to Quash Subpoenas of JAMS, Inc. and Carol A. Wittenberg. Other Court Name: USDC-DC. Other Court Case Number: 1:17-cv-00901-ABJ. (Filing Fee $ 47.00, Receipt Number 465401183684). Document filed by Jane Doe. (Sanford, David) (Entered: 07/14/2017) |
| 07/14/2017 | 9 | DECLARATION of David Sanford in Opposition re: 1 MOTION to Quash Subpoenas of JAMS, Inc. and Carol A. Wittenberg. Other Court Name: USDC-DC. Other Court Case Number: 1:17-cv-00901-ABJ. (Filing Fee $ 47.00, Receipt Number 465401183684). Document filed by Jane Doe. (Attachments: # 1 Exhibit Ex. A- D.D.C. Preservation Order, # 2 Exhibit Ex. B- email from JAMS re preservation)(Sanford, David) (Entered: 07/14/2017) |
| 07/21/2017 | 10 | REPLY MEMORANDUM OF LAW in Support re: 1 MOTION to Quash Subpoenas of JAMS, Inc. and Carol A. Wittenberg. Other Court Name: USDC-DC. Other Court Case Number: 1:17-cv-00901-ABJ. (Filing Fee $ 47.00, Receipt Number 465401183684) . Document filed by Carol A. Wittenberg, Jams, Inc.. (Attachments: # 1 Affidavit Declaration of Virginia Corvey) (Wallace, William) (Entered: 07/21/2017) |
| 07/28/2017 | | Minute Entry for proceedings held before Judge Denise L. Cote, Part I: Oral Argument held on 7/28/2017 re: 1 MOTION to Quash Subpoenas of JAMS, Inc. and Carol A. Wittenberg. Other Court Name: USDC-DC. Other Court Case Number: 1:17-cv-00901-ABJ. (Filing Fee $ 47.00, Receipt Number 465401183684) filed by In re Subpoenas Issued to JAMS, Inc. and Carol A. Wittenberg. (Court Reporter Martha Drevis) (gr) (Entered: 07/28/2017) |
| 07/28/2017 | 11 | ORDER: IT IS HEREBY ORDERED that for the reasons stated on the record during the July 28, 2017 conference: 1) The motion to transfer is denied. 2) The motion to quash the subpoenas served on JAMS, Inc. and Mediator Carol A. Wittenberg is granted. 3) The motion for sanctions is denied. (Signed by Judge Denise L. Cote, Part I on 7/28/2017) (gr) (Entered: 07/28/2017) |
| 08/22/2017 | 12 | NOTICE OF APPEAL from 11 Order on Motion to Quash,. Document filed by Jane Doe. Filing fee $ 505.00, receipt number 0208-14041113. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Sanford, David) (Entered: 08/22/2017) |
| 08/22/2017 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 12 Notice of Appeal. (tp) (Entered: 08/22/2017) |
| 08/22/2017 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 12 Notice of Appeal filed by Jane Doe were transmitted to the U.S. Court of Appeals. (tp) (Entered: 08/22/2017) |
| 08/22/2017 | 13 | TRANSCRIPT of Proceedings re: conference held on 7/28/2017 before Judge Denise L. Cote. Court Reporter/Transcriber: Martha Martin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript |

| | | |
|---|---|---|
| | | Restriction. After that date it may be obtained through PACER. Redaction Request due 9/12/2017. Redacted Transcript Deadline set for 9/22/2017. Release of Transcript Restriction set for 11/20/2017.(McGuirk, Kelly) (Entered: 08/22/2017) |
| 08/22/2017 | 14 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 7/28/17 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 08/22/2017) |
| 09/05/2017 | 15 | **FILING ERROR - NO ORDER/JUDGMENT SELECTED FOR APPEAL - NOTICE OF CROSS APPEAL. Document filed by Jams, Inc.. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Wallace, William) Modified on 9/5/2017 (nd). (Entered: 09/05/2017)** |
| 09/05/2017 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Wallace, William to RE-FILE Document No. 15 Notice of Cross Appeal.. The filing is deficient for the following reason(s): the filers were not selected for the appeal; the order/judgment being appealed was not selected;. Re-file the appeal using the event type Notice of Cross Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (nd)** (Entered: 09/05/2017) |
| 09/05/2017 | 16 | FIRST NOTICE OF CROSS APPEAL from 11 Order on Motion to Quash,. Document filed by JAM, Inc, Carol A Wittenberg. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Wallace, William) (Entered: 09/05/2017) |
| 09/05/2017 | | Appeal Fee Due: for 16 Notice of Cross Appeal. Appeal fee due by 9/19/2017. (tp) (Entered: 09/05/2017) |
| 09/05/2017 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 16 Notice of Cross Appeal. (tp) (Entered: 09/05/2017) |
| 09/05/2017 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 16 Notice of Cross Appeal filed by JAM, Inc, Carol A Wittenberg were transmitted to the U.S. Court of Appeals. (tp) (Entered: 09/05/2017) |
| 09/07/2017 | | Appeal Fee Payment: for 16 Notice of Cross Appeal. Filing fee $ 505.00, receipt number 0208-14102126. (Wallace, William) (Entered: 09/07/2017) |

| PACER Service Center |
|---|
| **Transaction Receipt** |
| 10/06/2017 13:19:41 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— :
                                           :
In re: Subpoenas Issued to JAMS, Inc. and  :
Carol A. Wittenberg,                       :           Miscellaneous Docket No.
                                           :
        Nonparty Respondents               :
———————————————————— :            17 MISC 207
                                           :
JANE DOE,                                  :
                                           :
        Plaintiff,                         :
                                           :
V.                                         :           Civil No. 1:17-cv-00901-ABJ
                                           :           Pending in the United States
                                           :           District Court for the District of
PROSKAUER ROSE LLP.                        :           Columbia.
                                           :
        Defendant.                         :
———————————————————— :

MOTION TO QUASH SUBPOENAS SERVED ON NON-PARTIES
JAMS, INC. AND NEUTRAL MEDIATOR CAROL A WITTENBERG

        Nonparties JAMS, Inc. and Neutral Mediator Carol A. Wittenberg (hereinafter,

"Wittenberg" and jointly with JAMS "JAMS"), by and through undersigned counsel,

respectfully move, pursuant to Fed. R. Civ. Pro. 45 and 81 for an order quashing two subpoenas,

one served on JAMS, Inc., and the other served on mediator Carol A. Wittenberg in connection

with litigation between Jane Doe and Proskauer Rose, LLP currently pending in United States

District Court in the District of Columbia,  *Jane Doe v. Proskauer Rose LLP,* Case No. 1:17-cv-

00901-ABJ (D.D.C.)  The subpoenas at issue, attached as Exhibit A to the *Memorandum in*

*Support of Motion to Quash Subpoenas S*erved on Non-parties JAMS, Inc. and Neutral Mediator

*Carol A. Wittenberg,* call for compliance in this district.   **Return before Judge _____**

 **on July 11, 2017 at 11:00 a.m.**

The subpoenas at issue call for the production of confidential and privileged notes prepared by the neutral mediator Wittenberg during a mediation session that all parties agreed in writing would be confidential and not subject to subpoena.  Then notes are legally protected material not subject to disclosure.  The Subpoenas should be quashed.

In support of this motion, JAMS submits and relies on the *Memorandum of Law in Support of Their Motion to Quash Subpoenas Served on Non-parties JAMS, Inc. and Neutral Mediator Carol A. Wittenberg*, together with the attachments thereto and the Declaration of Matthew York.

Respectfully submitted,

/s/  William E. Wallace III

_____
William E. Wallace III
NY Bar No.    4779518
D.C. Bar No.:  298000
Capital Legal Group (US) PLLC
1717 Pennsylvania Avenue, N.W. Suite 1025
Washington, D.C.  20004-2595
Telephone:  (202) 559-9185
Facsimile:  (202) 644-5227
Email:  WWallace@CapLegal.US

*Counsel for Non-Parties JAMS, Inc.*
*and Carol A. Wittenberg*

June 15, 2017

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Motion to Quash Subpoenas Served on Non-parties JAMS, Inc. and Neutral Mediator Carol A. Wittenberg* was served by electronic mail' on this 15th day of June 2017, to:

David Sanford, Esq.
**SANFORD HEISLER SHARP, LLP**
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009
dsanford@sanfordheisler.com

Andrew Melzer
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
amelzer@sanfordheisler.com

Kevin Sharp
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
ksharp@sanfordheisler.com

**Colin Ryle Kass**
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 600 South
Washington, DC 20004
ckass@proskauer.com

/s/  William E. Wallace III
_____
William E. Wallace III

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: Subpoenas Issued to JAMS, Inc. and Carol A. Wittenberg, Nonparty Respondents | : : : : : : : | Miscellaneous Docket No. 17 MISC 207 |
| JANE DOE, Plaintiff, V. PROSKAUER ROSE LLP. Defendant. | : : : : : : : : : : : | Civil No. 1:17-cv-00901-ABJ Pending in the United States District Court for the District of Columbia. |

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH
SUBPOENAS SERVED ON NON-PARTIES JAMS, INC. AND
<u>NEUTRAL MEDIATOR CAROL A WITTENBERG</u>

William E. Wallace III
NY Bar No.   4779518
D.C. Bar No.:  298000
Capital Legal Group (US) PLLC
1717 Pennsylvania Avenue, N.W. Suite 1025
Washington, D.C.  20004-2595
Telephone:  (202) 559-9185
Facsimile:  (202) 644-5227
Email:  WWallace@CapLegal.US

*Counsel for Non-Parties JAMS, Inc.
and Carol A. Wittenberg*

June 15, 2017

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................. 1

II.   THE FACTS ...................................................................................... 3

   A.   THE PARTIES ................................................................................ 3

   B.   THE MEDIATION ........................................................................... 4

   C.   THE SUBPOENAS .......................................................................... 6

III.   THE LAW ....................................................................................... 7

   A.   DISCOVERY OF NON-PARTIES IS GOVERNED BY FEDERAL RULES OF CIVIL PROCEDURE 45 AND 26 .................................................................... 7

   B.   THE PLAINTIFF AND HER COUNSEL ARE BOUND BY THEIR EXPLICIT AGREEMENT NOT TO SERVE A SUBPOENA ON JAMS OR THE MEDIATOR. ................................ 8

   C.   THERE IS A STRONG PUBLIC POLICY FAVORING MEDIATION AND THE CONFIDENTIALITY THAT IS AN ESSENTIAL COMPONENT OF MEDIATION ........................... 10

   D.   THE MOTION TO QUASH SHOULD BE GRANTED BECAUSE THE SUBPOENAS SEEK THE PRODUCTION OF INFORMATION LEGALLY PROTECTED FROM DISCLOSURE ............ 13

   E.   THE SUBPOENAS ARE LITTLE MORE THAN A FISHING EXPEDITION AND SHOULD BE QUASHED. .................................................................................. 16

   F.   THE MEDIATOR'S NOTES ARE PROTECTED BY FEDERAL RULE OF EVIDENCE 408 ............ 18

IV.   MOVANT'S REQUEST REIMBURSEMENT OF FEES AND EXPENSES ................... 19

V.   CONCLUSION .................................................................................. 20

## Exhibits

A.  Subpoenas delivered to nonparties JAMS, Inc. and Mediator Carol A. Wittenberg.

B.  Declaration of JAMS General Manager, Matthew York.

C.  JAMS Mediation Agreement, signed by Plaintiff [signature redacted], Counsel for Plaintiff and Several Partners of Defendant law firm.

D.  Biography of Carol A. Wittenberg.

E.  *Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preservation Order to Preserve Critical Evidence From Imminent Destruction*, filed in *Jane Doe v. Proskauer Rose LLP,* Case No. 1:17-cv-00901-ABJ pending in the United States District Court for the District of Columbia.

F.  Complaint, *Jane Doe v. Proskauer Rose LLP,* Case No. 1:17-cv-00901-ABJ, pending in the United States District Court for the District of Columbia.

G.  Procedures of the Mediation Program for the Southern District of New York.

## Table of Authorities

**Cases**

*Application of Behar*, 779 F. Supp. 273, 275 (S.D.N.Y. 1991) .................................................... 18

*AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) ........................................................ 9

*Bernard v. Galen Group, Inc.*, 901 F. Supp. 778 (S.D.N.Y. 1995) ............................. 2, 10, 12, 19

*Brown v. Cushman & Wakefield, Inc.*, 235 F. Supp. 2d 291 (S.D.N.Y. 2002) ............................. 9

*Bruce v. Christian*, 113 F.R.D. 554, 561 (S.D.N.Y. 1987) ......................................................... 16

*Buckeye Check Cashing Inc. v. Cardegna*, 546 U.S. 440 (2006) ................................................. 9

*Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) .............................................. 19

*Fein v. Numex Corp.*, 92 F.R.D. 94, 96 (S.D.N.Y. 1981) ............................................................ 17

*Folb v. Motion Picture Indus. Pension & Health Plans,* 16 F. Supp.2d 1164 at 1171 (C.D. Cal. 1998), aff'd, 216 F.3d 1082 (9th Cir. 2000) ................................................................................ 14

*Foxgate Homeowners' Association Inc v Bramalea California Inc*, 25 P 3d 1117 (Cal 2001) ... 15

*General Motors Corporation v Lahocki*, 286 Md 714 (1980) ...................................................... 15

*Henry v. Morgan's Hotel Group,*  2016 WL 303114, (S.D.N.Y. Jan. 25, 2016) ........................... 7

*Herman Miller v. Thom Rock Realty Co.,* 46 F.3d 183, 189 (2d. Cir. 1995)................................. 9

*In re All. Pharm. Sec. Litig.*, 995 WL 51189, at *1 (S.D.N.Y. Feb. 9, 1995)............................. 16

*In re Am. Broad. Companies, Inc.,* 189 Misc. 2d 805, 808 (NY Sup. Ct. 2001) ......................... 17

*In re Anonymous,* 283 F.3d 627, 636-37 (4th Cir.2002)............................................................... 12

*In re Application to Quash Subpoena to Nat. Broad. Co., Inc.,* 79 F.3d 346, 351 (2d Cir. 1996) 17

*In re Application to Quash Subpoena to National Broadcasting Company, Inc.,* 79 F.3d 346 (2nd Cir. 1996)..................................................................................................................................... 17

*In re Grand Jury Investigation*, 599 F.2d 1224, 1232 (3d Cir. 1979) ......................................... 16

*In re Teligent,*  640 F.3d 53,(2d Cir. 2011)...................................................................... 2, 10, 11

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 1985 WL 315 (S.D.N.Y. Feb. 28, 1985) ..... 17

*Iridium India Telecom Ltd. v. Motorola, Inc.,* 165 Fed.Appx. 878, 880 (2d Cir.2005)............... 12

*Jaffee v. Redmond*, 518 U.S. 1 (1996) ........................................................................ 14

*Lake Utopia Paper Ltd. v. Connelly Containers, Inc.,* 608 F.2d 928, 930 (2nd Cir. 1979) ......... 12

*Legg v. Conklin*, 2008 WL 2704348, at *2 (W.D.N.Y. July 2, 2008) .......................................... 16

*Lehr v.. Ajjlitto,* 382 NJ Super. 376 (App. Div. 2006) ................................................................. 15

*Martindell v. Int'l Tel. & Tel. Corp.,* 594 F.2d 291, 296 (2d Cir.1979)...................................... 12

*Paranzino v. Barnett Bank*, 690 So. 2d 725 (Fla. Dist. Ct. App. 1997)....................................... 15

*Sheldone v. Pa. Tpk. Comm'n,* 104 F. Supp. 2d 511, 513-17 (W.D. Pa. 2000)............................ 15

*Smith v. Lehman Bros., Inc.,* 1996 WL 383232, at *1 (S.D.N.Y. July 8, 1996)............................ 9

*State v. Williams,* 184 *NJ.* 432, 446-50, 877 *A.2d* 1258 (2005).................................................. 15

*Surles v. Air France,*  2001 WL 815522, at *4 (S.D.N.Y. July 19, 2001), *aff'd,*  2001 WL
 1142231 (S.D.N.Y. Sept. 27, 2001)........................................................................................ 16

*Trammel v. United States,* 445 U.S. 40 (1980) ...................................................................... 13, 14

*Tuskey v. Volt Info. Sci., Inc.,* 2001 WL 873204, at *3-4 (S.D.N.Y. Aug. 3, 2001)...................... 9

*Von Bulow v. Von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) ....................................................... 14

*Woodward Governor Co. v. Curtiss-Wright Flight Sys.*, 164 F.3d 123, 126 (2d Cir. 1999)........ 14

**Statutes**

28 U.S.C. 651 et seq.................................................................................................................. 11

28 U.S.C. 652 .......................................................................................................................... 3, 15

5 U.S.C. 571 et seq................................................................................................................... 11

9 U.S.C. 2.................................................................................................................................... 9

Fed. R. Evid. 501 .................................................................................................................. 13, 14

**Other Authorities**

*Procedures of the Mediation Program for the Southern and Eastern Districts of New York* .. 3, 15

**Rules**

Fed. R. Civ. P. 26(b)(1)...................................................................................................... 7

Fed. R. Civ. P. 26(b)(2)(C) ................................................................................................ 7

Fed. R. Civ. P. 45(d)(1)...................................................................................................... 19

Fed. R. Civ. P. 45(d)(3)(A) ................................................................................................ 7

Fed. R. Civ. P. 45(d)(3)(B) ................................................................................................ 7

Fed. R. Evid. 408 .......................................................................................................... **2, 18**

Fed. R. Evid. 501 .......................................................................................................... 13, 14

Local Rules 83.9 of the United States District Courts for the Southern and Eastern Districts of
New York.......................................................................................................................... 3, 15

**Treatises**

Joseph Lipps, *The Path Toward A Federal Mediation Privilege: Approaches Toward Creating Consistency for a Mediation Privilege in Federal Courts,* American Journal of Mediation
(2011)................................................................................................................................ 20

Nonparties JAMS, Inc. and Neutral Mediator Carol A. Wittenberg (hereinafter,
"Wittenberg" and jointly with JAMS "JAMS"), by and through undersigned counsel, hereby
submit this memorandum of law in support of their *Motion to Quash Subpoenas Served on Non-
parties JAMS, Inc. and Neutral Mediator Carol A. Wittenberg*.  With this memorandum of law,
JAMS also submits the Declaration of Matthew York, ("York Decl.").

## I.   PRELIMINARY STATEMENT

Plaintiff Jane Doe (hereinafter "Plaintiff" or "Doe") has sued the Proskauer Rose LLP
law firm (hereinafter "Defendant" or "Proskauer") in federal court in Washington, D.C. asserting
various gender based claims of job discrimination. (Ex. F, Complaint.)  Before the complaint was
filed, Plaintiff and Defendant agreed to participate in a mediation administered by JAMS to be
conducted at the JAMS offices in Manhattan.  As a condition to JAMS' agreement to facilitate
the mediation, plaintiff personally, together with her lawyers, explicitly agreed, in writing that
(a) the mediation would be confidential, and for purposes of settlement, (b) nothing about the
mediation would be used in litigation *for any purpose*, (c) neither party would serve a subpoena
on JAMS or the mediator, and (d) neither party would argue that JAMS or the mediator are
essential parties to any litigation that might ensue.  (Ex. C, Mediation Agreement at 1-2.)

Two days of mediation ensued without a settlement of plaintiff's claims.  Plaintiff
immediately filed a twelve count complaint against Proskauer.  (Ex. F. Complaint.) As part of
the litigation, Plaintiff now claims that during the mediation session held on March 23, 2017, a
Proskauer lawyer allegedly "threat[ened] to terminate Plaintiff Jane Doe because of her
complaints of discrimination and retaliation." (Ex. E, Memorandum of Points *and Authorities in
Support of Plaintiff's Motion for Preservation Order to Preserve Critical Evidence From*

*Imminent Destruction* at 1-2, (hereinafter, "Plaintiff's Mem.").)[1]  Plaintiff speculates that the

mediator may have made a written note of the alleged threat in the confidential, handwritten

notes taken during the mediation (hereinafter, the "Notes"). (*Id.*)

By the third party Rule 45 Subpoenas at issue here, Plaintiff seeks the production of the

mediator's confidential handwritten Notes for use in the underlying litigation, and has signaled

that she will try to compel the mediator's testimony.[2]  The Notes are legally protected material

not subject to disclosure.  The Subpoenas should be quashed and the mediator protected from

Plaintiff's thinly-veiled threat to try to compel her to testify.

There is no allegation or suggestion that the Notes taken by the mediator have not been

kept confidential by JAMS and the mediator.  Indeed, the Notes have not been shown to anyone

outside the JAMS organization.  (Ex. B, York Decl. at ¶4.)  Nonetheless, plaintiff now contends

that "[t]he mediator's notes and anticipated testimony are the only available evidence apart from

the parties' own testimony" to support plaintiff's claims of retaliation.  (Ex. E, Plaintiff's Mem.

at 4-5.)

The Notes (and the mediator's testimony) are protected by (a) applicable case and

common law, such as *In re Teligent*, 640 F.3d 53,(2d Cir. 2011) and *Bernard v. Galen Group,

Inc.*, 901 F. Supp. 778 (S.D.N.Y. 1995), (b) Federal Rules of Evidence 501 in conjunction with

the Uniform Mediation Act and CPLR Section 4547, (c) Federal Rule of Evidence 408, (d) the

---

[1] Plaintiff's motion was denied by United States District Court Judge Berman, the presiding judge in the underlying case, *Jane Doe v. Proskauer Rose LLP,* Case No. 1:17-cv-00901-ABJ (D.D.C.).

[2] Although the Subpoenas are *deuces tecum*, and seek only the production of the mediator's Notes for use in the underlying litigation, Plaintiff's counsel has made clear that they also intend to take steps to compel the mediator to testify. (Ex. E, *Plaintiff's Mem* at 2.; ("If the mediator is compelled to testify, the notes would likely be used as an aid in refreshing recollection …").)  Indeed, the Notes themselves, without the testimony of the mediator, would serve no legitimate purpose.

Alternative Dispute Resolution Act, 28 U.S.C. 652 in conjunction with Local Rules 83.9 of the United States District Courts for the Southern and Eastern Districts of New York and the *Procedures of the Mediation Program for the Southern and Eastern Districts of New York*, (e) public policy, and, perhaps most importantly, (g) the terms of the contractual agreements signed by the parties setting forth the ground rules of the mediation.  (Ex. C, Mediation Agreement.)

JAMS seeks an order (a) quashing the two subpoenas, (b) protecting the mediator from Plaintiff's thinly veiled threat to issue a subpoena to compel her testimony in the future, and (c) awarding the movants reimbursement for the significant fees and expenses incurred in moving to quash the patently improper subpoenas.

## II.  THE FACTS

### A.  The Parties

Proskauer "is a large international law firm with multiple offices across the country and over the globe. While Proskauer's principal office is located in Manhattan, Proskauer also maintains an office in Washington, D.C." (Ex. F, Complaint at ¶ 11)

Plaintiff, Jane Doe is, and has since 2013, been an equity partner at Proskauer "based out of Proskauer's Washington, D.C. office." (*Id* at ¶ ¶ 4, 10, 15).  Plaintiff claims to be the victim of pervasive gender based employment discrimination by Proskauer. (*Id.* at *passim)*.  She was represented at the mediation by the same law firm that is representing her in the underlying litigation in Washington DC, and the same lawyers who signed and served the Subpoenas *sub judice*. (Ex. C, Mediation Agreement; Ex. F, Complaint; and, Ex. A, Subpoenas.)

JAMS is a national organization which provides neutral, alternative dispute resolution {"ADR") services to the public, including mediation and arbitration. (https://www.jamsadr.com/about-

jams/)  Although JAMS' principal office is in California, it has an office in New York City and

provides its services internationally. (*Id.*)

Mediator Carol A. Wittenberg is a widely respected arbitrator and mediator with 30 years

of experience, is the author of numerous articles on the subject of the mediation and arbitration

of labor and employment disputes, and is well known for successfully mediating innumerable

labor and employment claims.  (https://www.jamsadr.com/wittenberg/)

### B.  The Mediation

In or about March, 2017, JAMS was retained by the parties to perform mediation services

incident to plaintiff's allegation that she was and continues to be the victim of gender based

employment discrimination.  The plaintiff was represented at the mediation by several partners

from Sanford Heisler Sharp, LLP, a law firm with offices in New York, Washington, DC and

other locations. Proskauer was represented by several partners of the Proskauer law firm. (Ex. C,

Mediation Agreement.)

As a condition to accepting the engagement to mediate, JAMS required the Plaintiff and

all of the lawyers participating in the mediation to agree to certain conditions.  Among them

were the understanding that (a) the mediation would be for the purpose of reaching a settlement

of the plaintiff's claims and would not be used for any purpose in any litigation, (b) the

mediation would be confidential, and (c) neither party would issue a subpoena for the mediator's

Notes or for her testimony. (Ex. C, Mediation Agreement.)  In addition, everyone participating in

the mediation agreed in advance that neither JAMS nor the mediator would be claimed to be an

essential party to any subsequent litigation. (*Id.*)  Paragraph III of the Mediation Agreement,

titled "Confidentiality," provides:

In order to promote communication among the parties, counsel and the mediator and *to facilitate settlement of the dispute,* each of the undersigned agrees that *the entire mediation process is confidential. All statements made during the course of the mediation are privileged settlement discussions,* and are made without prejudice to any party's legal position, *and are inadmissible for any purpose in any legal proceeding.* These offers, promises, conduct and statements (a) will not be disclosed to third parties except persons associated with the participants in the process, and (b) *are privileged and inadmissible for any purposes, including impeachment, under Rule 408 of the Federal Rules of Evidence and any applicable federal or state statute, rule or common law provisions.* (Emphasis added.)

(*Id.* at 1).  The agreement also provides:

*Each party agrees to make no attempt to compel the mediator's or any JAMS employee's testimony, nor to compel the mediator or any JAMS employee to produce any document provided by the other party to the mediator or to JAMS.* The parties agree to defend the mediator and JAMS from any subpoenas from outside parties arising out of this Agreement or mediation. *The parties agree that neither the mediator nor JAMS is a necessary party in any arbitral or judicial proceeding relating to the mediation or to the subject matter of the mediation.* (Emphasis added.)

(*Id.* at 2, "IV. Disqualification of Mediator and Exclusion of Liability.")

Plaintiff personally, together with the very attorneys representing her in this litigation, agreed, without exception or reservation, to these conditions; and, each of them signed the written agreement *on two separate occasions* before proceeding with the actual mediation. In addition to signing the written agreement twice, mediator Wittenberg also advised the parties orally of these conditions at the start of the mediation on March 23, 2017. (Ex.B, York Decl. at ¶ 5.)

The mediation took place over two days, the first session on March 23, 2017 and the second session on May 12, 2017.  (Ex. E, Plaintiff's Mem. at 1, 4.)  Plaintiff now claims during the first mediation session, "[o]n March 23, 2017 … Proskauer communicated a direct threat to

terminate Plaintiff Jane Doe because of her complaints of discrimination and retaliation." (*Id.* at

1-2.)  Plaintiff also claims, "[t]he mediator took contemporaneous notes of all proceedings," and

speculates that the mediator may have heard the alleged threat and made note of it.  (*Id*. at 1);

Plaintiff does not claim to know, or even have reason to know, what notes the mediator took or

did not take, what is reflected in the Notes and what is not.  In short, plaintiff does not know that

the hoped-for evidence will materialize if allowed to rummage through the confidential Notes.

The mediation did not result in a resolution of plaintiff's claim; and on about May 12,

2017 (apparently, on the same day and immediately after the completion of the second day of

mediation), plaintiff filed in the United States District Court for the District of Columbia a

twelve count complaint.  (Ex. F, Complaint.)  A week later, plaintiff's lawyers delivered to the

JAMS offices in New York the subpoenas they previously agreed they would not serve, seeking

to compel the disclosure of information they previously agreed would remain confidential and

not subject to subpoena, and threatening to compel the testimony of the mediator who they

previously promised they would not depose, by asserting and relying on the argument they

previously agreed they would not advance.  (Ex. A, Subpoenas.)

### C.  The Subpoenas

Each subpoena seeks the production of:

> All notes of the Parties' March 23, 2017 mediation and all other
> documents which memorialize or reference alleged threats or
> statements made by Defendant Proskauer Rose LLP, its
> representatives, or its agents to terminate Plaintiff from the
> Proskauer Rose LLP law firm.  (Ex. A, Subpoenas.)

The only document potentially responsive to the subpoenas within the possession,

custody and control of JAMS and Wittenberg, are the "notes of the Parties' March 23, 2017

mediation."

### III. THE LAW

#### A. Discovery of Non-Parties is Governed by Federal Rules of Civil Procedure 45 and 26

Federal Rule of Civil Procedure 45 governs discovery of non-parties by subpoena.  Fed. R. Civ. P. 45(d)(3)(A) provides "[o]n timely motion, the court for the district where compliance is required **must quash** or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." (Emphasis added.)  In addition, the court may, pursuant to Fed. R. Civ. P. 45(d)(3)(B) quash or modify a subpoena "if it requires disclosing a trade secret or other confidential research, development, or commercial information."  With respect to the latter provision, "the court may, instead of quashing or modifying a subpoena, order …production under specified conditions if the serving party (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and (ii) ensures that the subpoenaed person will be reasonably compensated."

In addition, like the rule governing the production of documents between parties, the proper scope of discovery for non-parties under Rule 45 is set out in Federal Rule of Civil Procedure 26(b), which allows discovery of non-privileged material "relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1).  A parties' discovery demands cannot be unmoored from the actual claims and defenses at issue in the case, and the courts "must limit the frequency or extent of discovery otherwise allowed by these rules … if it determines that (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C).

As Judge Cott recently made clear in *Henry v. Morgan's Hotel Group,* 2016 WL 303114, (S.D.N.Y. Jan. 25, 2016), quashing third party subpoenas served in a discrimination and

retaliation litigation based on plaintiff's speculation with respect to what the requested discovery might turn up, "the amended Rule [26] is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information." .

### B.   The Plaintiff and Her Counsel Are Bound by their Explicit Agreement Not to Serve a Subpoena on JAMS or the Mediator.

The subpoenas should be quashed first and foremost because both the plaintiff, an extremely well-experienced and well-recognized lawyer at a major international law firm (Ex. F, Complaint at ¶¶ 17, 19) and her lawyers, equally well experienced in matters relating to employment litigation (https://sanfordheisler.com/), knowingly and explicitly agreed they would ***not*** serve the very subpoenas at issue here, and agreed they would not do exactly what they are doing.  Neither Plaintiff, nor her lawyers have proffered or even suggested any reason why they should not be held to the promises they made when they signed the Mediation Agreement.  There is not even a hint of fraud, duress or other improper conduct relating to the signing of the agreement.

The Mediation Agreement was prepared to bind the parties when they contemplated proceeding with a mediation; it set the ground rules for the mediation and thereafter. Plaintiff and her trial counsel clearly understood what they were getting and what they were waiving.  They agreed to the terms of the Mediation Agreement knowingly and willfully.

Having agreed to the ground rules, and having taken advantage of the opportunity to mediate[3], Plaintiff should not be permitted to renege on the bargained for consideration. If

---

[3] Plaintiff also agreed to participate in a *second* session of mediation, **after** the alleged threat was made.

agreements to mediate are to have any meaning, litigants must be held to the bargain they strike when negotiating the terms of the mediation, just as so many other litigants have been held to their pre-litigation contracts impacting their rights in subsequent litigation. *E.g.*, contractual agreements to arbitrate and waive the right to in-court proceedings, *Buckeye Check Cashing Inc. v. Cardegna*, 546 U.S. 440 (2006)[4]; contractual waiver of the right to bring a class action enforced, *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011); and contractual agreements to waive the right to a jury trial, *Herman Miller v. Thom Rock Realty Co.,* 46 F.3d 183, 189 (2d. Cir. 1995).

As noted by Judge Berman in sustaining Magistrate Judge Pack's findings in *Brown v. Cushman & Wakefield, Inc.,* 235 F. Supp. 2d 291 (S.D.N.Y. 2002):

> [the] jury waiver … was a conspicuous part of Plaintiff's employment agreement and … Plaintiff, a Harvard M.B.A. who had worked as an investment banker before becoming a commercial real estate broker, could "have negotiated about the clause if she tried." … The [court]Plaintiff's argument that she did not read the employment agreement before signing it as having "no merit." *Id. See, e.g., Tuskey v. Volt Info. Sci., Inc.,* 2001 WL 873204, at *3-4 (S.D.N.Y. Aug. 3, 2001) ("parties are `conclusively' bound by the contracts they sign whether or not the party has read the contract so long as there is no fraud, duress or some other wrongful act of the other party"); *Smith v. Lehman Bros., Inc.,* 1996 WL 383232, at *1 (S.D.N.Y. July 8, 1996).

The Plaintiff's contractual waiver of the right to seek discovery of the mediator, or serve subpoenas on the mediator, is devoid of any hint of fraud, duress or other wrongful act, and should be enforced.

---

[4] See also, Federal Arbitration Act, 9 U.S.C. 2 which provides that written contracts to arbitrate a dispute shall be "valid, irrevocable, and enforceable."

### C. There is a Strong Public Policy Favoring Mediation and the Confidentiality that is an Essential Component of Mediation

Enforcing Plaintiff's contractual obligation to respect the confidentiality of the mediation process and to refrain from serving subpoenas on the mediator is consistent with and supported by the strong public policy of New York. *E.g.*, *In re Teligent*, 640 F.3d 53,(2d Cir. 2011); *Bernard v. Galen Group, Inc*., 901 F. Supp. 778 (S.D.N.Y. 1995).

The judicial system, both federal and state, rely heavily on alternative dispute resolution procedures, including mediation, to alleviate the crushing burden of litigation. Mediation works in large measure because it comes with the promise of confidentiality; based on the explicit agreement of the participants, such as the case *sub judice,* or because there are court orders, local rules or statutes imposing confidentiality. Attempts to undermine the confidentiality of mediations is contrary to the strong policy on New York and elsewhere and should not be tolerated.

If an individual cannot rely on a guarantee of the confidentiality of their disclosures and cannot trust the mediator will not disclose private information to another party, the potential effectiveness of mediation will quickly diminish. Confidentiality allows parties to be confident that the mediator will not take sides regardless of what happens.

Confidentiality is critical not only to the success of the process but also to the effectiveness of the neutral. Mediators must be perceived as, and act as neutrals, participants in the mediation whose personal opinions are irrelevant to the process. The appearance of neutrality will be significantly and substantively damaged if the mediator can be called on to testify about the substance of the mediation, or about her opinion of the mediation or of the parties. Both the

appearance and the reality of the mediator's neutrality are essential to generating the climate of trust necessary for mediation to be effective.[5]

The Second Circuit in, *In re Teligent*, 640 F.3d 53 (2d Cir. 2011) had this to say about the strong public policy of confidentiality to be accorded the mediation process:

> Confidentiality is an important feature of the mediation and other alternative dispute resolution processes. Promising participants confidentiality in these proceedings "promotes the free flow of information that may result in the settlement of a dispute," ..., and protecting the integrity of alternative dispute resolution generally, ... ***We vigorously enforce the confidentiality provisions of our own alternative dispute resolution, the Civil Appeals Management Plan ("CAMP"), because we believe that confidentiality is "essential" to CAMP's vitality and effectiveness***. (Internal citations omitted; emphasis added.)

Drawing on the importance of maintaining the confidentiality of mediations, as reflected in the policies underlying the Uniform Mediation Act ("UMA"), the Administrative Dispute Resolution Act of 1996 ("ADRA 1996"), 5 U.S.C. 571 et seq.,[6] and the Administrative Dispute Resolution Act of 1998 ("ADRA 1998"), 28 U.S.C. 651 et seq., Circuit Judge Pooler went on to rule that,

> a party seeking disclosure of confidential mediation communications must demonstrate (1) a special need for the confidential material, (2) resulting unfairness from a lack of discovery, and (3) that the need for the evidence outweighs the interest in maintaining confidentiality. *Accord Iridium India*

---

[5] Likewise, if mediators are unsure about the confidentiality of their notes taken during the mediation, a predictable outcome will be fewer notes taken by mediators, and that is not likely to lead to a better process or outcome.

[6] ADRA 1996 directs district courts to maintain and make available to litigants alternative dispute resolution programs. *See* 28 U.S.C. 651(b). Although ADRA 1996 left the particulars of those programs to the local rules of each court, *see id.,* it did require courts to "provide for the confidentiality of the alternative dispute resolution processes and ... prohibit disclosure of confidential dispute resolution communications." *Id.*

*Telecom Ltd. v. Motorola, Inc.,* 165 Fed.Appx. 878, 880 (2d Cir.2005) (summary order) (movant must show "a compelling need or extraordinary circumstances necessary to modify [a] protective order"); *see also In re Anonymous,* 283 F.3d 627, 636-37 (4th Cir.2002); *cf. The Street.Com,* 273 F.3d at 229 ("Where there has been reasonable reliance by a party or deponent, a District Court should not modify a protective order granted under Rule 26(c) absent a showing of improvidence in the grant of [the] order or some extraordinary circumstances or compelling need" (alteration in original, internal quotation marks omitted)); *Martindell v. Int'l Tel. & Tel. Corp.,* 594 F.2d 291, 296 (2d Cir.1979) (same). All three factors are necessary to warrant disclosure of otherwise non-discoverable documents.

Plaintiff in this matter cannot satisfy any of these requirements, much less all of them.

The Second Circuit in *Tangent,* relied in part on Judge Denny Chin's decision in *Bernard v. Galen Group, Inc.,* 901 F. Supp. 778 (S.D.N.Y. 1995). Much like what the plaintiff's lawyers are trying to do here, the plaintiff's lawyer in *Bernard* improperly disclosed to the trial judge confidential information from and about a court ordered mediation.[7] Judge Denny Chin (as a District Court Judge) was not pleased with plaintiff's breach of mediation confidentiality and sanctioned plaintiff's counsel. Echoing the language of the Second Circuit's decision in *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.,* 608 F.2d 928, 930 (2nd Cir. 1979), Judge Chin reasoned that "if participants cannot rely on the confidential treatment of everything that

---

[7] In an attempt to mediate a trademark infringement dispute, the parties In *Bernard*, like the parties here, agreed in writing to the confidentiality of the mediation process. Shortly after the mediation commenced, the parties related conflicting accounts of the mediation through unsolicited letters to the trial judge. The plaintiffs' lead counsel accused the defendants of falling to make any serious settlement offer, and making the mediation as "a very expensive waste of time." The defendants responded that "they ha[d] offered more than is justified or reasonable and have done everything they can to resolve the matter" and requested that the judge "keep the mediation process open." 901 F. Supp. at 781. In a follow-up letter to the judge, plaintiff's counsel argued that the defendants' claim "that they have attempted in good faith to settle" constituted "an outrageous attempt to mislead the court," and then asserted that the defendant's characterization of the process compelled the plaintiffs to disclose in court "the details of the parties' settlement discussions . . . in order to set the record straight." (*Id.*) Which he then did, including the specific terms of settlement offers proposed by both the defendants and the plaintiffs. (*Id.*)

transpires during [mediations] then counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute." 901 F. Supp. at 784.

Judge Chin went on to emphasize that "[p]articipants in the Mediation Program rely on the understanding that all matters discussed during the mediation process will be kept confidential, and the breach of the applicable confidentiality provisions threatens the integrity of the entire Program." *Id.* at 784.

New York's strong policy of confidentiality of alternative dispute resolution procedures can scarcely be debated. That the mediation process would, for all practical purposes, cease its important role in dispute resolution in the absence of court enforced confidentiality, especially where, as here, very sophisticated litigants have knowingly, willfully and voluntarily agreed to confidentiality, can hardly be questioned. Plaintiff's attempt to pierce the confidentiality of the mediation process should be rejected as contrary to the strong public policy of New York.

### D. The Motion to Quash Should be Granted Because the Subpoenas Seek the Production of Information Legally Protected From Disclosure

Federal Rule of Evidence 501 grants the authority to federal courts to adopt evidentiary privileges through their judicial reason and experience. Fed. R. Evid. 501. Congress enacted Rule 501 instead of the specifically enumerated privileges originally proposed by the Advisory Committee and approved by the Supreme Court, in favor of the more flexible approach ultimately set out in the rule. *Trammel v. United States,* 445 U.S. 40, 47 (1980).

When a federal court confronts a federal question or pendent state claims, the common law of the federal court applies. *Woodward Governor Co. v. Curtiss-Wright Flight Sys.*, 164

13

F.3d 123, 126 (2d Cir. 1999) ("questions about privilege in federal question cases are resolved by the federal common law"); *Von Bulow v. Von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) ("the federal law of privilege controls the question whether the privileges asserted by [a party] should be recognized").

In determining whether an evidentiary privilege should apply in any given case, trial courts follow the four-pronged test set out in *Jaffee v. Redmond*, 518 U.S. 1 (1996).  While paying deference to the maxim "that the public . . . has a right to every man's evidence," the Supreme Court in *Jaffee* recognized that "[e]xceptions from the general rule disfavoring testimonial privileges may be justified, …by a ``public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Quoting, Trammel v. United States,* 445 U.S. 40*,* 50 (1980).

In assessing whether a privilege will serve "the public good," Justice Stevens directed the lower courts to examine the following four factors: (1) whether the privilege is necessary for confidence and trust, (2) whether the privilege serves public ends, (3) whether the loss of evidence due to the privilege is modest, and (4) whether denying the privilege would frustrate similar state privileges. See, *Folb v. Motion Picture Indus. Pension & Health Plans,* 16 F. Supp.2d 1164 at 1171 (C.D. Cal. 1998), aff'd, 216 F.3d 1082 (9th Cir. 2000).

In *Folb v. Motion Picture Industry Pension & Health Plans*, supra, the Central District of California crafted a federal, common law mediation privilege under Fed. R. Evid. 501.  Applying the Supreme Court's *Jaffee* test, the *Folb* court held that communications made in connection with a mediation are privileged, and may not be discoverable or admissible as evidence in future

litigation. This holding established the framework upon which numerous other courts have relied applying a federal mediation privilege in appropriate circumstances.[8]

The Alternative Dispute Resolution Act, 28 U.S.C. 652, instructs federal district courts to adopt local rules to apply confidentially in their dispute resolution programs. 28 U.S.C. 652 (2006).  The text of section 652(d) specifically instructs courts to "provide for the confidentiality of the alternative dispute resolution processes and prohibit disclosure of confidential dispute resolution communications."  The Southern District of New York's response to the ADRA is found in Local Rules 83.9 of the United States District Courts for the Southern and Eastern Districts of New York and the "*Procedures of the Mediation Program for the Southern and Eastern Districts of New York*" which sets forth specific and detailed procedures for cases directed to mediation by the trial judges in the Southern District of New York. (Ex. G.)

The court sponsored mediation program provides for the confidentiality of the mediation process and explicitly prohibits subjecting the mediator to discovery.  See, Ex. F, "*Procedures of the Mediation Program for the Southern and Eastern Districts of New York* at ⁋1(d) ("The mediator shall not be called as a witness or deponent in any proceeding related to the dispute in

---

[8] See e.g., *Sheldone v. Pa. Tpk. Comm'n,* 104 F. Supp. 2d 511, 513-17 (W.D. Pa. 2000)(applying the four-factor test from *Jaffee,* the Western District of Pennsylvania followed the reasoning of *Folb in* applying a federal mediation privilege.)  See also, *Lehr v.. Ajjlitto,* 382 NJ Super. 376 (App. Div. 2006)("The issue of the confidentiality of mediation proceedings is a matter of great public and systemic importance," citing *State v. Williams,* 184 *NJ.* 432, 446-50, 877 *A.2d* 1258 (2005)); *Foxgate Homeowners' Association Inc v Bramalea California Inc*, 25 P 3d 1117 (Cal 2001)("confidentiality is essential to effective mediation 'because it 'promote[s] a candid and informal exchange regarding events in the past. ... This frank exchange is achieved only if the participants know that what is said in the mediation will not be used to their detriment through later court proceedings and other adjudicatory processes.'"); *General Motors Corporation v Lahocki*, 286 Md 714 (1980). *Paranzino v. Barnett Bank*, 690 So. 2d 725 (Fla. Dist. Ct. App. 1997).

which the mediator served, or be compelled to produce documents that the mediator received or

prepared for mediation.")

### E. The Subpoenas Are Little More Than a Fishing Expedition and Should be Quashed.

Plaintiff claims the Notes might show this or may contain that, but she admits, as she

must, she really does not know what is contained in the Notes because neither she, nor her

counsel (nor counsel for Proskauer) has seen the Notes.  Plaintiff's argument to support the

Subpoenas relies on nothing more than speculation.  See *Surles v. Air France*, 2001 WL 815522,

at *4 (S.D.N.Y. July 19, 2001), *aff'd*, 2001 WL 1142231 (S.D.N.Y. Sept. 27, 2001) (Rule 26

discovery requests "could not be based on pure speculation or conjecture" and "courts faced with

such requests would routinely decline to authorize fishing expeditions") (*quoting, In re All.

Pharm. Sec. Litig.*, 995 WL 51189, at *1 (S.D.N.Y. Feb. 9, 1995)).

Plaintiff's speculation about what might be in the mediator's confidential Notes is not a

sufficient basis for setting aside Plaintiff's contractual promises, the compelling public policy

favoring the confidentiality of the mediation process or the mediator privilege created by Fed. R.

Evid. 501.  See *In re Grand Jury Investigation*, 599 F.2d 1224, 1232 (3d Cir. 1979) (finding

plaintiff's "naked assertion" and "general, unsubstantiated allegation" that it might discover

relevant information if granted access to privileged material was not sufficient to overcome the

privilege); *Bruce v. Christian*, 113 F.R.D. 554, 561 (S.D.N.Y. 1987)( ("plaintiff offers no more

than allegations that such [relevant information] would be found . . . . Such bare allegations are

insufficient."). *Legg v. Conklin*, 2008 WL 2704348, at *2 (W.D.N.Y. July 2, 2008) ("general

allegations about the possible relevance of the requested document are too speculative to justify

the intrusion" of discovery).

Merely showing that documents are relevant to the issues in the case is not sufficient. Instead, a party "must show that the information sought 'is crucial to the party's case,' or that it goes to the 'heart of the claims,' or that it is 'directly relevant to the [party's] claim.'" *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 1985 WL 315 (S.D.N.Y. Feb. 28, 1985) ("For non-parties in particular, 'even a modest burden may be unjustified where the discovery sought is only marginally relevant." *quoting Fein v. Numex Corp.*, 92 F.R.D. 94, 96 (S.D.N.Y. 1981).) Plaintiff's failure to provide anything more than speculation as to what the Notes will prove is fatal. *In re Application to Quash Subpoena to Nat. Broad. Co., Inc.,* 79 F.3d 346, 351 (2d Cir. 1996).

Plaintiff's position rests only on the general possibility that the Notes might offer a way to challenge the credibility of the defendant's anticipated denial. This is neither specific enough nor critical enough to prove necessary. The test is not merely that the material be helpful or probative, but whether or not the defense of the action may be presented without it. *In re Am. Broad. Companies, Inc.,* 189 Misc. 2d 805, 808 (NY Sup. Ct. 2001). When the courts speak of confidential information being critical or necessary to the proof or a claim or defense, it does not have in mind general and ordinary impeachment material or matters which might arguably bear on the assessment of credibility of witnesses. *In re Application to Quash Subpoena to National Broadcasting Company, Inc.,* 79 F.3d 346 (2nd Cir. 1996).("while it is clear that any inconsistent statements [found in the requested outtakes] would be relevant … for impeachment purposes, it is far from clear that they would be necessary … Ordinarily, impeachment material is not critical or necessary to the maintenance or defense of a claim, and there is no clear and specific showing that it would be so here.  Certainly, there is no showing that [the] defense to [plaintiff's] action rises or falls on impeachment evidence of the type sought here.")

Even if Plaintiff were allowed to rummage through the confidential Notes of the mediator and come up with something she considered useful, at best, such information would likely only be cumulative of other evidence obtained in party discovery.  Compelled disclosure is not appropriate in such situations. *Application of Behar*, 779 F. Supp. 273, 275 (S.D.N.Y. 1991) (when material would be cumulative of other evidence, it cannot be 'necessary or critical' to an action").

### F.  The Mediator's Notes are Protected by Federal Rule of Evidence 408

Federal Evidence *Rule* 408 states:

> When a claim is disputed as to validity or amount, evidence of statements or conduct by parties or their attorneys in settlement negotiations, with or without a mediator present, including offers of compromise or any payment in settlement of a related claim, shall not be admissible to prove liability for, or invalidity of, or amount of the disputed claim. Such evidence shall not be excluded when offered for another purpose; and evidence otherwise admissible shall not be excluded merely because it was disclosed during settlement negotiations ... (Fed. R. Evid. 408, emphasis added)

The Subpoenas before the court seek exactly what Rule 408 is designed to prohibit,  The Notes are not being sought for an ancillary purpose unrelated to proving liability; they are being sought in the hopes of proving Defendant's liability. It is important to note that the parties by agreement expanded significantly the boundaries of the Rule 408 prohibition,  The Mediation Agreement reflects the Plaintiff's agreement that "statements (a) will not be disclosed to third parties … and (b) are privileged and inadmissible ***for any purposes***," (Emphasis added; Ex. C, Mediation Agreement at 1.)

### IV. Movant's Request Reimbursement of Fees and Expenses

Federal Rule of Civil Procedure 45(d)(1) provides:

(d) Protecting a Person Subject to a Subpoena; Enforcement. *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. **The court for the district where compliance is required must enforce this duty and impose an appropriate sanction— which may include lost earnings and reasonable attorney's fees— on a party or attorney who fails to comply.** Fed. R. Civ. P. 45(d)(1).

In issuing the patently improper subpoenas that it served on JAMS and the mediator, Plaintiff and her attorneys have failed to comply with their obligation to avoid imposing undue burden or expense on a non-party.  JAMS requests an order permitting it to submit a claim for fees incurred in connection with responding to the subpoenas. *Cf.*, *Bernard v. Galen Group, Inc.*, 901 F. Supp. 778 (S.D.N.Y. 1995) (sanctions assessed); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.").

One commentator has encouraged federal courts to make greater use of Rule 11 sanctions to stem what is viewed by some as the misuse of the confidentiality of mediation and cavalier treatment of the promises made as a condition of proceeding with mediation.

> To more affirmatively place attorneys on notice of the importance of keeping mediation communications confidential, courts should use their authority to grant sanctions in federal court. Rule 11 of the Federal Rules of Civil Procedure grants courts the broad authority to sanction parties for submitting documents for "any improper purpose."149 Federal judges could begin using Rule 11 as their basis for granting sanctions against parties that rely on privileged mediation communications. With the increasing use of mediation and a general recognition that communications during the process are confidential and potentially privileged, it is not unreasonable to conclude that their use is improper.

Joseph Lipps, *The Path Toward A Federal Mediation Privilege: Approaches Toward Creating Consistency for a Mediation Privilege in Federal Courts,* American Journal of Mediation (2011).

### V. CONCLUSION

Confidentiality and neutrality are the life and breadth of mediation.  To require testimony of a mediator is to require that the mediator take sides in a dispute.  It makes a lie of the promises that are made by the mediator and each of the participants to the mediation.  When a mediator is forced to take sides, or is put in a position of it appearing as though a side has been taken, the resulting breach of trust negatively impacts not only the particular dispute, but the entire mediation process.  That bell cannot be unrung.

With increasingly crowded dockets, the courts have an important interest in encouraging and supporting the robust use of mediation, and a strong commitment to confidentiality on the part of the judiciary is essential to the success of mediation.  If litigants can get a bite at the mediation apple and all the potential benefits that can come from it by the simple expedient of making an empty promise of confidentiality that is relegated to the waste basket if the mediation does not turn out the way they hoped, mediation will cease to have a meaningful place in resolving disputes.  This path will not lead to a happy ending.

This experienced lawyer-plaintiff, and her equally well experienced litigation counsel, willingly and voluntarily agreed to forgo issuing a subpoena on JAMS in order to take a shot at resolving what appears to be a significant dispute.  Plaintiff should not be permitted to cause untold damage to the integrity of the mediation process by now reneging on the promises and representations they made in the hope of finding a useful kernel of evidence in the mediator's handwritten, confidential Notes.  The subpoenas should be quashed and movant's awarded their reasonably incurred fees and expenses.

Respectfully submitted,


/s/ William E. Wallace III

_____

William E. Wallace III
NY Bar No.    4779518
D.C. Bar No.:  298000
Capital Legal Group (US) PLLC
1717 Pennsylvania Avenue, N.W. Suite 1025
Washington, D.C.  20004-2595
Telephone:  (202) 559-9185
Facsimile:  (202) 644-5227
Email:  WWallace@CapLegal.US

*Counsel for Non-Parties JAMS, Inc.
and Carol A. Wittenberg*

Dated:  June 15, 2017

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Memorandum of Law in Support of Their Motion to Quash Subpoenas S*erved on Non-parties JAMS, Inc. and Neutral Mediator Carol A. Wittenberg' was served by electronic mail' on this 15th day of June, 2017, to:

David Sanford, Esq.
**SANFORD HEISLER SHARP, LLP**
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009
dsanford@sanfordheisler.com

Andrew Melzer
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
amelzer@sanfordheisler.com

Kevin Sharp
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
ksharp@sanfordheisler.com

**Colin Ryle Kass**
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 600 South
Washington, DC 20004
ckass@proskauer.com

/s/ William E. Wallace III
_____
William E. Wallace III

EXHIBIT  A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| JANE DOE | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  1:17-cv-00901-ABJ |
| PROSKAUER ROSE LLP | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                      Carol A. Wittenberg

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: All notes of the Parties' March 23, 2017 mediation and all other documents which memorialize or reference alleged threats or statements made by Defendant Proskauer Rose LLP, its representatives, or its agents to terminate Plaintiff from the Proskauer Rose LLP law firm.

| Place: Sanford Heisler Sharp, LLP | Date and Time: |
|---|---|
| 1350 Avenue of the Americas, 31st Floor | June 17, 2017 at 5:00 p.m. |
| New York, New York 10019 | |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     05/18/2017

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | *he Sal* |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*     Jane Doe
, who issues or requests this subpoena, are:

David Sanford, 1666 Connecticut Avenue NW, Ste. 300, Washington, DC 20009; (202) 499-5201; dsanford@sanfordheisler.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:17-cv-00901-ABJ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                           _____
                                                              *Server's signature*

                                                              _____
                                                              *Printed name and title*

                                                              _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | | |
|---|---|---|
| JANE DOE | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| PROSKAUER ROSE LLP | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                    JAMS, Inc.

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: All notes of the Parties' March 23, 2017 mediation and all other documents which memorialize or reference alleged threats or statements made by Defendant Proskauer Rose LLP, its representatives, or its agents to terminate Plaintiff from the Proskauer Rose LLP law firm.

| Place: Sanford Heisler Sharp, LLP | Date and Time: |
|---|---|
| 1350 Avenue of the Americas, 31st Floor New York, New York 10019 | June 17, 2017 at 5:00 p.m. |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     05/18/2017

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*     Jane Doe
, who issues or requests this subpoena, are:
David Sanford, 1666 Connecticut Avenue NW, Ste. 300, Washington, DC 20009; (202) 499-5201; dsanford@sanfordheisler.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT  C

JAMS
Mediation
Agreement

**Case Name:** REDACTED vs. Proskauer Rose LLP
**JAMS Ref. No.:** 1425023139
**Panelist:** Carol A. Wittenberg

# I. Participants and Procedure.

The parties, and if they desire, their representatives are invited to attend mediation sessions.  No one else may attend without the permission of the parties and the consent of the mediator.

During the session, the mediator may have joint and separate meetings with the parties and their counsel. If a party informs the mediator that information is being conveyed to the mediator in confidence, the mediator will not disclose the information.   The parties agree that the mediator is not acting as an attorney or providing legal advice on behalf of any party.

If a party wishes to terminate its participation for any reason, it may do so by giving notice to the mediator and the other parties.  The parties will continue to be bound by the confidentiality provisions of this agreement and will also continue to be bound by their agreement to pay for those services rendered up to the point of that party's withdrawal.

# II. Disclosure.

The mediator, each party, and counsel confirm that they have disclosed any past or present relationship or other information that a reasonable person would believe could influence the mediator's impartiality and that no conflict of interest or appearance of a conflict of interest exists.

In addition, the mediator practices in association with JAMS.  From time to time, JAMS may enter into arrangements with corporations (including insurance companies), government entities, and other organizations to make available dispute resolution professionals in a particular locale, for a specific type of matter or training, or for a particular period of time.  Also, because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS may have participated in an arbitration, mediation or other dispute resolution proceeding with the parties, counsel or insurers in this case and may do so in the future.   Furthermore, the parties should be aware that each JAMS neutral, including the neutral in this case, has an economic interest in the overall financial success of JAMS.  The mediator is not aware of any aspect of these relationships that would create a conflict or interfere with his/her acting as a mediator in this matter.  The parties acknowledge that these factors do not constitute a conflict of interest or the appearance of a conflict of interest.

# III. Confidentiality.

In order to promote communication among the parties, counsel and the mediator and to facilitate settlement of the dispute, each of the undersigned agrees that the entire mediation process is confidential. All statements made during the course of the mediation are privileged settlement discussions, and are made without prejudice to any party's legal position, and are inadmissible for any purpose in any legal proceeding.  These offers, promises, conduct and statements (a) will not be disclosed to third parties except persons associated with the participants in the process, and (b) are privileged and inadmissible for any purposes, including impeachment, under Rule 408 of the Federal Rules of Evidence and any applicable federal or state statute, rule or common law provisions.

JAMS
Mediation
Agreement

**REDACTED**

**Case Name:** ⬛ vs. Proskauer Rose LLP
**JAMS Ref. No.:** 1425023139
**Panelist:** Carol A. Wittenberg
Page 2 of 2

# IV. Disqualification of Mediator and Exclusion of Liability.

Each party agrees to make no attempt to compel the mediator's or any JAMS employee's testimony, nor to compel the mediator or any JAMS employee to produce any document provided by the other party to the mediator or to JAMS.   The parties agree to defend the mediator and JAMS from any subpoenas from outside parties arising out of this Agreement or mediation. The parties agree that neither the mediator nor JAMS is a necessary party in any arbitral or judicial proceeding relating to the mediation or to the subject matter of the mediation.   Neither JAMS nor its employees or agents, including the mediator, shall be liable to any party for any act or omission in connection with any mediation conducted under this Agreement.

# V. Records.

Any documents provided to the mediator by the parties will be destroyed by JAMS 30 days after the conclusion of the mediation, unless JAMS is otherwise instructed by the parties.

BY: _____

FOR: _____

DATED: _____

**REDACTED**

DATED: _____

BY: _____

FOR: _____

DATED: 3/23/17

BY: _____

FOR: Proskauer

DATED: _____

BY: _____

FOR: _____

DATED: 3.23.17

BY: _____

FOR: Proskauer

DATED: 3/23/17

BY: _____

FOR: Proskauer

DATED: 3/23/17

BY: _____

FOR: _____

DATED: _____

BY: _____

FOR: _____

DATED: _____

EXHIBIT  E

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JANE DOE,

     PLAINTIFF,

v.

PROSKAUER ROSE LLP,

     DEFENDANT.

Case No. 1:17-cv-00901-ABJ

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S EMERGENCY MOTION FOR PRESERVATION ORDER
TO PRESERVE CRITICAL EVIDENCE FROM IMMINENT DESTRUCTION**</u>

## PRELIMINARY STATEMENT

At a mediation of Plaintiff's gender discrimination suit against Defendant Proskauer Rose, a Proskauer attorney representing the Firm threatened Plaintiff that she would be terminated because of her complaints of discrimination. Proskauer's threat constitutes illegal retaliation. A mediator took contemporaneous notes of the proceedings, but under the mediation organization (JAMS)'s procedures, the notes will be destroyed as early as this Monday, May 22, 2017.

Plaintiff moves for emergency relief to direct JAMS and the mediator to preserve these important notes. In discrimination suits, courts have often ordered production of evidence of retaliatory threats even when such threats are made during settlement discussions or at a mediation. Because the mediator's notes here may contain critical proof of Proskauer's retaliation against Plaintiff (cf. FBI Director Comey's memorandum), the Court should order JAMS to retain those notes. This relief prejudices neither Defendant nor JAMS and merely maintains the possibility of a future motion to compel.

## FACTUAL BACKGROUND AND SUMMARY

This case involves claims for gender discrimination and retaliation under the Equal Pay Act ("EPA"), Title VII,[1] corresponding state and local law, and related common law causes of action; as well as claims for interference with and retaliation for protected Family and Medical Leave Act ("FMLA") leave.

On March 23, 2017, the parties engaged in mediation before a mediator at JAMS. The mediator took contemporaneous notes of all proceedings. In a joint session at the mediation, Proskauer communicated a direct threat to terminate Plaintiff Jane Doe because of her complaints

---

[1] The Complaint will be amended to assert a Title VII claim once Plaintiff receives a right to sue letter from the EEOC.

1

of discrimination and retaliation. A Proskauer attorney, speaking for the Firm (the Firm represented itself), addressed Plaintiff: "You need to understand… you are going to be terminated. Your complaint upset a lot of people." This threat is an unlawful retaliatory act, and forms a central basis for several of Plaintiff's retaliation claims. (*See* Complaint ¶¶ 9, 58, 69, 75, 86, 94, 114, 121, 128) It is Plaintiff's understanding that the statements are recorded – in words or in substance – in the mediator's contemporaneous notes.

On May 12, 2017, the parties participated in a second day of mediation at JAMS. After the mediation concluded, the mediator informed Plaintiff's counsel that the notes from the mediation would soon be destroyed. In particular, the mediator indicated, JAMS has an official policy that files from a mediation are destroyed after sixty (60) days. This means that the notes of the March 23 session could be destroyed as early as this Monday, May 22, 2017.

Simultaneously with this motion, Plaintiff is serving JAMS with a Rule 45 subpoena for the mediator's notes to corroborate her claim that Proskauer made an unlawful retaliatory threat. If the mediator is compelled to testify, the notes would likely be used as an aid in refreshing recollection – if not as evidence in their own right. The mediator's notes and testimony – coming from a neutral, disinterested party – may well be the best, most credible evidence on this key disputed issue. But once the notes are destroyed, the subpoena will be mooted and this crucial source of evidence will be lost forever.

Under circumstances such as these – where an alleged illegal act is committed in the course of confidential settlement proceedings – courts regularly hold that Fed. R. Civ. P. 408 and any applicable mediation privileges do not bar disclosure. Nevertheless, the Court need not determine at this stage whether the evidence in question would be admissible and whether its production should be compelled. The Court should simply order that the mediator's March 23 notes be

2

preserved from impending destruction. Otherwise, the issue of the evidence's discoverability will be mooted and Plaintiff will be severely prejudiced in her ability to prove her retaliation claims.

Accordingly, Plaintiff submits a proposed order directing JAMS, a non-party, to immediately preserve the notes and files of the mediation until further notice from the Court. The requested relief will merely preserve the status quo, will avoid imminent and irreparable harm to Plaintiff's ability to prove her retaliation claims, and will impose no significant burden on JAMS.

## ARGUMENT

### I.   The Mediator's Notes Involve Issues of Central Importance to this Case

Plaintiff asserts several retaliation claims and related causes of action based on Proskauer's threat at the March mediation. This threat has not been rescinded and continues to hang over Plaintiff's head. Plaintiff contends that the threat itself was unlawful retaliation, regardless of whether she is actually terminated.

In *Burlington N. & Santa Fe. Rwy. v. White*, 548 U.S. 53 (2006), the Supreme Court held that prohibited retaliation consists not only of actual personnel actions that affect the terms and conditions of employment but any conduct which "could well dissuade a reasonable worker from making or supporting a charge of discrimination." A direct threat to terminate an individual because of her complaints of discrimination fits squarely within this standard. *See, e.g.*, *Lawrence v. Lew*, 156 F. Supp.3d 149, 165 (D.D.C. 2016)("courts in this District have generally found materially adverse employment action where the employee suffered a credible threat of termination"); *Ali v. Dist. of Columbia Govt.*, 810 F. Supp.2d 78, 88-89 (D.D.C. 2011)(threat to discipline and terminate plaintiff's friend: "A credible threat of termination might

3

well dissuade a reasonable employee from pursuing a charge of discrimination.");[2] *Rattigan v. Holder*, 604 F. Supp. 2d 33, 52-53 (D.D.C. 2009)(collecting cases)(noting that threats or prospects of harm may have a deterrent effect on protected activity and thus be actionable retaliation: "Taken together, *Burlington* and *Rochon* [*v. Gonzales,* 438 F.3d 1211, 1219 (D.C. Cir. 2006)] indicate that whether an action is 'materially adverse' is determined by whether it holds a deterrent **prospect** of harm, and not by whether the harm comes to pass or whether any effects are felt in the present.")(emphasis in original), *aff'd in relevant par*t, 645 F.3d 975, 986-87 (D.C. Cir. 2011) (expressing "no doubt" that jury could find *Burlington* satisfied by initiation of investigation creating "ominous prospects" of "possible negative repercussions" up to potential termination).[3]

Likewise, threats of retaliatory termination violate the anti-retaliation protections of the EPA, 29 U.S.C. § 215(a)(3). *See, e.g., Perez v. Oak Grove Cinemas, Inc.,* 68 F. Supp.3d 1234, 1249 (D. Or. 2014)("threatening to terminate" employees who participate in Department of Labor investigation "is properly considered a form of 'discrimination' [under § 215(a)(3)] because such threats thwart and interfere with the employee's protected right to participate in the investigation… without fear of reprisal"); *Adams v. Sch. Bd. of Hanover Cty.,* No 3:05CV310, 2008 WL 5070454, at *16 (E.D. Va. Nov. 26, 2008)("threat of economic reprisal or termination"); *Hernandez v. City Wide Insulation of Madison, Inc.,* 508 F. Supp.2d 682, 694 (E.D. Wisc. 2007).

Here, Proskauer denies that it made *per se* retaliatory threats at the mediation. The mediator's notes and anticipated testimony are the only available evidence apart from the parties'

---

[2] *Accord: Ross v. U.S. Capitol Police*, 195 F. Supp.3d 180, 205-206 (D.D.C. 2016)(proposed notice of termination, even in absence of actual discharge).

[3] *See further Commonwealth v. Bull HN Info. Sys.*, 16 F. Supp. 2d 90, 108-09 (D. Mass. 1998) ("If . . . threats of retaliation are not actionable. . . then a plaintiff or government enforcement body would have to wait until an employer actually retaliates before invoking the [retaliation] protections of [the ADEA]. Where the threatened retaliation is clearly illegal, where it chills the redress of legal rights, however, such a conclusion can only be described as absurd.")

own testimony. Thus, this evidence is essential to the search for truth in this action; it may be *the*
evidence needed to break a potential he-said-she-said impasse on Proskauer's threat of retaliatory
termination and ultimately resolve this matter.

**II.     The Mediator's Notes and Testimony Would Likely Be Discoverable and Admissible
          in Further Proceedings: Courts Have Repeatedly Allowed Discovery Into Alleged
          Unlawful Retaliation Committed During Settlement Negotiations or at a Mediation**

Plaintiff acknowledges that mediations are typically confidential. As a general rule, to
foster robust negotiations, the parties must be able to communicate freely. However, Proskauer's
conduct here is extraordinary and presents an exception. It is axiomatic that parties cannot use a
mediation or other settlement proceedings to shield and insulate illegal conduct, including – in an
employment case such as this one – unlawful acts and threats of retaliation.  Wrongdoing that
occurs in the course of settlement proceedings is subject to discovery and may form the basis for
an independent claim. *See, e.g., Carney v. American Univ.*, 151 F.3d 1090, 1095 (D.C. Cir.
1998)(under Fed. R. Civ. P. 408, correspondence that was part of settlement negotiations "can be
used to establish an independent violation (here, **retaliation**) unrelated to the underlying claim
which was the subject of the correspondence (race **discrimination**).")(emphasis added); *Cerni v.
J.P. Morgan Securities, LLC*, 208 F. Supp.3d 533, 540-41 (S.D.N.Y. 2016) ("Rule 408 does not
exclude evidence of alleged threats to retaliate for protected activity when the statements occurred
during negotiations focused on the protected activity and the evidence serves to prove liability
either for making, or later acting upon, the threats.")(citing *Pace v. Paris Maint. Co.*, 7 Fed. Appx.
94 (2d Cir. 2001)); *Carr v. Health Ins. Plan of Greater N.Y.*, 99 Civ. 3706, 2001 WL 563722, at
\*4 (S.D.N.Y. May 23, 2001)(allowing retaliation claim premised on statements during settlement
communications to proceed: "The force of Rule 408 is inapplicable when the claim is based upon
some wrong that was committed in the course of the settlement discussions."); *Samadi v. Quality*

*Furniture LLC*, No. CV 12-593, 2012 WL 12870242 (D. Ariz. July 23, 2012)(confidentiality statutes and policies pertaining to EEOC mediations did not preclude claim for unlawful retaliatory conduct during mediation). Under the circumstances present here, disclosure would not undermine the policy of encouraging settlements, but instead would prevent defendants such as Proskauer from abusing the settlement context as cover for unlawful retaliation and other illegal acts.

Thus, although the Court need not address these issues in the present posture, Plaintiff would ultimately be likely to succeed on a motion to compel the mediator's notes and testimony on the limited subject of Proskauer's alleged illegal threats. At this stage, preserving this evidence from impending destruction prejudices no one and does nothing more than preserve the status quo.

**III.     Courts Regularly Intercede to Prevent the Imminent Destruction of Critical Evidence and the Court Should Follow Suit Here**

Federal courts have long been recognized to have implied powers necessary to manage their cases and exercise their jurisdiction. *E.g. U.S. v. Hudson,* 7 Cranch 32, 34, 3 L. Ed. 259 (1812) (inherent power to fine for contempt); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991) (inherent power to impose sanctions for bad-faith conduct and to vacate court's own judgment upon proof of fraud); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980) (inherent power to assess attorney's fees). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630-31 (1962) (inherent power to dismiss action *sua sponte* for lack of prosecution); *see also Shepherd v. Am. Broad. Cos.,* 62 F.3d 1469, 1474 (D.C. Cir. 1995) (inherent power to enter default judgement against all defendants).

Federal courts have the inherent power to order that evidence be preserved as part of their general authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Pueblo of Laguna v. U.S.,* 60 Fed. Cl. 133, 135-36 (2004) (quoting *Link,* 370

Case 17-2607, Document 57, 12/11/2017, 2145416, Page54 of 138

A51

Case 1:17-mc-00207-RJ Document 215 Filed 06/16/17 Page 9 of 12
Case 1:17-cv-00904-RJ Document 215 Filed 06/16/17 Page 9 of 12

U.S. at 630-31); *see also, e.g., Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1071 (C.D. Cal. 2009). Similarly, under the All Writs Act, courts have the power to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. *See, e.g., Pueblo of Laguna*, 60 Fed. Cl. at 137 (All Writs Act empowers a court to preserve relevant evidence in order to maintain the integrity of its fact-finding and adjudicative functions). Courts frequently invoke the Act to support appropriate orders governing the conduct of non-parties. *See, e.g., Sarnecka-Crouch v. Billington*, Civ. No. 06-1169, 2012 WL 3060165 at *2 n.3 (D.D.C. July 26, 2012)(directing Commissioner of Social Security Administration to provide defendant with social security documents pertaining to plaintiff); *Evans v. Williams*, No. CIV. 76-293, 1999 WL 1212884 (D.D.C. Aug. 20, 1999)(issuing writ to Family Division of Superior Court requiring that plaintiffs' counsel be given access to court files).

Here, a preservation order is necessary to preserve crucial evidence destined for imminent destruction. Absent a court order, it is virtually certain that this evidence will be lost. The harm to Plaintiff may well be irreparable. Without the contemporaneous notes, the mediator's recollection of relevant events may falter or be challenged by the time the mediator is compelled to testify. In contrast, simply retaining the mediator's notes pending further proceedings poses no significant burden or prejudice. *See, e.g., Williams v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 144, 147 (D. Mass. 2005)(ordering preservation of evidence where it is necessary and not unduly burdensome); *Pueblo of Laguna*, 60 Fed. Cl. at 138 (same). *See also Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429 W.D. Pa. 2004)(setting forth three-prong test, balancing: (i) the court's concern that the evidence will not be maintained absent an order; (ii) the possibility of irreparable harm to the party seeking the order; and (iii) the practical ability to maintain and preserve the evidence); *accord: Treppel v. Biovail Corp.*, 233 F.R.D. 363, 370-72

7

(S.D.N.Y. 2006)(distilling *Capricorn* balancing test: (i) the danger of destruction; (ii) the content of the documents and their importance to the litigation; and (iii) the burden of preservation).[4]

The need for a preservation order is especially pressing here because JAMS is a non-party with no independent obligation to preserve evidence. *Cf., e.g., Capricorn Power*, 220 F.R.D. at 434 (describing situations in which a preservation order would be necessary and not superfluous: "At times evidence may be outside of the possession of all parties and this may create a concern for the continuing existence of the evidence at question."); *Slahi v. Bush*, No. Civ. A 05-881, 2005 WL 1903682 (D.D.C. July 18, 2005)(among numerous cases entering preservation orders in habeas proceedings because the discovery provisions of the Federal Rules of Civil Procedure – including the duty to preserve evidence – do not automatically apply). Without a prompt order from the Court, there is nothing to prevent JAMS from carrying out its routine document destruction policy and thereby needlessly jeopardizing Plaintiff's ability to prove her claims.

Consequently, the Court should issue a standard document preservation order requiring JAMS to retain any notes or other documents that memorialize or reference Proskauer's alleged threats to terminate Plaintiff Doe.

---

[4] The Court should decline to apply a preliminary injunction standard. In particular, it would be anomalous to require a showing that the underlying claims are likely to succeed on the merits in order to salvage from the shredder the very evidence which may establish those claims. *See, e.g., Treppel*, 233 F.R.D. at 370 (applying injunction-like standard would anomalously require the court to "evaluate the merits of the litigation even before evidence has been gathered, let alone produced to the opposing party or submitted to the court."); *Pueblo of Laguna*, 60 Fed. Cl. at 138 n. 8 (no reason "to consider whether plaintiff is likely to be successful on the merits of its case in deciding whether to protect records from destruction.... [S]uch an approach would be decidedly to put the cart before the horse."); *Capricorn*, 220 F.R.D. at 433 ("proof of a probability of success in litigation is not an appropriate consideration in the determination whether to order preservation of documents"). In any event, the very content of Defendants' alleged statement – threatening termination in direct connection with Plaintiff's claims – demonstrates a sufficient likelihood of success.

## CONCLUSION

A non-party, JAMS, is in possession of highly-relevant evidence slated to be destroyed as early as this coming Monday, May 22 – before Plaintiff has an opportunity to litigate disputes over the enforceability of the subpoena. The evidence is unique and irreplaceable (along the order of the Comey memo) and is not available from other sources. Further, the evidence apparently consists of nothing more than a few pages of handwritten notes, and its preservation can be accomplished quickly and easily without any significant burden. The Court should therefore order that these documents be retained pending further proceedings. The proposed order will save the documents from their looming date with the shredder and prevent any issues surrounding their potential disclosure from being rendered moot.

Dated: May 18, 2017                            Respectfully submitted,


                                               /s/ David Sanford
                                               David Sanford, D.C. Bar No. 457933
                                               Vince McKnight, D.C. Bar No. 293811
                                               Altomease Kennedy, D.C. Bar No. 229237
                                               Kate Mueting, D.C. Bar No. 988177
                                               **SANFORD HEISLER SHARP, LLP**
                                               1666 Connecticut Avenue NW, Suite 300
                                               Washington, DC 20009
                                               Telephone: (202) 499-5201
                                               Facsimile: (202) 499-5199
                                               dsanford@sanfordheisler.com

                                               Andrew Melzer*
                                               Alexandra Harwin, D.C. Bar No. 1003018
                                               **SANFORD HEISLER SHARP, LLP**
                                               1350 Avenue of the Americas, 31st Floor
                                               New York, New York 10019
                                               Telephone: (646) 402-5655
                                               Facsimile: (646) 402-5651
                                               jheisler@sanfordheisler.com
                                               aharwin@sanfordheisler.com

Case 17-2607, Document 57, 11/54/2017, 2145416, Page57 of 138

Case 1:17-mc-00207-P1   Document 2-5   Filed 06/16/17   Page 12 of 12
Case 1:17-cv-00901-ABJ   Document 7-5   Filed 05/18/17   Page 11 of 11

Kevin Sharp*
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020
ksharp@sanfordheisler.com

*Pro hac vice* application forthcoming


## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on this 18th day of May 2017, he caused the foregoing Memorandum of Points and Authorities in Support of Plaintiff's Emergency Motion for Preservation Order to Preserve Critical Evidence from Imminent Destruction via the Court's CM/ECF system and by a process server:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036

*Defendant*

JAMS, Inc.
620 Eighth Ave.
34th Floor
New York, NY 10018

/s/ David Sanford
David Sanford

EXHIBIT  F

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE DOE,** | |
| **PLAINTIFF,** | **COMPLAINT** |
| **v.** | |
| **PROSKAUER ROSE LLP,** | **Case No. _____** |
| **DEFENDANT.** | |

Plaintiff Jane Doe is a partner at Proskauer Rose LLP, an international law firm with an office in Washington, D.C. Plaintiff is the ███████████████████████████ ██████████████ Plaintiff brings this action to remedy discrimination, retaliation, and other harms she has suffered and continues to suffer at Proskauer.

## I. OVERVIEW

1. Defendant Proskauer Rose LLP is one of the highest-grossing law firms in the world. According to *The American Lawyer*, Proskauer's gross revenue was $852.5 million in 2016, with average profits per equity partner of $2.315 million.[1] Almost all aspects of Firm management and operations are tightly controlled by Proskauer's currently all male Executive Committee.

2. Proskauer professes – to its attorneys, the legal community, and the public at large – that it has a deep commitment to "equal opportunity and diversity in the practice of law," as well as "corporate social responsibility" and "legal justice." As part of this commitment, Proskauer claims to have "long championed the professional development and career advancement of

---

[1] *See 2017 Am Law 100*, THE AMERICAN LAWYER (Apr. 26, 2017), http://www.americanlawyer.com/id=1202784616627.

1

women." Behind the curtain, however, the reality is far less flattering: in fact, Proskauer faces a serious gender discrimination problem that it has repeatedly failed – and indeed refused – to fix.

3. Even by BigLaw standards, the number of female partners at Proskauer is very low. Only 13% of Proskauer's equity partners are female, compared to an estimated 18% of equity partners in BigLaw generally.[2] Even within the ranks of equity partners at Proskauer, there are substantial gender disparities. The Firm's five highest paid male partners earn more than double the amount that the five highest paid female partners earn.

4. Since Plaintiff joined the firm in 2013, she has been among Proskauer's hardest-working and most productive equity partners.

5. During her time at Proskauer, however, Plaintiff has been overtly objectified based on her sex. Proskauer Chairman Joseph Leccese frequently complimented Plaintiff's appearance, describing her as "elegant" and "glamorous" and praising her "presence" and ability to "light up a room."

6. Ralph C. Ferrara, who is a prominent securities litigator in Proskauer's D.C. office, has been far blunter. Almost every time he saw Plaintiff in the office, he made suggestive or inappropriate comments about her appearance. He drew close to her in a lascivious manner and made inappropriate comments regarding her appearance, body, clothing, or "sexiness." Plaintiff complained to Proskauer's General Counsel, Stephen Obus, about inappropriate statements that Mr. Ferrara made to Plaintiff and to and about summer associate candidates, but the Firm took no action to discipline Mr. Ferrara or stop his harassment. Indeed, Mr. Ferrara's conduct has continued unabated since Plaintiff complained.

---

[2] *See* National Association of Women Lawyers, NAWL NINTH ANNUAL SURVEY, *available at* http://www.nawl.org/p/cm/ld/fid=506 (surveying female partnership rates at AmLaw200 firms).

7.      Despite her stand-out performance, Proskauer discriminated against Plaintiff based on her gender, paying her *millions of dollars* less than male partners who are similarly or less productive than she is.  The Firm simultaneously discriminated against Plaintiff – a single mother who has sole custody over her son – based on her status as a female caregiver and based on her taking of statutorily protected leave.  For example:[3]

a.      In 2016, the Firm set the annualized pay of a new male partner at *approximately 65% more* than Plaintiff, even though the new male partner's client originations were approximately 63% of Plaintiff's and he had no track record at Proskauer.

b.      From 2014 through 2016, the Firm paid another male partner 55% more than Plaintiff, even though his client originations were 79% of Plaintiff's, his billable hours were 55% of hers, and his total hours were approximately 88% of hers.

c.      From 2014 through 2016, the Firm paid another male partner 40% more than Plaintiff, even though his client originations were just 9% of Plaintiff's, his billable hours were 47% of hers, and his total hours were 62% of hers.

d.      From 2014 through 2016, the Firm paid another male partner 40% more than Plaintiff, even though his client originations were approximately the same as Plaintiff's, his billable hours were 55% of hers, and his total hours were 77% of hers.

8.      When Plaintiff engaged in protected activity and complained that her pay was inequitable compared to her male peers, Proskauer retaliated against her instead of providing redress.  Proskauer aggressively rebuked her, excluded her from client development activities and firm leadership, treated her in a hostile manner, damaged her client relationships, isolated her from

---

[3] The names of the male partners referenced in Paragraphs 7(a)-(d) of this Complaint have been provided to Defendant separately.

3

her peers and team members, demeaned her to her peers and clients, denied her access to almost all of the Firm's client files, refused to assign her to work on Firm-client matters except those she originated, barred from all Firm partner meetings and functions, including the Firm retreat, and refused to increase her pay to a level commensurate with her substantial contributions.

9.      Then, after Plaintiff retained counsel and informed Proskauer that she was prepared to bring litigation, Proskauer further retaliated by threatening to terminate her, stating, "you need to understand… you are going to be terminated. Your complaint upset a lot of people."

**II.     THE PARTIES**

10.     **PLAINTIFF JANE DOE** ("Plaintiff") has been a partner at Proskauer Rose LLP since ████████.  At all times relevant to this action, Plaintiff has been a covered "employee" under the statutes invoked in this action.  At all times relevant to this action, Plaintiff was based out of Proskauer's Washington, D.C. office.  She has also performed substantial work in Maryland for clients in Maryland or with business in Maryland, including attending client meetings, agency meetings, mediations and depositions and appearing in Court.

11.     **DEFENDANT PROSKAUER ROSE LLP** ("Proskauer" or the "Firm") is a large international law firm with multiple offices across the country and over the globe.  While Proskauer's principal office is located in Manhattan, Proskauer also maintains an office in Washington, D.C.  Proskauer is subject to, *inter alia*, the New York Rules of Professional Conduct and the D.C. Rules of Professional Conduct, both of which prohibit discrimination in the practice of law on the basis of sex.

**III.    JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action is based on the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and the

4

Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. This Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District under 28 U.S.C. § 1391(b). Proskauer has an office in this District and transacts substantial business in this District on an ongoing basis. A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

### IV. FACTUAL ALLEGATIONS

#### A. *Plaintiff's Outstanding Performance Record*

14. Plaintiff is a member of the bars of the District of Columbia, the Commonwealth of Virginia, the State of Maryland, and the Supreme Court of the United States.

15. Plaintiff has worked at Proskauer Rose LLP since ███████ as an equity partner in the Firm's ██████████ Law Department in Washington, D.C.

16. In Proskauer's press release announcing her hire, Plaintiff was described as██████ ████████████████████████ Her hire was characterized as reflecting the Firm's commitment to attracting ██████████████████████████ ████████████████████

17. Since she began her employment with Proskauer, Plaintiff has been the co-head and then head of Proskauer's D.C. █████████ practice, co-head of Proskauer's ████████████ Group, and co-head and then head of Proskauer's ██████ ████████ Group. Plaintiff is also editor of the Firm's █████████████ █████████ blog and co-editor of the Firm's ████████████ blog.

18. At Proskauer, Plaintiff has been a stand-out performer. From 2014 to 2016, Plaintiff ranked **6th** among the Firm's over 180 equity partners for her billable hours and ranked **18th** for her robust client originations. In addition, Plaintiff has made important contributions to

the Firm generally and its Washington, D.C. office in particular, including transforming the D.C. ███████████ practice and managing one of the most productive and profitable office practice groups. She is the ███████████ for the D.C. office, serves on the firm-wide Marketing Committee, and, when Proskauer relocated its Washington, D.C. office, served on both the design and art selection committees. *Yet, when it comes to her compensation, Plaintiff ranks only **32nd** among equity partners.*

19.    Plaintiff has earned substantial recognition outside the Firm. Legal publications have recognized her as a leader in the profession, including *Chambers USA* (for ███████ ███████ in the District of Columbia in 2012, 2014-2016), *The Legal 500 United States* (for ██████████████████████████████ in 2014-2016), *Washington, DC Super Lawyers* (2008-2017), *Washington Business Journal* (2004 and 2009), and *Washingtonian* Magazine (as a top Washington Lawyer for ████████ in 2004, 2007, 2009, 2011, 2013, and 2015). In the *Legal Times*'s most recent "Leading Lawyers" series, Plaintiff was voted by her peers as "The Top ███████████ Attorney" in the District of Columbia. She is rated AV Preeminent by Martindale-Hubbell. Plaintiff is also a nationally-recognized speaker who has spoken at numerous national conventions and seminars, including conventions hosted by the American Bar Association and the Industry Liaison Group.

20.    Before she raised complaints of discrimination and retaliation at the Firm, Plaintiff's strong contributions were repeatedly acknowledged by Proskauer's leadership, including Proskauer's Chairman Joseph M. Leccese. For example, Chairman Leccese commented that Plaintiff was the most successful lateral transition in the history of Proskauer. Chairman Leccese also told Plaintiff that she was an "amazing partner," that she had "the perfect practice," and that he wished she had "a hundred [Janes]." He remarked that Proskauer's profits would soar

if all the partners were as productive and marketing-oriented as Plaintiff.

**B.** *Proskauer's Anti-Discrimination and Anti-Retaliation Obligations*

21.    Proskauer is subject to the New York Rules of Professional Conduct and the D.C. Rules of Professional Conduct, in addition to disciplinary rules in the other jurisdictions where Proskauer maintains offices or otherwise represents clients.

22.    The New York Rules of Professional Conduct prohibit discrimination in the practice of law on the basis of sex.  The D.C. Rules of Professional Conduct prohibit discrimination in conditions of employment on the basis of sex and family responsibility.  All Proskauer partners are entitled to protection from gender discrimination under the New York Rules of Professional Conduct.  Proskauer partners in Washington, D.C. are also entitled to protection from gender and family responsibility discrimination under the D.C. Rules of Professional Conduct.

23.    According to Proskauer's Equal Employment Opportunity and Anti-Harassment Policy: "Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits discriminatory practices, including harassment."

24.    Proskauer's Equal Employment Opportunity and Anti-Harassment Policy further provides that "Proskauer prohibits retaliation against any individual who reports discrimination or harassment or participates in an investigation of such reports. Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action."

25.    The protections set forth in Proskauer's Equal Employment Opportunity and Anti-Harassment Policy apply to the Firm's partners.

26.     Proskauer's partners have a right to work in a professional atmosphere free of discrimination and retaliation.

27.     It is an implicit term of Proskauer's Partnership Agreement that Proskauer partners, including Proskauer's Chairman and Executive Committee, will adhere to their basic ethical obligations under all applicable Rules of Professional Conduct.  Refraining from gender discrimination in the practice of law and in the terms of employment are fundamental ethical duties in New York and the District of Columbia, respectively.

28.     Female partners would not join the Firm if they believed that Proskauer and its Executive Committee claimed the unfettered right to discriminate against them based on their gender or family responsibilities, or to retaliate against them for raising concerns about discrimination.

29.     Plaintiff would not have joined the Proskauer partnership absent an understanding that she would be compensated fairly in relation to her male partners, would not be discriminated against based on her gender and family responsibilities, and would not be retaliated against for seeking to address any discrimination or harassment that she or others might encounter.

30.     Proskauer and its Executive Committee have legal, ethical, contractual, and fiduciary duties not to discriminate or retaliate against Firm partners, including based on gender.

### C.     *Proskauer's Unlawful Acts and Omissions*

31.     When Plaintiff joined Proskauer in ██, the Firm set her total compensation at an annualized rate of $█ million per year (inclusive of signing bonus), prorated because she joined the Firm mid-year.  When she tried to negotiate for higher compensation, Allan Fagin, the Firm's former Chairman, repeatedly assured Plaintiff that she would quickly move up to an annual compensation level of more than $3 million per year if she generated revenue at a level of $7

8

million per year or more.  Plaintiff was told that future pay increases would be based primarily on the business she originated for the Firm.

32.     In ▮▮▮, her first full year at the Firm, Plaintiff excelled, but Proskauer did not increase her compensation to a level commensurate with her strong performance.  Plaintiff originated approximately $7.4 million in client revenue that year, billed over 2,600 hours, and worked over 3,100 hours in total.  Yet the Firm increased her compensation by only 2% – to $▮▮ million per year – and paid her substantially less than many similarly situated male partners.  For example, the Firm paid a male partner who had joined Proskauer less than a year before Plaintiff compensation of $6 million (more than two-and-a-half times Plaintiff's compensation), even though his client originations and hours were substantially lower than Plaintiff's.

33.     After she was notified of her allocation in early December 2014, Plaintiff expressed concerns about her compensation level to the D.C. office head, to an Executive Committee member, and to others, but Proskauer would not address the inequities in Plaintiff's compensation. However, Plaintiff was assured once again that she was a "star" and should anticipate substantial increases in the future.

34.     In 2015, Plaintiff's performance was even stronger.  She originated over $9.2 million in client revenue, billed nearly 2,600 hours, and worked nearly 2,900 hours in total.  By this point, Plaintiff had helped transform the D.C. ▮▮▮▮▮▮▮▮▮ practice, driving substantial revenue, and supervising one of the most productive teams in the entire practice group.

35.     At a meeting with her ▮▮▮▮▮▮▮▮▮▮▮▮ in late 2015 to discuss upcoming allocation decisions for 2015, Plaintiff objected that she was not being paid equitably in relation to her male peers.  She expressed an expectation that she be paid at least $2.75 million –

a conservative request considering Plaintiff's performance and contributions to the Firm and the compensation received by male peers.

36.     ████████████, however, responded to Plaintiff's complaint by interrogating Plaintiff on why she thought she deserved more compensation. He demanded, "*What makes you think that you should be paid more than me?*"

37.     Plaintiff left the conversation with ████████████ feeling demoralized and attacked, and she immediately complained to D.C. office head Paul Hamburger, to an Executive Committee member, and to others regarding ████████████'s comments to and treatment of her.  On information and belief, Proskauer did not investigate her concerns or impose any discipline on ████████████.

38.     Following her complaints about inequitable treatment in late 2015, the Firm's treatment of Plaintiff grew increasingly hostile.  In March 2016, when Plaintiff suffered a family emergency and had to step down as first chair from an upcoming trial, rather than respond with sympathy and support, ████████████ berated Plaintiff, baselessly claiming, among other things, that she had concealed her family situation from the Firm.

39.     Taking the lead from ████████████, the two male litigators who took over the trial were overtly hostile to Plaintiff, frequently disregarding her advice and offers of assistance, demeaning and belittling her, disparaging her to her peers and clients, and at times yelling at her.  When the case proceeded to trial in April 2016, Plaintiff did everything she could from the D.C. office to assist.  However, the male litigators repeatedly refused to coordinate or strategize with Plaintiff regarding the trial.

40.     On one occasion shortly after the trial, ████████████ ████████ pressured Plaintiff to sign an opinion letter regarding a potential settlement.  Plaintiff

objected that it would be unethical for her to do so under the circumstances and refused to sign it. In response, ███████████████ yelled at Plaintiff and baselessly accused her of "lying" about client communications that he knew nothing about.

41.     The Firm's hostile treatment took a psychological and physiological toll on Plaintiff.  She experienced symptoms of emotional distress that included hypertension, extreme anxiety, a heart-valve condition, esophagitis, and insomnia.  Plaintiff had to seek treatment, take medication, and take repeated medical leave as a consequence of Defendant's mistreatment.

42.     As a result of Defendant's mistreatment, Plaintiff's blood pressure soared so high that she was rushed by ambulance to the hospital, where she was diagnosed with severe hypertension, a heart value condition, and esophagitis.  All of these medical conditions were tied to the extreme stress she was experiencing at work.  Plaintiff's doctor described her as a "walking heart attack."  Shortly thereafter, at the recommendation of her internist, Plaintiff met for the first time in her life with a psychiatrist, who directed her to enter psychotherapy and prescribed medication to control her severe anxiety.

43.     By September 2016, it was clear that Plaintiff was being marginalized at the Firm. Despite her expertise and track record, she was rarely asked to work on the Firm's client matters. For example, even though she had extensive experience in matters involving the ████████████ ████████████████, and even though she chairs this practice area at the Firm, Proskauer began diverting those matters away from her to a male junior associate and a male junior partner with little or no relevant expertise.

44.     In addition, since Plaintiff complained, Proskauer has not asked Plaintiff to pitch or to participate in a single ██████████ litigation matter for Firm or prospective Firm clients. By contrast, during this same period, Proskauer was referring numerous ██████████ litigation cases

to male partners in the New York, Los Angeles, and Chicago offices, including a newly hired male

equity partner. Sitting through monthly office head meetings, Plaintiff has heard about Proskauer

referring case after case, including clients and cases in the D.C. area, to male partners.

45.      Plaintiff – recognizing that the Firm was attempting to marginalize her – expressed

interest in taking on a greater role at the Firm, but Proskauer rebuffed her efforts.

46.      In a one-on-one meeting held in late September 2016 with Chairman Leccese,

Plaintiff offered to take a greater leadership role in the Firm's Washington, D.C. office (something

that had been discussed when she initially joined the Firm) and in the ████████████████

Department. Plaintiff also shared various ideas for new marketing niches and offered to become

more involved in lateral recruiting (which had been a big focus of Plaintiff's at her prior firms and

was desperately needed for the Firm's dwindling D.C. office). Every proposal she made, however,

was soundly rejected by Chairman Leccese. Indeed, Chairman Leccese repeatedly told Plaintiff

that the practices she described were being developed or handled by other (generally male)

partners.

47.      Later that same night, at a cocktail reception and dinner held by the Firm, Plaintiff

was treated as *persona non grata*. Chairman Leccese pointedly refused to sit next to Plaintiff and

sat with his back to her the entire night.

48.      The hostile treatment continued when Plaintiff came to New York in October 2016

for a series of meetings to discuss her 2016 compensation allocation. When Plaintiff greeted

████████████████████████ at a Partners' luncheon, he turned his shoulder and pushed his

right elbow at her chest, blocking Plaintiff from approaching him in front of other partners. This

public shunning left Plaintiff feeling shaken, embarrassed, and isolated.

49.     Later that same day, at an in-person meeting with an Executive Committee member, Plaintiff was informed that there was a faction of partners, headed by ████████████████, looking for something to use against Plaintiff in the compensation process.  This became clear to Plaintiff later that day when she met with ████████████████████████.

50.     At that meeting, ████████████████████████ subjected Plaintiff to extreme and unwarranted scrutiny.  While discussing the draft year-end self-evaluation that Plaintiff had prepared, ██████████████████'s tone and demeanor were hostile; he subjected Plaintiff to cross examination on an array of details in the draft and peppered her with criticisms that were baseless.

51.     Following these incidents, Plaintiff's blood pressure again became dangerously high and she had to increase her daily hypertension medications.  Her anxiety about her career and the unlawful treatment she was experiencing at work became so severe that for the first time she began taking anti-anxiety medication during the day, at the recommendation of her psychiatrist.

52.     After suffering this hostile treatment and experiencing such emotional and physical distress, Plaintiff had little choice but to escalate her complaints.

53.     On November 8, 2016, Plaintiff sent a lengthy email to Chairman Leccese and the Firm's General Counsel, Stephen Obus, objecting to the discriminatory and retaliatory treatment she had experienced at Proskauer.  In that email, Plaintiff expressed her concerns about gender pay inequality, explaining that she was stunned by how her compensation compared to male peers who had significantly less client originations and billable hours than she did.  She described the hostile treatment she was receiving from ██████████████████████ and expressed concern that her compensation would continue to be suppressed due to ongoing discrimination and retaliation.

54.    In her email to Chairman Leccese, Plaintiff stressed: "I deserve (1) not to be subjected to hostile and unprofessional treatment; (2) not to be discriminated or retaliated against; and (3) to be compensated equitably compared to my peers."  Plaintiff also explained to Chairman Leccese how she made the difficult decision to step forward to advocate for more equitable treatment.  Taking inspiration from her teenage daughter, Plaintiff wrote: "I have to stand up for her to make certain that she -- after 27 years of practicing medicine, or law, or whatever profession she chooses -- and girls like her do not face the dilemma that I now face: do I remain quiet and allow male partners about whom I have complained destroy my career or do I, despite the possible consequences, take[] steps to ensure that I am treated fairly and not exposed to an increasingly hostile situation?  I am determined to take the second path and let the chips fall where they may.  I hope it does not come to that."

55.    On November 16, 2016, Plaintiff was interviewed by General Counsel Obus and long-time employment partner Betsy Plevan.  When asked by Ms. Plevan why she believed there was a gender problem, Plaintiff explained that she had been subjected to many gender-related comments, including comments relating to her appearance and family situation; observed that male partners have not suffered the same overt abuse; and noted that as a pay equity expert, she could see the discrimination in the numbers, drawing distinctions between the treatment of other male partners and herself.

56.    Ultimately, despite Plaintiff's complaint, in 2016 the Firm again failed to increase her compensation to a level commensurate with her strong performance.  That year, Plaintiff had generated over $8.4 million in revenue on clients she originated, billed nearly 2,300 hours, and worked over 2,600 hours in total, despite the fact that she was suffering from emotional and physical damage as a consequence of the Firm's mistreatment.  Once again, the Firm failed to

14

increase her compensation to the level she had been ████████████████████

████████████████

██ ████████████████████████████████ would not result in

adequate redress, and she made the decision to take legal action. On February 14, 2017, Plaintiff

– through her attorneys – communicated to General Counsel Obus, advising Proskauer that she

had retained counsel to pursue claims of discrimination and retaliation against the Firm.

58. Shortly after learning that Plaintiff had retained employment counsel, the Firm

threatened to terminate her as a result of her complaining about gender discrimination.

## COUNT I
### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 206(d); 29 U.S.C. § 216(b)

59. Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

60. Proskauer is Plaintiff's "employer," and Plaintiff is an "employee" of Proskauer,

within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq.*, as amended

by the Equal Pay Act of 1963 ("Equal Pay Act").

61. Proskauer has discriminated against Plaintiff in violation of the Equal Pay Act by

paying her less than similarly situated male employees who performed jobs which required equal

skill, effort, and responsibility, and which were performed under similar working conditions.

62. The differential in pay between Plaintiff and similarly situated male partners was

not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was

due to sex.

63. Proskauer caused, attempted to cause, contributed to, or caused the continuation of

wage rate discrimination based on sex in violation of the Equal Pay Act.

15

64.     Proskauer willfully paid Plaintiff less than similarly situated male employees.  The foregoing conduct constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a).  Because Defendant has willfully violated the Equal Pay Act, a three-year statute of limitations applies to such violations pursuant to 29 U.S.C. § 255(a).

65.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial losses, as well as non-economic damages, including emotional and physical distress, humiliation, embarrassment, and mental anguish.

66.     Plaintiff is entitled to all legal and equitable remedies available for violations of the Equal Pay Act, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## COUNT II
### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b) RETALIATION

67.     Plaintiff re-alleges and incorporates each and every allegation contained in this Complaint.

68.     Plaintiff engaged in protected activity under the Equal Pay Act, including complaining to Proskauer about gender discrimination in compensation and informing Proskauer that she had retained counsel to bring claims of gender discrimination in compensation.

69.     Defendant engaged in adverse employment actions against Plaintiff for engaging in protected activity.  Among other things, Proskauer excluded Plaintiff from client matters, declined to allow Plaintiff to pitch or to participate in any employment litigation matter for Firm

16

clients, rebuffed her efforts to assume a greater leadership role at the Firm, tolerated and facilitated an environment where she was targeted for harassment and humiliation by Firm leadership, demeaned and belittled her to her peers and clients, and refused to rectify pay disparities. Recently, Proskauer has threatened to terminate Plaintiff.

70.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial losses, as well as non-economic damages, including emotional and physical distress, humiliation, embarrassment, and mental anguish.

71.     Plaintiff is entitled to all legal and equitable remedies available for violations of the Equal Pay Act, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## COUNT III
### VIOLATION OF THE FEDERAL FAMILY AND MEDICAL LEAVE ACT OF 1993
### 29 U.S.C. § 2601, *et seq.*

72.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

73.     The federal Family and Medical Leave Act of 1993 entitles employees to take leave because the employee is suffering from a serious health condition or in order to care for a child who is suffering from a serious health condition.

74.     Plaintiff took FMLA-qualifying leave related to her own serious health conditions and relating to the care of her child who was suffering from a serious health condition.

75.     Defendant interfered with Plaintiff's ability to take FMLA-protected leave and then discriminated and retaliated against her for taking FMLA-protected leave. Among other things,

Defendant disrupted her client relationships, demeaned her to her peers, impermissibly considered her FMLA-qualifying leave when rendering compensation decisions, and created an environment hostile to the taking of statutorily protected leave. Further, Defendant recently threatened to terminate Plaintiff in retaliation for asserting her claims, which include FMLA claims.

76. Defendant's conduct was not in good faith and was in intentional violation of Plaintiff's FMLA rights.

77. As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial losses, as well as non-economic damages.

78. Because of Defendant's unlawful conduct, Plaintiff is entitled to all legal and equitable remedies available for violations of the FMLA, including an award of back pay, front pay, liquidated damages, and attorneys' fees and costs.

## COUNT IV
### VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### D.C. Code § 2-1401, *et seq.* AS AMENDED
### PAY DISCRIMINATION

79. Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

80. Defendant, an employer within the meaning of the DCHRA, has discriminated against Plaintiff by treating her differently from, and less preferably than, similarly situated males by subjecting her to pay discrimination in violation of the DCHRA.

81. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff entitling her to punitive damages.

82. As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

18

83. Because of Defendant's discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

84. Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

## COUNT V
### VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### D.C. Code §§ 2-1401, *et seq.* AS AMENDED
### RETALIATION

85. Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

86. Defendant, an employer within the meaning of the DCHRA, has discriminated against Plaintiff by retaliating against her for complaining about and opposing her discriminatory treatment, including pay discrimination, in violation of the DCHRA.

87. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff, entitling her to punitive damages.

88. As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

89. Because of Defendant's discrimination and retaliation, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

90. Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT VI
## VIOLATION OF THE DISTRICT OF COLUMBIA
## FAMILY AND MEDICAL LEAVE ACT
### D.C. Code § 32-507

91.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

92.     The D.C. Family and Medical Leave Act ("DCFMLA") entitles employees to take leave because the employee is suffering from a serious health condition or in order to care for a child who is suffering from a serious health condition.

93.     Plaintiff took DCFMLA-qualifying leave related to her own serious health conditions and relating to the care of her child who was suffering from a serious health condition.

94.     Defendant interfered with Plaintiff's ability to take DCFMLA-protected leave and then discriminated and retaliated against her for taking DCFMLA-protected leave.  Among other things, Defendant disrupted her client relationships, demeaned her to her peers and clients, impermissibly considered her FMLA-qualifying leave when rendering compensation decisions, and created an environment hostile to the taking of statutorily protected leave.  Further, Defendant recently threatened to terminate Plaintiff in retaliation for asserting her claims, which include DCFMLA claims.

95.     Defendant's conduct was not in good faith and was in intentional violation of Plaintiff's DCFMLA rights.

96.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial losses, as well as non-economic damages.

97.     Because of Defendant's unlawful conduct, Plaintiff is entitled to all legal and equitable remedies available under D.C. Code § 32-509, including actual damages, statutory liquidated damages, and attorney's fees and costs.

<u>COUNT VII</u>
**VIOLATION OF THE MARYLAND EQUAL PAY FOR EQUAL WORK LAW**
**Md. Labor & Employment Code §§ 3-301 *et seq.***

98.     Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

99.     Defendant Proskauer is an employer within the meaning of Md. Labor & Employment Code § 3-301 and employed Plaintiff in Maryland within the meaning of Md. Labor & Employment Code § 3-101.  Plaintiff is admitted to practice law in Maryland.

100.     Proskauer has discriminated against Plaintiff within the meaning of the Maryland Equal Pay law, Md. Labor & Employment Code § 3-304, by providing her with lower pay than similarly situated male colleagues on the basis of her gender. Plaintiff performed similar duties of the same character and type as her male counterparts.

101.      Plaintiff and similarly situated male partners all performed jobs that required equal skill, effort, and responsibility.

102.     Defendant discriminated against Plaintiff by subjecting her to discriminatory pay in violation of the Equal Pay law.

103.     The differential in pay between Plaintiff and similarly situated male partners was not due to seniority, merit, quantity or quality of production, or a legitimate factor other than sex, but was due to gender.

104.     Further, Defendant discriminated against Plaintiff in violation of the Maryland Equal Pay law by providing less favorable employment opportunities to her based on her sex, within the meaning of Md. Labor & Employment Code § 3-304(a), (b)(1)(ii).

105.     Defendant caused, attempted to cause, contributed to or caused the continuation of pay discrimination and other discrimination based on gender, in violation of the Maryland Equal Pay law.

106.     Defendant knew or reasonably should have known that its conduct violated Md. Labor & Employment Code § 3-304.

107.     As a result of Defendant's conduct as alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to: lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

108.     Because of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the Equal Pay law, including liquidated damages, interest, and other compensation pursuant to Md. Labor & Employment Code § 3-307.

109.     Attorneys' fees should be awarded under Md. Labor & Employment Code § 3-307.

**COUNT VIII**
**VIOLATION OF THE MARYLAND EQUAL PAY FOR EQUAL WORK LAW**
**Md. Labor & Employment Code §§ 3-301 *et seq.***
**RETALIATION**

110.     Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

111.     Defendant Proskauer is an employer within the meaning of Md. Labor & Employment Code § 3-301 and employed Plaintiff within Maryland within the meaning of Md. Labor & Employment Code § 3-101.

112.     Plaintiff engaged in protected activity under the Equal Pay law by complaining to Proskauer about gender discrimination in compensation, including by inquiring about and discussing the reasons for her own wages and the wages of male comparators.

113.    Because of these complaints, Proskauer discriminated against Plaintiff by reassigning and excluding her from client matters in violation of Md. Labor & Employment Code § 3-304.1(a). Proskauer declined to invite Plaintiff to pitch or to participate in any employment litigation matter for the Firm, instead referring numerous employment litigation cases to male partners, also in violation of § 3-304.1(a). Proskauer further discriminated against Plaintiff by facilitating and tolerating an environment where she was targeted for harassment and humiliation by Firm leadership.

114.    Furthermore, Proskauer has recently threatened to terminate Plaintiff in violation of § 3-304.1(a).

115.    Defendant knew or reasonably should have known that its conduct violated Md. Labor & Employment Code § 3-304.1.

116.    Under Md. Labor & Employment Code § 3-307, Plaintiff is entitled to back pay, liquidated damages, and other relief.

117.    Attorneys' fees should be awarded under § 3-307.

## COUNT IX
## BREACH OF FIDUCIARY DUTY

118.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

119.    Proskauer owes a fiduciary duty to Plaintiff based on her status as a member of the Firm's partnership.

120.    Proskauer has a duty to deal fairly, honestly, and openly with Plaintiff. Without limiting the generality of the foregoing, Proskauer has a duty not to discriminate or retaliate against Plaintiff.

121.    Proskauer has breached its fiduciary duty to Plaintiff by failing treat her equitably and instead discriminating and retaliating against Plaintiff. Without limiting the generality of the

foregoing, Proskauer has violated its duty to Plaintiff by impermissibly discriminating against her based on her gender, caregiver status, and taking of qualifying leaves and by baldly threatening to fire her in retaliation for asserting her good faith claims of discrimination and retaliation.

122.    Plaintiff suffered substantial damages as a result of the Proskauer's breach of its fiduciary duties.

**COUNT X**
**BREACH OF CONTRACT/BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

123.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

124.    Every contractual arrangement inherently carries with it a covenant of good faith and fair dealing.

125.    Encompassed within Defendant's obligation to act in good faith were any promises which a reasonable person in Plaintiff's shoes would be justified in understanding were included. The covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Even where a contract contemplates the exercise of discretion by one party, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.  Rather, the party must exercise its discretion reasonably and in good faith.

126.    Under the Firm's Partnership Agreement, Proskauer's Executive Committee determines the allocation of profits to the Firm's partners.  It is an implied term of the Proskauer Partnership Agreement that the Executive Committee will not make profit allocation decisions in a manner that is discriminatory or retaliatory.

127.    Further, it is an implicit and material part of the Partnership Agreement that Proskauer and its Executive Committee will not otherwise discriminate or retaliate against partners, including on the basis of gender.

128.    Defendant breached the covenant of good faith and fair dealing by arbitrarily discriminating and retaliating against Plaintiff, falsely promising to increase her compensation, demeaning and belittling her to her peers, and maliciously interfering with her client relationships. Further, Defendant has threatened to terminate Plaintiff for asserting good faith discrimination and retaliation claims.

129.    Plaintiff has been damaged by Proskauer's breach of its contractual obligations, including the covenant of good faith and fair dealing, in an amount to be determined at trial.

## COUNT XI
## FRAUDULENT MISREPRESENTATION

130.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

131.    Proskauer repeatedly made false statements to Plaintiff that it would raise her compensation to specific levels if she continued to demonstrate similar performance and results.

132.    At the time Proskauer made these statements, Proskauer knew it had no intention to honor them but merely wished to induce Plaintiff to join the Firm and then to placate Plaintiff and string her along.

133.    Proskauer intended to deceive Plaintiff into continuing to work for the Firm at her present compensation, while generating millions of dollars in revenues.

134.    Plaintiff justifiably relied on Proskauer's false representations that increased compensation was coming to her. She remained at Proskauer and continued to work extraordinarily long hours and bring in large revenues for the Firm.

135.    Plaintiff has been damaged by her reliance on Proskauer's representations. She has never been paid the compensation that she was promised when she joined the Firm. As a result, she is entitled to damages to be determined at trial.

## COUNT XII
## UNJUST ENRICHMENT

136.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

137.    Under the common law doctrine of unjust enrichment, Proskauer, by its policies and actions, benefited from, and increased its profits by failing to pay Plaintiff all compensation due to her as a Partner.

138.    Proskauer accepted and received the benefits of the work performed by Plaintiff, the business and revenues she generated for the Firm, and her annual capital contributions and was unjustly enriched. It is inequitable and unjust for Proskauer to reap the benefits of Plaintiff's work and financial contribution without proper remuneration.

139.    Plaintiff is entitled to relief for this unjust enrichment in an amount equal to the benefits and contribution unjustly retained by Proskauer, plus interest on these amounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.    Award Plaintiff all back pay, front pay, lost benefits, liquidated damages, compensatory damages, punitive damages, and other damages available under law;

B.    Award Plaintiff all pre-judgment interest and post-judgment interest available under law;

C.    Award Plaintiff all of her litigation costs and expenses, including reasonable attorneys' fees;

D.    Enter judgment in favor of Plaintiff in excess of $50 million; and

E.    Award other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

The Plaintiff demands trial by jury of all issues triable of right to a jury.

Dated: May 12, 2017                          **SANFORD HEISLER SHARP, LLP**

By:    _____
David Sanford, D.C. Bar No. 457933
Vince McKnight, D.C. Bar No. 293811
Altomease Kennedy, D.C. Bar No. 229237
Kate Mueting, D.C. Bar No. 988177
**SANFORD HEISLER SHARP, LLP**
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009
Telephone: (202) 499-5201
Facsimile: (202) 499-5199
dsanford@sanfordheisler.com

Andrew Melzer* (AM-7649)
Alexandra Harwin, D.C. Bar No. 1003018
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5655
Facsimile: (646) 402-5651
jheisler@sanfordheisler.com
aharwin@sanfordheisler.com

Kevin Sharp, TN Bar No. 016287
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020
ksharp@sanfordheisler.com

*_pro hac vice_ application forthcoming

EXHIBIT  G

**Local Civil Rule 83.9. Alternative Dispute Resolution (Southern District Only) [formerly Local Civil Rule 83.12]**

**(a) Alternative Dispute Resolution Options:**
The U.S. District Court for the Southern District of New York provides litigants with opportunities to discuss settlement through judicial settlement conferences and mediation.

(b) **Definition of Mediation** In mediation, parties and counsel meet, sometimes collectively and sometimes individually, with a neutral third party (the mediator) who has been trained to facilitate confidential settlement discussions. The parties articulate their respective positions and interests and generate options for a mutually agreeable resolution to the dispute. The mediator assists the parties in reaching their own negotiated settlement by defining the issues, probing and assessing the strengths and weaknesses of each party's legal positions, and identifying areas of agreement and disagreement. The main benefits of mediation are that it can result in an expeditious and less costly resolution of the litigation, and can produce creative solutions to complex disputes often unavailable in traditional litigation.

(c) **Administration of the Mediation Program**
(1) The Mediation Supervisor, appointed by the Clerk of the Court, shall administer the Court's mediation program. The Chief Judge shall appoint one or more District Judges or Magistrate Judges to oversee the program.
(2) The Mediation Supervisor, in consultation with other Court personnel, shall ensure that information about the Court's mediation program is available on the Court's website which will be updated as needed.
(3) The mediation program shall be governed by the "Procedures of the Mediation Program for the Southern District of New York," which sets forth specific and more detailed information regarding the mediation program, and which is available on the Court's official website (www.nysd.uscourts.gov) or from the Mediation Office.
(4) In no event is the scheduling of mediation to interfere with any scheduling order of the Court.

(d) **Consideration of Alternative Dispute Resolution** In all civil cases, including those eligible for mediation pursuant to paragraph (e), each party shall consider the use of mediation or a judicial settlement conference and shall report to the assigned Judge at the initial Rule 16(b) case management conference, or subsequently, whether the party believes mediation or a judicial settlement conference may facilitate the resolution of the lawsuit. Judges are encouraged to note the availability of the mediation program and/or a judicial settlement conference before, at, or after the initial Rule 16(b) case management conference.

(e) **Mediation Program Eligibility**

(1) All civil cases other than social security, habeas corpus, and tax cases are eligible for mediation, whether assigned to Manhattan or White Plains.

(2) The Board of Judges may, by Administrative Order, direct that certain specified categories of cases shall automatically be submitted to the mediation program. The assigned District Judge or Magistrate Judge may issue a written order exempting a particular case with or without the request of the parties.

(3) For all other cases, the assigned District Judge or Magistrate Judge may determine that a case is appropriate for mediation and may order that case to mediation, with or without the consent of the parties, before, at, or after the initial Rule 16(b) case management conference. Alternatively, the parties should notify the assigned Judge at any time of their desire to mediate.

(f) **Judicial Settlement Conferences**

Judicial settlement conferences may be ordered by District Judges or Magistrate Judges with or without the request or consent of the parties.

**MARCH 2015 COMMITTEE NOTE**

**Local Civil Rule 83.9 has been revised to make clear that judicial settlement conferences are an available form of alternative dispute resolution.**

**COMMITTEE NOTE**

Local Civil Rule 83.9 has been revised to refer to the "Procedures of the Mediation Program for the Southern District of New York." This revision is intended to increase flexibility in the administration of the Mediation Program.



**United States District Court
Southern District Of New York**

Procedures of the Mediation Program
(12/9/2013)

These Procedures are promulgated for the management of the Mediation Program of the Southern District of New York. They shall not be deemed to vest any rights in litigants or their attorneys and shall be subject to such amendments from time to time as shall be approved by the Court.

1. **Confidentiality**

   a. Consistent with Standard V of the Model Standards of Conduct for Mediators[1], any communications made during the mediation process shall be confidential except as to the provisions indicated in this section. The mediator shall not disclose any information about the mediation to anyone except for Mediation Office staff. Administrative aspects of the mediation process, including the assignment of a mediator, scheduling and holding of sessions, and a final report that the case has concluded or not concluded through mediation, or that parties failed to participate, are not confidential and will appear on the docket of the case.

   b. The parties may not disclose discussions with the mediator unless all parties agree, because it is required by law, or because otherwise confidential communications are relevant to a complaint against a mediator or the Mediation Program arising out of the mediation. The parties may agree to disclose information provided or obtained during mediation to the Court while engaged in further settlement negotiations with a District or Magistrate Judge. The parties may disclose the terms of settlement if either party seeks to enforce those terms.

   c. The mediation process shall be treated as a compromise negotiation for purposes of Rule 408 of the Federal Rules of Evidence and state rules of evidence. Documents and information otherwise discoverable under the Federal Rules of Civil Procedure shall not

---

[1] <u>Model Standards of Conduct for Mediators,</u> promulgated by the American Bar Association, American Arbitration Association, and the Association for Conflict Resolution (August 2005).

be shielded from discovery merely because they are submitted or referred to in the mediation.

    d.  The mediator shall not be called as a witness or deponent in any proceeding related to the dispute in which the mediator served, or be compelled to produce documents that the mediator received or prepared for mediation.

**2. Assignment of the Mediator**

    a.  Cases enter the Mediation Program either through a process of automatic referral or by referral of a specific case from the assigned judge. In both instances the Mediation Office is notified through a Mediation Referral Order. The mediators on the panel for the Southern District of New York are divided into sub-groups based on areas of subject matter expertise. Once the Mediation Office receives the Mediation Referral Order, a mediator is selected at random from the sub-group of mediators who have the subject matter expertise that is relevant to the case. If no such mediator is available, the Mediation Office will select a mediator at random from a sub-group of mediators with expertise in a related subject matter. The mediator selected must respond as quickly as possible, but no later than three (3) business days, to accept the assignment, to request an extension of time to clear conflicts from the Mediation Supervisor, or to decline. Upon notice that the selected mediator has declined, or after three (3) business days without notice of acceptance or a request for an extension of time, another mediator will be selected. Once a mediator has accepted the case the Mediation Supervisor shall notify the mediator and the parties of the assignment. The assignment of a case to a mediator should take place within ten (10) business days of the receipt by the Mediation Supervisor of the Mediation Referral Order.

    b.  Mediators are provided with a free PACER account to access pleadings and other relevant information that may be needed when considering whether to accept a case. At the mediator's request, the Mediation Office will forward documents and information to the mediator directly.

**3. Disqualification**

    a.  Before accepting an appointment as a mediator, and at all times after accepting such an appointment, a mediator shall disclose to the Mediation Office, in the first instance, any circumstance that could give rise to a reasonable apprehension of a lack of impartiality such as those circumstances enumerated under 28 U.S.C. § 455.



**United States District Court**
**Southern District Of New York**

**Mediation Confidentiality Agreement**

Parties, counsel for the Parties, and the mediator agree as follows:

1. Any communications made during the mediation process shall be confidential except as to the provisions indicated in this agreement. The mediator shall not disclose any information about the mediation to anyone except for Mediation Office staff. Administrative aspects of the mediation process, including the assignment of a mediator, scheduling and holding of sessions, and a final report that the case has concluded or not concluded through mediation, or that parties failed to participate, are not confidential and will appear on the docket of the case.

2. The parties may not disclose discussions with the mediator unless all parties agree, because it is required by law, or because otherwise confidential communications are relevant to a complaint against a mediator or the Mediation Program arising out of the mediation. The parties may agree to disclose information provided or obtained during mediation to the Court while engaged in further settlement negotiations with a District or Magistrate Judge. The parties may disclose the terms of settlement if either party seeks to enforce those terms.

3. The mediation process shall be treated as a compromise negotiation for purposes of Rule 408 of the Federal Rules of Evidence and state rules of evidence. Documents and information otherwise discoverable under the Federal Rules of Civil Procedure shall not be shielded from discovery merely because they are submitted or referred to in the mediation.

4. The mediator shall not be called as a witness or deponent in any proceeding related to the dispute in which the mediator served, or be compelled to produce documents that the mediator received or prepared for mediation.

The undersigned have read and agree to comply with this agreement.

Dated:

Plaintiff(s): _____     Defendant(s): _____

Attorney(s) for Plaintiff(s):_____     Attorney(s) for Defendant(s):_____

Mediator:_____     Observer(s):_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SUBPOENAS ISSUED TO JAMS, INC. AND CAROL A. WITTENBERG, <br><br> NON-PARTY RESPONDENTS <br><br> JANE DOE, <br><br>    PLAINTIFF, <br><br> v. <br><br> PROSKAUER ROSE LLP, <br><br>    DEFENDANT. | Miscellaneous Docket No. 1:17-mc-00207-P1 <br><br> **Case No. 1:17-cv-00901-ABJ** <br> *Pending in the U.S. District Court for the District of Columbia* |

**PLAINTIFF'S OPPOSITION TO MOTION TO QUASH SUBPOENAS SERVED ON NON-PARTIES JAMS, INC. AND NEUTRAL MEDIATOR CAROL A. WITTENBERG**

# TABLE OF CONTENTS

Introduction and Summary ....................................................................................1

Factual and Procedural Background ......................................................................3

Argument ..............................................................................................................4

I.   The Court Should Transfer JAMS' Motion to the D.D.C. Pursuant to Rule 45(f) ...........4

II.   Alternatively, the Court Should Deny JAMS' Motion on the Merits:
Independent Unlawful Acts Committed During Settlement Proceedings,
Including Mediations, Are Not Confidential or Shielded from Disclosure .....................7

A.   Protections Against Retaliation are a Central and Essential Part of any Statutory
Employment Scheme, Including the Statutes at Issue Here .........................................7

B.   Proskauer's Official Directive to Terminate Plaintiff for Pursuing Her Complaints
and Claims of Discrimination Constitutes an Unlawful Retaliatory Act ....................9

C.   Rules and Provisions Protecting the Confidentiality of Settlement Proceedings,
Including Mediations, Do Not Shield Independent Illegal or Tortious Acts ............11

1.   The Parties' Mediation Agreement Does Not Provide a Distinct
Basis to Quash ..............................................................................................13

2.   The Policy in Favor of Confidential Mediation Is Outweighed Here
By a Strong Public Policy Demanding that Proskauer Be Held
Accountable for its Retaliatory Threats........................................................14

3.   Neither the Federal Rules of Evidence Nor This District's
Court-Sponsored Mediation Program Present a Bar to Disclosure
Under the Circumstances..............................................................................16

D.   Plaintiff's Subpoena is Not a Speculative "Fishing Expedition" But a Targeted
Request for Highly Relevant and Admissible Information .......................................17

III.   In the Alternative to Compelling Production, the Court May Review the Mediator's
Notes In Camera or Direct Continued Preservation Pending Further Developments......18

IV.   The Court Should Not Issue Sanctions Against Plaintiff .................................................18

Conclusion ..........................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Sch. Bd. of Hanover Cty.*, No 3:05CV310,
   2008 WL 5070454 (E.D. Va. Nov. 26, 2008) ........................................................ 10
*Ali v. Dist. of Columbia Govt.*, 810 F. Supp.2d 78 (D.D.C. 2011) ............................... 9
*Alvarez v. 894 Pizza Corp.*, No. 14-CV-6011,
   2016 U.S. Dist. LEXIS 102145 (E.D.N.Y. Aug. 2, 2016) ...................................... 7
*Application of Behar*, 779 F. Supp. 273 (S.D.N.Y. 1991) ........................................... 17
*Bernard v. Galen Group Inc.*, 901 F. Supp. 778 (S.D.N.Y. 1995) ...................... 14, 20
*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) ........... 8, 9
*Cadence Pharmas., Inc. v. Multisorb Techs., Inc.*, No. 16MC22G,
   2016 WL 4267567 (W.D.N.Y. Aug. 15, 2016) ................................................... 5, 6
*Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272  (1987) ................................... 7
*Carney v. American University*, 151 F.3d 1090 (D.C. Cir. 1998) .............................. 11
*Carr v. Health Ins. Plan of Greater N.Y.*, 99 Civ. 3706,
   2001 WL 563712 (S.D.N.Y. May 23, 2001) ....................................................... 11
*Cerni v. J.P. Morgan Secs., LLC*, 208 F. Supp.3d 533 (S.D.N.Y. 2016) ............. 11, 14
*Chambers v. Capital Cities/ABC*, 159 F.R.D. 441 (S.D.N.Y. 1995) .......................... 12
*Complex Sys., Inc. v. ABN Amro Bank, N.V.*, No. 08 Civ. 7497,
   2014 WL 1055263 (S.D.N.Y. Mar. 13, 2014) .................................................... 15
*Corning Glass Works v Brennan*, 417 US 188 (1974) ................................................. 7
*Cusumano v. Microsoft Corp.*, 162 F.3d 707 (1st Cir. 1998) ..................................... 20
*Davis v. O'Melveny & Myers*, 485 F.3d 1066 (9th Cir. 2007) ................................... 12
*Duck v. U.S. SEC*, 317 F.R.D. 321, (D.D.C. 2016) ................................................... 5, 7
*E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738 (1st Cir. 1996) ...................................... 12
*EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085 (5th Cir. 1987) ...... 12
*Electronic Privacy Ctr. v. U.S. Dept. of Homeland Security*,
   999 F. Supp.2d 61 (D.D.C. 2013) ...................................................................... 16
*F.D.I.C. v. Axis Reinsurance Co.*, No. 13 Misc. 380,
   2014 WL 260586 (S.D.N.Y. Jan. 23, 2014) ...................................................... 4, 5
*Flynn v. FCA US LLC*, 216 F. Supp.3d 44 (D.D.C. 2016) ..................................... 5, 6
*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, Civ. No 14-958,
   2017 WL 664016 (D.D.C. Feb. 17, 2017) .......................................................... 17
*Franks v. Bowman Transp. Co.*, 424 U.S. (1976) ....................................................... 7
*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) .................................... 7
*Goldberg v. Amgen, Inc.*, 123 F. Supp.3d 9, 23 (D.D.C. 2015) ................................. 19
*Heritage Global Partners, LP v. Prevezon Holdings, Ltd.*, No. 14-mc-318,
   2015 WL 728463 (S.D.N.Y. Feb. 19, 2015) ...................................................... 19
*Hernandez v. City Wide Insulation of Madison, Inc.*, 508 F. Supp.2d 682 (E.D. Wisc. 2007) .... 10
*Hoffman v. Sbarro, Inc.*, No. 97 Civ. 4484, 1997 WL 736703 (S.D.N.Y. Nov. 26, 1997) ......... 12
*In re Application to Quash Subpoena to Nat'l Broadcasting Co., Inc.*,
   79 F.3d 346 (2d Cir. 1996) ................................................................................. 17
*In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002) .......... 13
*In re Subpoena Issued to CFTC*, 370 F. Supp.2d 201 (D.D.C. 2005) ........................ 16
*In re Teligent, Inc.*, 640 F.3d 53 (2d Cir. 2011) ................................................... 14, 15

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, No. 75 Civ. 5388,
  1985 WL 315 (S.D.N.Y. Feb. 28, 1985 ................................................................ 17
*Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167 (2005) ........................................ 8
*Lawrence v. Lew*, 156 F. Supp.3d 149 (D.D.C. 2016) ............................................ 9
*Matter of Am. Broadcasting Cos.*, 189 Misc.2d 805 (Sup. Ct. N.Y. Cty. 2001) ........................... 17
*McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352 (1995) ............................ 7
*Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288 (1960).............................. 8
*Newman & Assocs. v. J.K. Harris & Co., LLC*, No. 04Civ.9264,
  2005 WL 3610140 (S.D.N.Y. Dec. 15, 2005) .................................................. 16
*Pace v. Paris Maint. Co.*, 7 Fed. Appx. 94 (2d Cir. 2001) ...................................... 11
*Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp.3d 1234 (D. Or. 2014)....................... 10
*Proulx v. Citibank, N.A.*, 659 F. Supp. 972 (S.D.N.Y. 1987).................................... 8
*Rattigan v. Holder*, 604 F. Supp. 2d 33 (D.D.C. 2009),
  *aff'd in relevant part*, 645 F.3d 975 (D.C. Cir. 2011) ........................................ 9
*Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006) ............................................ 9
*Ross v. U.S. Capitol Police*, 195 F. Supp.3d 180 (D.D.C. 2016)............................... 9
*Samadi v. Quality Furniture LLC*, No. CV 12-593,
  2012 WL 12870242 (D. Ariz. July 23, 2012) ........................................... *passim*
*Simuro v. Shedd*, No. 2:13-cv-30, 2014 WL 5776149 (D. Vt. Nov. 6, 2014) .............................. 19
*Sky Medical Supply Support Claim Servs., Inc.*, No. CV 12-6383,
  2017 WL 1133349 (E.D.N.Y. Mar. 24, 2017) .................................................. 17
*Small v. Nobel Biocare, USA, LLC*, 808 F. Supp.2d 584 (S.D.N.Y. 2011).............................. 16
*Sparks v. Seltzer*, No. 05-CV-1061, 2006 WL 2358157 (E.D.N.Y. Aug. 14, 2006) ................... 12
*Sullivan v, Little Hunting Park Inc.*, 396 U.S. 229 (1969) ...................................... 8
*Town of Newton v. Rumery*, 480 U.S. 386 (1987) ................................................ 12
*U.S. v. One Parcel of Property*, 930 F.2d 139 (2d Cir. 1991) ................................ 16
*U.S. v. Warshak*, No. 1:06-CR-111, 2007 WL 4410237 (S.D. Ohio Dec. 13, 2007) ............. 13
*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) .......................................... 20
*Wultz v. Bank of China*, 304 F.R.D. 38, 46 (D.D.C. 2014).......................................... 5
*X Corp. v. John Doe*, 805 F. Supp. 1298 (E.D. Va. 1992)......................................... 12
*XY, LLC v. Trans Ova Genetics, L.C.*, 307 F.R.D. 10 (D.D.C. 2014) ....................... 4-5

**Statutes**

28 U.S.C. § 652.............................................................................................. 15
29 U.S.C. § 206(d), Equal Pay Act of 1963............................................... 7, 8, 19
29 U.S.C. § 215…………………………………………………………………...…10
42 U.S.C. §§ 2000e, *et seq.*, Title VII of the Civil Rights Act of 1964 (as amended) ........ 6, 7, 17

**Rules**

Fed. R. Civ. P. 45 ...................................................................................... *passim*
Fed. R. Evid. 408. ...................................................................................... *passim*
Fed. R. Evid. 501. ........................................................................................... 16
Fed. R. Evid. 612. ...................................................................................... 2, 18

**A94**

**Other Authorities**

Advisory Committee Notes to the 2013 Amendments to Rule 45............................................. 4, 5

EEOC Compl. Man. (BNA) § 614.1(f)(2), at 614:0007 (Apr. 1988) ............................................ 8

## INTRODUCTION AND SUMMARY

Non-party JAMS'[1] Motion to Quash Plaintiff's Rule 45 subpoena rests on the truism that mediation communications are ordinarily confidential. But this is not the ordinary case and represents the exception to the rule.

In this case, Defendant abused the mediation process by employing it as cover to commit an unlawful act: threatening to fire Plaintiff for pursuing her claims. Proskauer chided Plaintiff that her complaints had upset Firm leadership and gave notice that she would be terminated as a result: "**You need to understand… You are going to be terminated.  Your complaint upset a lot of people.**" This type of retaliation strikes at the root of anti-discrimination law and imperils its protections. Credible threats such as these chill victims of discrimination – and their advocates – from coming forward with complaints and seeking redress for discriminatory practices.

While the public policy reasons for fostering open and robust settlement discussions are significant, they are surmounted here. Plaintiff seeks not to expose the parties' settlement offers and demands or the basis behind them – including any assessment of Plaintiff's underlying claims – but merely to elicit critical evidence of Proskauer's illegal retaliatory conduct.  The law is clear that neither FRE 408 nor any associated privileges can be used to insulate independent unlawful acts that transpire during the course of settlement discussions. Indeed, a rule allowing mediations to be used as fertile ground (and safe harbor) for retaliatory threats and similar illegal conduct would not safeguard but undermine the integrity of the process. Parties would lose confidence in this important mechanism for resolving claims and be less likely to resort to mediation.

Significantly, JAMS seeks not only to shield itself from disclosure but to silence Plaintiff from testifying regarding Proskauer's conduct at the mediation and to sanction her for prosecuting

---

[1] Plaintiff uses the term "JAMS" to refer to Non-Party Respondents JAMS, Inc and Mediator Carol A. Wittenberg, collectively.

a retaliation claim arising out of that conduct. The result would be that Proskauer could escape all liability for its acts. Mediation rules and agreements are not exculpatory provisions that provide license to commit illegal actions with impunity. At no point did Plaintiff anticipate the unforeseeable: that Proskauer would use the mediation as a cloak for a brazen act of retaliation.

Hence, the Court should enforce the subpoena and deny JAMS' Motion to Quash. The mediator's notes and testimony are likely the best and most reliable evidence – apart from Plaintiff's own testimony and records – of Proskauer's retaliatory conduct and will aid the trial court in resolving this matter on the merits. Notably, while accusing Plaintiff of speculating and fishing, JAMS does not actually dispute Plaintiff's account of what occurred at the mediation or deny that it is memorialized in the mediator's notes.

At minimum, even if the Court does not direct production at this time, it should instruct JAMS to continue to preserve the notes in anticipation of the mediator's deposition and testimony on the subject of Proskauer's retaliatory threats. It is foreseeable that the mediator may use the notes as a memory aid; without her contemporaneous notes, she may well be unable to testify with an accurate recollection of events. If the notes are used for this purpose, Plaintiff will be entitled to a copy under FRE 612. In addition, if the mediator denies Proskauer's conduct or is unable to recall on the record, Plaintiff may be able to impeach the mediator with the notes.

Finally, under Rule 45, this Court lacks authority to sanction Plaintiff for pursuing a retaliation claim arising out of Defendant's unlawful acts during the mediation. The subpoena imposes no "undue burden or expense" on JAMS (Rule 45(d)(1)); compliance would simply involve turning over no more than a handful of pages of written notes that JAMS has committed to preserving. Nor has Plaintiff refused to obey an order relating to the subpoena. Rule 45(g).[2]

---

[2] Pursuant to Fed. R. Civ. P. 45(f), Plaintiff requests that JAMS' motion to quash be transferred to the D.D.C., the issuing court, where the underlying action is pending. Having addressed Plaintiff's preservation

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Jane Doe is a partner at Proskauer. After experiencing discrimination and retaliation in the workplace, she repeatedly complained to Proskauer and ultimately notified the Firm that she had retained counsel to represent her on her discrimination and retaliation claims. The parties agreed to a pre-suit mediation at JAMS before Mediator Carol A. Wittenberg. Plaintiff understood and believed that both parties approached the mediation in good faith, to attempt to work out a final resolution of Plaintiff's claims. (Doe Decl. ¶ 4)

On March 23, 2017, the parties engaged in mediation before Ms. Wittenberg, who took contemporaneous notes of all proceedings. In a joint session, Proskauer directly threatened to fire Plaintiff because of her discrimination claims. A designated Proskauer representative admonished Doe and notified her: "You are going to be terminated. Your complaint upset a lot of people." (Doe Decl. ¶ 5; Complaint, JAMS Mot. Ex. F ¶ 9) Proskauer's decree is, by itself, an unlawful act and forms a key basis for Plaintiff's retaliation claims. (Compl. ¶¶ 9, 58, 69, 75, 94, 114, 121)

The parties participated in a second day of mediation on May 12, 2017. At the conclusion of the mediation, Mediator Wittenberg acknowledged that she had taken detailed handwritten notes of all mediation proceedings but indicated that those notes would soon be destroyed pursuant to official JAMS policy. Mediator Wittenberg further confirmed that Proskauer had in fact made a direct retaliatory threat on March 23. (Sanford Decl. ¶ 5)

Shortly after the conclusion of the mediation, Plaintiff filed her Complaint in the D.D.C., where she worked for Proskauer at all relevant times. (Complaint, JAMS Mot. Ex. F) On May 18,

---

motion regarding the documents in question here, the presiding judge is already closely familiar with the relevant issues. Further, the issues presented by JAMS' motion go well beyond a typical third-party subpoena; whether Plaintiff is entitled to develop and present evidence of her retaliation claim is inextricably tied up with the merits of the case – whether a retaliation claim based on conduct during a mediation is viable – and should be the province of the presiding D.D.C. court. This Court should thus defer to the D.D.C. for efficiency reasons and as a matter of judicial comity.

3

2017, Plaintiff made an emergency motion to preserve the mediator's notes, which were slated for imminent destruction. (JAMS Mot. Ex. E) The D.D.C. court granted a preservation Order the same day, reserving the question of whether the material "will ultimately be found to be relevant or admissible." (Ex. A to Sanford Decl., Minute Order) The next day, May 19, 2017, JAMS agreed to preserve the documents voluntarily (Sanford Decl. Ex. B); hence, the court directed Plaintiff to brief the issue of whether the Minute Order was moot, and ultimately lifted the Order as moot. The D.D.C. court expected to revisit the matter of discovery into the mediator's notes.

Concurrently with the preservation motion, Plaintiff served a subpoena *duces tecum* on JAMS for the production of the mediator's notes. (JAMS Motion Ex. A) JAMS now seeks to quash the subpoena on confidentiality grounds and to sanction Plaintiff for her temerity. This Court should either transfer the Motion to the D.D.C. court or deny it in all respects.

ARGUMENT

I.    **The Court Should Transfer JAMS' Motion to the D.D.C. Pursuant to Rule 45(f)**

In "exceptional circumstances," a court should transfer a motion to quash a Rule 45 subpoena to the issuing court, where the underlying action is pending.  Fed. R. Civ. P. 45(f). The revised Rule "and the comments thereto, clearly permit and encourage such [transfers]." *F.D.I.C. v. Axis Reinsurance Co.*, No. 13 Misc. 380, 2014 WL 260586, at *3 (S.D.N.Y. Jan. 23, 2014). Transfer is appropriate here for the precise reasons set forth in the Advisory Committee Notes to the 2013 Amendments to Rule 45: "to avoid disrupting the issuing court's management of the underlying litigation..." Moreover, Non-Party Respondent JAMS is a nationwide organization which has hired legal counsel based in Washington, D.C. The general default of Rule 45 – that motions to quash be heard in the jurisdiction where compliance is required – is meant to "avoid burdens on local nonparties subject to subpoenas." *Id*.; *see also*, *e.g.*, *XY, LLC v. Trans Ova*

4

*Genetics, L.C.*, 307 F.R.D. 10, 12 (D.D.C. 2014) (where third-party respondent is a national corporation, "the presumption in favor of local resolution carrie[s] less force"). There is *no* burden on JAMS from litigating the Motion to Quash in the D.D.C. rather than the S.D.N.Y.

Here, transfer of the Motion to the D.D.C. is compelled by "considerations of judicial efficiency and comity." *F.D.I.C.*, 2014 WL 260586, at *2; *see also Wultz v. Bank of China*, 304 F.R.D. 38, 46 (D.D.C. 2014)("the interests of judicial economy and avoiding inconsistent results"). The D.D.C. has already issued an order directing the preservation of the mediator's notes. In that order, the D.D.C. court indicated that it would revisit the question of whether the material is "relevant or admissible" (Sanford Decl. Ex. A), indicating that it anticipated ruling on the confidentiality issues raised by JAMS. *Cf. Wultz*, 304 F.R.D. at 47 (relying on the fact that the issuing court "has in fact taken an interest and active role in resolving any potential state secrets claim"). The D.D.C. court is thus faced with questions such as whether a retaliation claim premised on acts occurring during a mediation is viable as well as the appropriate scope of discovery on that claim. This Court should not "hamstring" or usurp the D.D.C. court's ability to rule on these issues and to "delineate the parameters of discovery" in the action. *F.D.I.C.*, 2014 WL 260586, at *2. The D.D.C. court is poised to address Defendants' dispositive motion(s) touching on the same issues, creating a risk of "inconsistent decisions"; this Court should not preempt the deciding court. *See Cadence Pharmas., Inc. v. Multisorb Techs., Inc.*, No. 16MC22G, 2016 WL 4267567, at *5 (W.D.N.Y. Aug. 15, 2016); *Duck v. U.S. SEC*, 317 F.R.D. 321, 324-25 (D.D.C. 2016).

The issues involved in third-party discovery on JAMS are particularly well-suited to resolution by the D.D.C. Courts have observed that the issuing court should generally address relevance questions because a relevance determination "can require the court to delve into the intricacies of the underlying dispute." *See Flynn v. FCA US LLC*, 216 F. Supp.3d 44, 47 (D.D.C.

2016)(holding that "the centrality of the relevance issue to resolving the motion to quash strongly weighs in favor of transferring the motion to the issuing court"). Likewise, the issuing court is much better positioned to address the question of whether Plaintiff's need for the evidence under subpoena – in light of other available evidence and discovery – overcomes any potential privileges or confidentiality interests asserted by JAMS. *Cf. id.* at 47-48 (issuing court better positioned to address duplication argument and confidentiality concerns).

Simply put, JAMS' Motion to Quash goes well beyond the question of whether a single subpoena is unduly burdensome to a third party, striking at the very factual and legal heart and foundation of Plaintiff's retaliation claim. Adjudicating the Motion may require a nuanced balancing analysis that considers the larger scope of the action. Accordingly, the D.D.C. is the only sensible and appropriate venue for the resolution of the Motion.

In contrast, the "prime concern" behind Rule 45(f), the burden on JAMS from litigating its Motion in the D.D.C., is minimal at best.  JAMS is an international organization with locations in both New York and Washington, D.C. The D.C. office is no minor outpost; according to JAMS' website, JAMS employs 32 neutrals in D.C.  The documents in question consist only of a handful of pages of notes and likely have already been copied and transmitted to JAMS' D.C.-based counsel, William E. Wallace of the Capital Legal Group. Finally, JAMS has retained said D.C.-based counsel – who is equally, if not more, prepared to litigate this matter in the D.D.C. Thus, it would not serve the purposes of the Rule to adjudicate the Motion in this forum.  *Cf. Cadence Pharmas.*, 2016 WL 4267567, at *4, 6.  Accordingly, the interests of efficiency and comity strongly outweigh JAMS' interests "in obtaining local resolution of the [M]otion." *See id.*; *see also, e.g., Flynn*, 216 F. Supp.3d at 48-49 (litigating subpoena even "halfway across the country" would present "minimal, if any," burden on an organization with national reach and sophisticated

counsel); *Duck*, 317 F.R.D. at 326 (circumstances in favor of transfer outweighed "minimal burden" on SEC from litigating subpoena in issuing court).

## II.   Alternatively, the Court Should Deny JAMS' Motion on the Merits: Independent Unlawful Acts Committed During Settlement Proceedings, Including Mediations, Are Not Confidential or Shielded from Disclosure

### A.   Protections Against Retaliation are a Central and Essential Part of any Statutory Employment Scheme, Including the Statutes at Issue Here

The anti-discrimination laws invoked in this suit – e.g. Title VII and the Equal Pay Act (EPA) – serve broad remedial purposes of promoting equal employment.  *See, e.g.*, *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 288 (1987)("The purpose of Title VII is to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of... employees over other employees.")(citation omitted); *Corning Glass Works v Brennan*, 417 U.S. 188, 208 (1974)("The [EPA] is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve.").[3]

It is axiomatic that these statutes cannot achieve their purpose – eradicating employment discrimination in all its forms and vestiges – unless victims of discrimination are willing to come forward. *Burlington N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 67 (2006)("Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses."); *Alvarez v. 894 Pizza Corp.*, No. 14-CV-6011, 2016 U.S. Dist. LEXIS 102145, at *5 (E.D.N.Y. Aug. 2, 2016)("In enacting the FLSA, Congress 'chose to rely on information and

---

[3]*See also, e.g., Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286-87 (1998)(Title VII: (i) "aims broadly to eradicate discrimination throughout the economy" and (ii) seeks to "make persons whole for injuries suffered through past discrimination.")(citation omitted); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976)("[I]n enacting Title VII… Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin, and ordained that its policy of outlawing such discrimination should have the highest priority")(citations omitted); *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 358 (1995) ("Congress designed the remedial measures in [Title VII] to serve as a spur or catalyst to cause employers to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of discrimination.")(citation omitted).

complaints received from employees seeking to vindicate rights claimed to have been denied. Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances.'")(quoting *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)); *Proulx v. Citibank, N.A.*, 659 F. Supp. 972, 978 (S.D.N.Y. 1987)("enforcement of Title VII rights is necessarily dependent on individual complaints")(citation omitted).

Thus, in *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 180 (2005), the Supreme Court read a private right of action for retaliation into Title IX; as the Court held, the act's objectives:

> would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation. If [institutions] were permitted to retaliate freely, individuals who witness discrimination would be loath to report it, and all manner of Title IX violations might go unremedied as a result. *See* [*Sullivan v, Little Hunting Park Inc.*, 396 U.S. 229, 237 (1969)] (noting that without protection against retaliation, the underlying discrimination is perpetuated).

> Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. **Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel.**

In Title VII and the EPA, Congress expressly enacted strong anti-retaliation protections. These protections are interpreted broadly. *See Burlington N.*, 548 U.S. at 67 ("Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends."); *see also* 2 EEOC Compl. Man. (BNA) § 614.1(f)(2), at 614:0007 (Apr. 1988)("If retaliation for engaging in such protected activity were permitted to go unremedied, it would have a chilling effect upon the willingness of individuals to speak out against employment discrimination"). If acts of retaliation were immune from legal challenge or recourse, victims and witnesses of discrimination would be chilled from coming forward; the statutory enforcement schemes would unravel and be rendered obsolete. Consequently, enforcing the statutes' anti-retaliation provisions is of paramount importance.

B. Proskauer's Official Directive to Terminate Plaintiff for Pursuing Her Complaints and Claims of Discrimination Constitutes an Unlawful Retaliatory Act

8

Plaintiff asserts several retaliation claims and related causes of action based on Proskauer's threat at the March 2017 mediation. Proskauer's official pronouncement that Plaintiff will be fired has not been rescinded and continues to hang over Plaintiff's head; it might still be carried out in the near future. Plaintiff contends that – particularly in light of Proskauer's other retaliatory conduct – the *diktat* itself is unlawful retaliation, regardless of whether it is consummated.

In *Burlington N.*, the Supreme Court held that prohibited retaliation consists not only of actual personnel actions but any conduct which "could well dissuade a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 57. In the D.C. Circuit, a direct threat to terminate an individual because of her complaints of discrimination fits squarely within this standard. *See, e.g.*, *Lawrence v. Lew*, 156 F. Supp.3d 149, 165 (D.D.C. 2016)("courts in this District have generally found materially adverse employment action where the employee suffered a credible threat of termination"); *Ali v. Dist. of Columbia Govt.*, 810 F. Supp.2d 78, 88-89 (D.D.C. 2011)(threat to discipline and terminate plaintiff's friend: "A credible threat of termination might well dissuade a reasonable employee from pursuing a charge of discrimination.");[4] *Rattigan v. Holder*, 604 F. Supp. 2d 33, 52-53 (D.D.C. 2009)(collecting cases)(noting that threats or prospects of harm may have a deterrent effect on protected activity and thus be actionable retaliation: "Taken together, *Burlington* and *Rochon* [*v. Gonzales,* 438 F.3d 1211, 1219 (D.C. Cir. 2006)] indicate that whether an action is 'materially adverse' is determined by whether it holds a deterrent ***prospect*** of harm, and not by whether the harm comes to pass or whether any effects are felt in the present.")(emphasis in original), *aff'd in relevant part*, 645 F.3d 975, 986-87 (D.C. Cir. 2011) (expressing "no doubt" that jury could find *Burlington* satisfied by initiation of investigation

---

[4] *Accord*: *Ross v. U.S. Capitol Police*, 195 F. Supp.3d 180, 205-206 (D.D.C. 2016)(proposed notice of termination qualified as retaliation, even in absence of actual discharge).

9

creating "ominous prospects" of "possible negative repercussions" up to potential termination).[5]

Similarly, threats of retaliatory termination violate the anti-retaliation protections of the EPA, 29 U.S.C. § 215(a)(3). *See, e.g.*, *Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp.3d 1234, 1249 (D. Or. 2014)("threatening to terminate" employees who participate in Department of Labor investigation "is properly considered a form of 'discrimination' [under § 215(a)(3)] because such threats thwart and interfere with the employee's protected right to participate in the investigation… without fear of reprisal"); *Adams v. Sch. Bd. of Hanover Cty.*, No 3:05CV310, 2008 WL 5070454, at *16 (E.D. Va. Nov. 26, 2008)("threat of economic reprisal or termination"); *Hernandez v. City Wide Insulation of Madison, Inc*., 508 F. Supp.2d 682, 694 (E.D. Wisc. 2007).

Here, Proskauer denies that it made *per se* retaliatory threats at the mediation. The mediator's notes and anticipated testimony are the only available evidence apart from the parties' own contradictory testimony. Thus, this evidence is essential to the search for truth in this action; it may be ***the*** evidence needed to break a potential he-said-she-said impasse on Proskauer's alleged decree of retaliatory termination and ultimately resolve this matter.

C.   Rules and Provisions Protecting the Confidentiality of Settlement Proceedings, Including Mediations, Do Not Shield Independent Illegal or Tortious Acts

Plaintiff acknowledges that mediations are typically confidential. As a general rule, to

---

[5] *See further, e.g., Commonwealth v. Bull HN Info. Sys.*, 16 F. Supp. 2d 90, 108-09 (D. Mass. 1998)("If... threats of retaliation are not actionable... then a plaintiff or government enforcement body would have to wait until an employer actually retaliates before invoking the [retaliation] protections of [the ADEA]. Where the threatened retaliation is clearly illegal, where it chills the redress of legal rights, however, such a conclusion can only be described as absurd."); *James v. Countrywide Fin. Corp.*, No. CV 10-4953, 2012 WL 6923758, at *6 (E.D.N.Y. Oct. 11, 2012)("the threat of job termination from being placed on [a] PIP could 'dissuade a reasonable worker from making or supporting a charge of discrimination.'")(citing *Burlington N.*); *Khan v. HIP Centralized Lab. Servs. Inc*., No. CV-03-2411, 2007 WL 1011325, at *11 (E.D.N.Y. Mar. 30, 2007)(threat of termination was actionable retaliation); *cf. Eldridge v. Rochester City Sch. Dist*., 968 F. Supp.2d 546, 560-61 (W.D.N.Y. 2013)("pressure of an internal investigation, coupled with a veiled threat of an involuntary transfer"); *Davis v. Goodwill Indus. of Greater N.Y. & N.J.*, No. 15 Civ. 7710, 2017 WL 1194686, at *9 (S.D.N.Y. Mar. 30, 2017)(disciplinary warnings).

foster robust negotiations, the parties must be able to communicate freely. However, Proskauer's conduct here is extraordinary and presents an exception. It is axiomatic that parties cannot use a mediation or other settlement proceedings to insulate illegal acts, including – in an employment case such as this one – unlawful threats of retaliation.  Wrongdoing that occurs in the course of settlement proceedings is subject to discovery and may form the basis for an independent claim. *See, e.g.*, *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998)(under Fed. R. Civ. P. 408, correspondence that was part of settlement negotiations "can be used to establish an independent violation (here, **retaliation**) unrelated to the underlying claim which was the subject of the correspondence (race **discrimination**).")(emphasis added); *Cerni v. J.P. Morgan Secs., LLC*, 208 F. Supp.3d 533, 540-41 (S.D.N.Y. 2016)("Rule 408 does not exclude evidence of alleged threats to retaliate for protected activity when the statements occurred during negotiations focused on the protected activity and the evidence serves to prove liability either for making, or later acting upon, the threats.")(citing *Pace v. Paris Maint. Co.*, 7 Fed. Appx. 94 (2d Cir. 2001)); *Carr v. Health Ins. Plan of Greater N.Y.*, 99 Civ. 3706, 2001 WL 563722, at *4 (S.D.N.Y. May 23, 2001)(allowing retaliation claim premised on statements during settlement communications to proceed: "The force of Rule 408 is inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions."); *Samadi v. Quality Furniture LLC*, No. CV 12-593, 2012 WL 12870242 (D. Ariz. July 23, 2012)(strict confidentiality statutes and policies pertaining to EEOC mediations did not preclude claim for unlawful retaliatory conduct during mediation).

Likewise, the fact that Plaintiff and her counsel signed a mediation agreement containing confidentiality provisions is not dispositive here. As a matter of public policy, a confidentiality agreement cannot be used to shield and immunize illegal conduct. It is a "bedrock" principle that "**a promise is unenforceable if the interest in its enforcement is outweighed in the**

11

**circumstances by a public policy harmed by enforcement of the agreement**." *E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738, 744 (1st Cir. 1996)(emphasis added)(citing *Town of Newton v. Rumery,* 480 U.S. 386, 392 (1987)). Accordingly, the *Astra USA* court held that an employer cannot use private non-assistance agreements to prevent disclosure of wrongdoing to the EEOC. *Id.*[6] *See also, e.g.*, *X Corp. v. John Doe,* 805 F. Supp. 1298, 1310 n. 24 (E.D. Va. 1992)("To the extent [a Confidentiality Agreement] prevented disclosure of evidence of a fraud on the government, that Agreement would be void as contrary to public policy. *In other words, X Corp. cannot rely on any contract to conceal illegal activity*.")(emphasis added); *Sparks v. Seltzer*, No. 05-CV-1061, 2006 WL 2358157, at *4 (E.D.N.Y. Aug. 14, 2006)("When balanced against the need for discovery in litigation, confidentiality agreements cannot preclude otherwise permissible discovery."); *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441, 444 (S.D.N.Y. 1995)("agreements obtained by employers requiring former employees to remain silent about underlying events leading up to disputes, or concerning potentially illegal practices… can be harmful to the public's ability to rein in improper behavior, and in some contexts ability of the United States to police violations of its laws… it is against public policy for parties to agree not to reveal, at least in the limited contexts of depositions or pre-deposition interviews concerning litigation arising under federal law, facts relating to alleged or potential violations of such law.")(citing cases); *Hoffman v. Sbarro, Inc.*, No. 97 Civ. 4484, 1997 WL 736703, at *1 (S.D.N.Y. Nov. 26, 1997)("To the extent that the [non-disclosure] agreement might be construed as requiring an employee to withhold

---

[6] Similarly, waiver of the right to file an EEOC Charge – even where the employee validly releases her claims – is void as against public policy. *See, e.g.*, *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1082-83 (9th Cir. 2007)(noting that it is well-established that employees may not contract away their rights to file claims with the EEOC and holding that this rule extends to complaints to federal and state labor agencies); *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1089-90 (5th Cir. 1987)(holding that waiver of the right to file EEOC charge "could impede the EEOC enforcement of civil rights laws"). Here, JAMS' apparent position that Plaintiff herself may not disclose anything that occurred at the mediation, including Proskauer's threats, would impermissibly prevent her from filing a related Charge of retaliation.

evidence relevant to litigation designed to enforce federal statutory rights, it is void.").[7]

Under the circumstances present here, disclosure would not undermine the policy of encouraging settlements, but instead would prevent defendants such as Proskauer from abusing the settlement context as cover for unlawful retaliation and other illegal acts. Accordingly, JAMS' arguments to quash the subpoena and keep Proskauer's conduct under wraps falter:

1. *The Parties' Mediation Agreement Does Not Provide a Distinct Basis to Quash*

The parties' Mediation Agreement is essentially coextensive with general rules regarding mediation: "In order to promote communication among the parties, counsel and the mediator and to facilitate settlement of the dispute," proceedings are ordinarily confidential and protected from disclosure. *See* JAMS Mot. Ex. C § III, Confidentiality (proceedings are "privileged and inadmissible… under [FRE 408] and any applicable federal or state statute, rule or common law provisions.") The parties contemplated, under these standard terms, that their settlement discussions regarding Plaintiff's claims would be made "without prejudice to any party's legal position." *Id.* Plaintiff could not anticipate that Proskauer would use the guise of mediation to levy an unlawful edict of retaliation. This was not a settlement communication, in any reasonable sense, but a naked illegal act timed for launch during the mediation. Consequently, as set forth in the prior section, the Agreement's confidentiality provisions are overcome on public policy grounds, just as FRE 408 and any associated privileges are overcome.

The parties' agreement not to compel the mediator's testimony (JAMS Mot. Ex. C § IV)

---

[7] *See further U.S. v. Warshak*, No. 1:06-CR-111, 2007 WL 4410237, at *9 (S.D. Ohio Dec. 13, 2007)("A company cannot use such a confidentiality agreement to shield itself from government inquiry into evidence of potential illegal behavior, when the government has probable cause… and the witnesses consent to the search. Defendants' position simply conflicts with public policy.")(citing cases); *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1135-37 (N.D. Cal. 2002)("To the extent that [the confidentiality] agreements preclude former employees from assisting in investigations of wrongdoing that have nothing to do with trade secrets or other confidential business information, they conflict with public policy in favor of allowing even current employees to assist in securities fraud investigations.")

13

likewise gives way to public policy concerns. (Notably, this provision does not cover production of the mediator's notes but only documents *provided to the mediator by the parties*.) While parties may knowingly and voluntarily agree to arbitration clauses and jury waivers, they may not agree to hide and suppress evidence of wrongdoing, such as Proskauer's retaliatory pronouncements.[8]

2.  *The Policy in Favor of Confidential Mediation Is Outweighed Here By a Strong Public Policy Demanding that Proskauer Be Held Accountable for its Retaliatory Threats*

Plaintiff does not dispute the general policy in favor of preserving the confidentiality of mediations. However, Plaintiff maintains, a bare threat to terminate Plaintiff in retaliation for her complaints is not a confidential mediation communication,[9] but an outright abuse of the mediation process for an unlawful purpose. A substantial line of cases, set forth above, has carved out an exception for such illegal acts. *See, e.g., Samadi*, 2012 WL 12870242, at *4. JAMS cites no law to the contrary but invokes cases involving disclosure of actual settlement offers and negotiations (and without the assertion of legal claims grounded on wrongdoing during the mediation). *See In re Teligent, Inc*., 640 F.3d 53, 56 (2d Cir. 2011)(defendant sought documents "relating to the negotiations leading up to the Settlement Agreement, including *all* mediation and settlement communications")(emphasis added); *Bernard v. Galen Group Inc*., 901 F. Supp. 778 (S.D.N.Y. 1995)(party disclosed the terms and specific dollar amounts of confidential settlement offers).

Thus, the *Teligent* test for disclosure of "confidential mediation communications" does not apply. A separate line of cases, discussed above, pertains to unlawful retaliatory threats made during settlement proceedings on the underlying claims. *See, e.g*., *Cerni*, 208 F. Supp.3d at 540-41; *Pace*, 7 Fed. Appx. at 97; *Samadi*, 2012 WL 12870242, at *4. The three-pronged *Teligent* test

---

[8] JAMS cites cases arising under the Federal Arbitration Act (FAA) and the strong policy in favor of arbitration. *See* JAMS Mot. at 9. The parties did not agree to arbitration here and the FAA is inapplicable.

[9] Similarly, the parties' discussion of what they will have for lunch – although likely immaterial – merits no protection, even though it transpires at a mediation.

is based on the premise that the documents are "otherwise non-discoverable," 640 F.3d at 58; that presumption is simply inapposite here. In any event, the *Teligent* standard is readily met:

- (1) *There is a special need for the material*— Plaintiff's retaliation claim is predicated on Proskauer's conduct during the mediation, and the mediator's notes and anticipated testimony are a primary source of evidence on that claim. If the mediation were deemed off-limits, Plaintiff would have *no* claim for Proskauer's threats.

- (2) *It would be unfair to bar discovery*—Apart from Plaintiff's own testimony (which JAMS also apparently seeks to preclude), the mediator's notes and testimony are the only available evidence to support Plaintiff's claim. Defendant Proskauer denies making the threats in question, creating a classic he-said-she-said situation. Without the requested discovery, Plaintiff may be unable to effectively make out and prosecute her claim – despite the mediator's explicit acknowledgment that the threats occurred.

- (3) *The need for the evidence outweighs the interest in maintaining confidentiality*—As opposed to confidential negotiations aimed towards resolving a matter, there is no interest in maintaining the confidentiality of illegal threats of retaliation. Any interest is heavily outweighed by Plaintiff's need for the evidence to establish her claims.

In sum, shielding Proskauer's conduct would not serve, but subvert, the policies behind maintaining confidentiality. Production here would not result a party "being burned" by its candid engagement in negotiations (*cf. Complex Sys., Inc. v. ABN Amro Bank, N.V.*, No. 08 Civ. 7497, 2014 WL 1055263, at *5 (S.D.N.Y. Mar. 13, 2014)); thus, it would not impede the mediation process by inhibiting forthright communication. *Cf. Teligent*, 640 F.3d at 59-60. Instead, disclosure would prevent Proskauer from cynically manipulating the process to escape liability for blatant, unlawful acts. Proskauer's attempt to chill Plaintiff's exercise of her rights through direct threats of retaliation should not be reflexively buried or excused under the watchword "mediation."

3. <u>*Neither the Federal Rules of Evidence Nor This District's Court-Sponsored Mediation Program Present a Bar to Disclosure Under the Circumstances*</u>

It is questionable whether a mediation privilege exists under FRE 501, particularly in the Second or D.C. Circuits (JAMS cites no law from either jurisdiction). *See In re Subpoena Issued to CFTC*, 370 F. Supp.2d 201 (D.D.C. 2005)(refusing to recognize settlement privilege that would protect documents from third-party discovery); *Electronic Privacy Ctr. v. U.S. Dept. of Homeland Security*, 999 F. Supp.2d 61, 78 (D.D.C. 2013)("courts in this circuit have refused to recognize a 'federal settlement privilege'"); *Newman & Assocs. v. J.K. Harris & Co., LLC*, No. 04Civ.9264, 2005 WL 3610140, at *2 (S.D.N.Y. Dec. 15, 2005)("courts have generally declined to recognize a privilege that would preclude discovery for the purpose of settlements or settlement negotiations."); *Small v. Nobel Biocare, USA, LLC*, 808 F. Supp.2d 584, 591 (S.D.N.Y. 2011).  In any case, the Court need not decide this issue; any privilege would be overcome here. *See Samadi*, 2012 WL 12870242, at *5-6. Proskauer's unlawful threats would fall well "outside of the scope of any privilege adopted." *Id.* at *5.[10] *Cf. U.S. v. One Parcel of Property*, 930 F.2d 139, 141 (2d Cir. 1991)("state-created privileges…are construed narrowly, and must yield when outweighed by a federal interest in presenting relevant information to a trier of fact")(citations omitted).

Further, the parties here engaged in private mediation and neither the Alternative Dispute Resolution Act (ADRA), 28 U.S.C. § 652, nor the S.D.N.Y.'s Mediation Program are applicable. Nevertheless, Proskauer's retaliatory conduct trumps any such confidentiality terms and policies. *See Samadi*, 2012 WL 12870242, at *3-4. Such confidentiality rules are intended to "allow parties to ADR proceedings to be forthcoming and candid, without fear that frank statements may later be used against them," *not* to "immunize anything and everything that was said during negotiations"

---

[10] The "most compelling basis" for adopting and applying a mediation privilege is where a party makes an admission about the underlying claims and would not have done so but for the mediation context (*id.* at *6), i.e.: where disclosure would result in a party "being burned" by its engagement in the mediation process. The situation present in this action – use of the mediation to levy an independent, unlawful threat – could not be more inapposite.  There is no public policy rationale for creating a privilege here. *See id.*

16

– including unlawful retaliatory threats. *Id.* at *4 (citation omitted).  Courts have thus held that the ADRA "is not a blanket rule of inadmissibility" but have "carve[d] out an exception" for independent claims of retaliation arising from mediation proceedings.  *Id.* (citing cases).[11]

D.   Plaintiff's Subpoena is Not a Speculative "Fishing Expedition" But a Targeted Request for Highly Relevant and Admissible Information

Plaintiff does not seek a vast trove of documents but, at most, a handful of pages of notes. Plaintiff has strong reason to believe that these notes memorialize Proskauer's threat to terminate her for pursuing her claims. (*See* Doe Decl. ¶ 6; Sanford Decl. ¶ 5)  Thus the notes are of central relevance to her retaliation claims.  As the contemporaneously-recorded observations of a third-party neutral, the notes are critical evidence supporting Plaintiff's claims and may be regarded as the best and most reliable proof.  While JAMS argues that the evidence might turn out to be cumulative, JAMS does not point to other available sources of discovery to substantiate Plaintiff's claim.  Indeed, unless Proskauer reverses course and admits to its acts, there likely are none.

JAMS also seeks to apply a heightened relevance and admissibility standard based upon assertions of confidentiality and privilege.[12]  But, as discussed above, unlawful retaliatory threats are neither confidential nor privileged, even when made during a mediation.  Moreover, JAMS

---

[11] Likewise, Fed. R. Evid. 408 is inapplicable, as set forth above.  *See, e.g., id.*  Even if it did pertain, Rule 408 relates solely to admissibility *at trial* and cannot be used "as a screen for curtailing… discovery." *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, Civ. No 14-958, 2017 WL 664016, at *1 n.1 (D.D.C. Feb. 17, 2017)(citations omitted); *accord: Sky Medical Supply Support Claim Servs.*, No. CV 12-6383, 2017 WL 1133349, at *5 n.7 (E.D.N.Y. Mar. 24, 2017)(emphasizing that FRE 408 is a rule of admissibility, not discoverability, and ordering third-party to make settlement agreement available for inspection).

[12] JAMS' invocation of a "critical or necessary" test comes from a qualified journalistic privilege under New York law. *See In re Application to Quash Subpoena to Nat'l Broadcasting Co., Inc.*, 79 F.3d 346, 351 (2d Cir. 1996)(citing N.Y. Civ. Rights Law § 79–h(c)); *Matter of Am. Broadcasting Cos.*, 189 Misc.2d 805, 808 (Sup. Ct. N.Y. Cty. 2001)(same); *Application of Behar*, 779 F. Supp. 273, 275 (S.D.N.Y. 1991) (same). Analogously, JAMS relies on precedent concerning the First Amendment associational privacy privilege, which imposes a particularly strict showing to obtain discovery into an organization's membership and finances. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, No. 75 Civ. 5388, 1985 WL 315, at *7-9 (S.D.N.Y. Feb. 28, 1985). These privileges, and associated case law, are entirely inapt.

17

misconstrues the nature of the evidence at issue – suggesting that Plaintiff seeks to use it only for purposes of impeachment. In fact, without limiting her presentation of evidence in further proceedings in the D.D.C. and at trial, Plaintiff intends to use evidence from the mediator affirmatively, in support of her case in chief on her retaliation claim. The D.D.C. will determine whether she is entitled to do so; at present, Rules 26 and 45 demand production.

### III.    In the Alternative to Compelling Production, the Court May Review the Mediator's Notes In Camera or Direct Continued Preservation Pending Further Developments

For the reasons set forth above, the Court should deny JAMS' Motion to Quash and order JAMS to comply with the subpoena. None of JAMS' objections ultimately bear weight.

Alternatively, if it wishes to exercise an abundance of caution, the Court may review the mediator's notes in camera to determine whether there are any notations material to Plaintiff's claim that Proskauer made a retaliatory threat during the mediation. The Court may then order production of only those pages containing references to Proskauer's threats or instruct that all content unrelated to such threats be redacted. *Cf.* Fed. R. Civ. P. 45(d)(3)(C).

At the very minimum, the Court should direct JAMS to continue to preserve the notes in advance of further proceedings. If the D.D.C. court ultimately compels the mediator's testimony, as Plaintiff expects it will, the notes are essential to the mediator's ability to testify fully and accurately, with a complete recollection of events. In that event, the notes would also be discoverable under Fed. R. Evid. 612.

### IV.    The Court Should Not Issue Sanctions Against Plaintiff

In the course of its Motion, JAMS suggests that Plaintiff should be sanctioned for breaching confidentiality by pursuing her retaliation claims—even invoking the specter of Rule 11. *See* JAMS Mot. at 12-13, 19-20. Such sanctions are entirely improper: They would merely punish Ms. Doe for pursuing a valid retaliation claim; insulate Proskauer's unlawful conduct; and undermine

Title VII, the EPA, similar statutes, and applicable ethical rules. In any case, as the compliance court, this Court's authority to issue sanctions is limited to Rule 45(d)(1) and Rule 45(g).

Ultimately, JAMS seeks sanctions under the rubric of Rule 45(d)(1). But Plaintiff's subpoenas are narrowly tailored and do not impose "undue burden or expense" on JAMS. The "undue burden" inquiry considers only "the harms inflicted by complying with the subpoena," and not "related follow-on issues, such as whether the subpoenaed information is potentially protected by a privilege." *Goldberg v. Amgen, Inc*., 123 F. Supp.3d 9, 23 (D.D.C. 2015)(citing cases). Plaintiff seeks production of the only documents at issue – a handful of pages of notes that JAMS has agreed to preserve pending the outcome of this Motion. There is simply no way in which Plaintiff could have targeted her subpoena any further. The only alternative course of action would have been for Plaintiff to refrain from third-party discovery entirely and thus hamstring herself in pursuing her retaliation claim. JAMS essentially seeks to penalize Plaintiff not for unduly burdensome discovery maneuvers but for seeking discovery on her claims at all.

Here, JAMS' request for sanctions falls along with the Motion to Quash. At minimum, Plaintiff's conduct is "not so unreasonable as to merit sanctions." *Heritage Global Partners, LP v. Prevezon Holdings, Ltd*., No. 14-mc-318, 2015 WL 728463, at *6 (S.D.N.Y. Feb. 19, 2015). Plaintiff did not issue the subpoena "in bad faith or for some improper purpose." *Goldberg*, 123 F. Supp.3d at 22-23. Critically, "the Second Circuit has reversed sanctions for attorney's fees or lost earnings absent a clear factual showing of bad faith and clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes." *Simuro v. Shedd*, No. 2:13-cv-30, 2014 WL 5776149, at *5 (D. Vt. Nov. 6, 2014) (declining to issue sanctions in absence of "clear evidence of bad faith or harassment")(citing

*Weinberger v. Kendrick,* 698 F.2d 61, 80 (2d Cir. 1982)). Sanctions are plainly unwarranted.[13]

## CONCLUSION

Proskauer subverted the fundamental norms of mediation to intimidate Plaintiff with notice that she would be terminated for pursing her complaints of discrimination. Plaintiff does not seek discovery into confidential settlement communications but into a direct, undisguised threat that forms the predicate for an independent cause of action for retaliation.   Contrary to JAMS' assertions, under the exceptional circumstances present here, disclosure will not chill robust settlement discussions or jeopardize the mediation process. Instead, disclosure in this case will safeguard the integrity of mediations by deterring parties from using them as asylum to commit unlawful acts – including illegal retaliatory threats – with impunity. Such retaliation is just as pernicious if it occurs during a mediation and should not be shielded from scrutiny.

Moreover, Plaintiff does not request that the mediator "take sides" in the parties' dispute. Rather, the mediator's notes (and potential eventual testimony) will simply present her best recollection of events as a disinterested third-party witness. The mediator will be acting as a scrivener, not an advocate. Any possible impression of "taking sides" is dispelled by the fact that production is wholly involuntary, compelled by subpoena and court order.

Accordingly, JAMS' Motion to Quash the subpoena and to sanction Plaintiff for pursuing her retaliation claims is misplaced and futile. The Court should either transfer the Motion to the D.D.C. or deny the Motion outright and order JAMS to comply with the subpoena.

---

[13] *Bernard v. Galen Group Inc.*, 901 F. Supp. 778 (S.D.N.Y. 1995) did not involve a Rule 45 subpoena but a party's violation of a court order as well as the confidentiality provisions of the court's mediation program. Unlike here, the party did not disclose independent unlawful acts committed during mediation but the terms and specific dollar amounts of confidential settlement offers. *Cusumano v. Microsoft Corp.*, 162 F.3d 707 (1st Cir. 1998), did not involve sanctions at all. Defendants offer no authority for sanctioning a third-party subpoena under Rule 45(d)(1) – much less under circumstances similar to those present here.

20

Dated: July 14, 2017                              **SANFORD HEISLER SHARP, LLP**

                                    By:     _s/ David Sanford_____
                                            David Sanford, D.C. Bar No. 457933
                                            Vince McKnight, D.C. Bar No. 293811
                                            Altomease Kennedy, D.C. Bar No. 229237
                                            Kate Mueting, D.C. Bar No. 988177
                                            **SANFORD HEISLER SHARP, LLP**
                                            1666 Connecticut Avenue NW, Suite 300
                                            Washington, DC 20009
                                            Telephone: (202) 499-5201
                                            Facsimile: (202) 499-5199
                                            dsanford@sanfordheisler.com

                                            Andrew Melzer (AM-7649)
                                            Alexandra Harwin, D.C. Bar No. 1003018
                                            **SANFORD HEISLER SHARP, LLP**
                                            1350 Avenue of the Americas, 31st Floor
                                            New York, New York 10019
                                            Telephone: (646) 402-5655
                                            Facsimile: (646) 402-5651
                                            jheisler@sanfordheisler.com
                                            aharwin@sanfordheisler.com

                                            Kevin Sharp, TN Bar No. 016287
                                            **SANFORD HEISLER SHARP, LLP**
                                            611 Commerce Street, Suite 3100
                                            Nashville, TN 37203
                                            Telephone: (615) 434-7000
                                            Facsimile: (615) 434-7020
                                            ksharp@sanfordheisler.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE SUBPOENAS ISSUED TO JAMS,
INC. AND CAROL A. WITTENBERG,

    **NON-PARTY RESPONDENTS**

**JANE DOE,**

    **PLAINTIFF,**

**v.**

**PROSKAUER ROSE LLP,**

    **DEFENDANT.**

Miscellaneous Docket No.
1:17-mc-00207-P1

**Case No. 1:17-cv-00901-ABJ**
*Pending in the U.S. District Court for the
District of Columbia*

### DECLARATION OF PLAINTIFF JANE DOE IN OPPOSITION TO MOTION TO QUASH THIRD-PARTY SUBPOENA

I, Jane Doe, hereby declare as follows:

1. Except as indicated, I make this Declaration based on personal knowledge.

2. I am over 21 years of age and fully competent to make this Declaration. If called and sworn as a witness, I would testify competently as to the facts in this Declaration.

3. On March 23, 2017, I attended a mediation at JAMS to attempt to resolve my claims against Proskauer.

4. As an attorney, I have significant familiarity and experience with mediations. I agreed to the mediation based on my belief and understanding that both parties would attempt to work out a resolution in good faith, with the assistance of a professional mediator. I did not – and could not – anticipate that Proskauer would use the mediation to make retaliatory threats against me.

5. But that is precisely what happened. At a joint session at the beginning of the mediation, Proskauer's representative – a Proskauer Labor and Employment attorney – admonished that Proskauer would soon fire me for raising complaints and pursuing claims of discrimination. To the best of my recollection, she stated: "You need to understand… You are going to be terminated. Your complaint upset a lot of people." These words stood out in my mind. I took them as a direct threat to punish me and destroy my career because of my complaints against the Firm.

6. Mediator Carol A. Wittenberg was present when this threat was made. In my observation and understanding, Ms. Wittenberg took contemporaneous notes of the mediation proceedings including the joint session. Ms. Wittenberg also acknowledged to me that she witnessed the threat. Therefore, I believe that Proskauer's retaliatory threat is likely recorded in Ms. Wittenberg's notes.

7. Proskauer's threat stunned me and exercised a substantial chilling effect on my willingness to pursue my claims against the Firm.

I affirm, under penalty of perjury, that the above information is true and correct to best of my knowledge and belief.

DATED: July 14, 2017

By

Jane Doe

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE SUBPOENAS ISSUED TO JAMS, INC. AND CAROL A. WITTENBERG,** | |
| **NON-PARTY RESPONDENTS** | Miscellaneous Docket No. 1:17-mc-00207-P1 |
| **JANE DOE,** | |
| **PLAINTIFF,** | **Case No. 1:17-cv-00901-ABJ** *Pending in the U.S. District Court for the District of Columbia* |
| **v.** | |
| **PROSKAUER ROSE LLP,** | |
| **DEFENDANT.** | |

## DECLARATION OF DAVID SANFORD IN OPPOSITION TO MOTION TO QUASH THIRD-PARTY SUBPOENA

I, David Sanford, hereby declare as follows:

1. I am the lead attorney for Plaintiff Jane Doe. Except as indicated, I make this Declaration based on personal knowledge.

2. I am over 21 years of age and fully competent to make this Declaration. If called and sworn as a witness, I would testify competently as to the facts in this Declaration.

3. On March 23, 2017 and May 12, 2017, I attended a mediation at JAMS to attempt to resolve my client's claims against Proskauer.

4. I agreed to the mediation and signed the mediation papers based on my belief and understanding that both parties would attempt to work out a resolution in good faith, with the assistance of a professional mediator. I did not – and could not – anticipate that Proskauer would use the mediation to make a retaliatory threat against my client.

5. At the end of the second day of mediation on May 12, 2017, I had a conversation with Mediator Carol A. Wittenberg. In the course of that conversation, Ms. Wittenberg confirmed that, during the March 23 mediation, Proskauer had threatened to terminate Ms. Doe for her complaints of discrimination. Ms. Wittenberg also acknowledged that she had taken detailed contemporaneous notes of all mediation proceedings. When I indicated that I would likely seek to compel production of the notes to support my client's claim of retaliation, Ms. Wittenberg responded that the notes would soon be destroyed pursuant to official JAMS policy.

6. My client filed a complaint against Proskauer in the D.D.C. on May 12, 2017.

7. On Thursday, May 18, my firm made an emergency motion for an order preserving Ms. Wittenberg's notes of the mediation, which we understood would be destroyed as soon as that coming Monday, May 22. The D.D.C. granted a preservation order the same day, May 18. A true copy of the court's minute order is attached as Exhibit A.

8. Concurrently with the preservation motion, my firm served subpoenas for production of the notes on JAMS and mediator Wittenberg. I received an email from a JAMS representative the following day, May 19, representing that JAMS would preserve and not destroy the notes. A true copy of the email is attached as Exhibit B.

9. JAMS then opposed our motion for a preservation order on the grounds that it was preserving the relevant documents voluntarily and that there was thus no need for the order. It represented to the court in its papers that "neither JAMS nor Wittenberg will destroy the documents pending a court review and final ruling" on the subpoenas. The D.D.C. accordingly directed Plaintiff Doe to brief the issue of whether the order was moot. The court ultimately lifted the order based on JAMS' representations that it would preserve the documents in question without a court order.

I affirm, under penalty of perjury, that the above information is true and correct to best of my knowledge and belief.

DATED: July 14, 2017

By:_____

David Sanford

| | |
|---|---|
| **From:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Sent:** | Thursday, May 18, 2017 6:18 PM |
| **To:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Subject:** | Activity in Case 1:17-cv-00901-ABJ DOE v. PROSKAUER ROSE, LLP Order on Motion to Expedite |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Columbia

#### Notice of Electronic Filing

The following transaction was entered on 5/18/2017 at 6:17 PM and filed on 5/18/2017

**Case Name:**        DOE v. PROSKAUER ROSE, LLP
**Case Number:**      1:17-cv-00901-ABJ
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**MINUTE ORDER. In light of [7] plaintiff's emergency motion for preservation order, JAMS is ordered to respond to plaintiff's motion by May 23, 2017. Pursuant to the Court's inherent authority to oversee discovery and the need to preserve the status quo pending a fuller evaluation of the issues, JAMS must preserve the mediator's notes from the parties' March 23, 2017 mediation session and all other documents related to the mediation pending further order of the Court. This order should not be interpreted as an indication that the Court has made any finding or determination as to whether the material will ultimately be found to be relevant or admissible; the Court is requiring the documents to be preserved so that such issues can be ruled upon based upon a full record at the appropriate time. In light of this order, [8] plaintiff's motion to expedite consideration of plaintiff's emergency motion is denied as moot. SO ORDERED. Signed by Judge Amy Berman Jackson on 5/18/2017. (lcabj2)**

**1:17-cv-00901-ABJ Notice has been electronically mailed to:**

David W. Sanford    dsanford@sanfordheisler.com, aharwin@sanfordheisler.com, amelzer@sanfordheisler.com, llim@sanfordheisler.com, schang@sanfordheisler.com, sroemer@sanfordheisler.com

**From:** Elizabeth Carter <ecarter@jamsadr.com>
**Date:** May 19, 2017 at 8:57:32 AM EDT
**To:** "aharwin@sanfordheisler.com" <aharwin@sanfordheisler.com>,
"jheisler@sanfordheisler.com" <jheisler@sanfordheisler.com>,
"dsanford@sandfordheisler.com" <dsanford@sandfordheisler.com>,
"kmckenna@proskauer.com" <kmckenna@proskauer.com>, "ksharp@sandfordheisler.com"
<ksharp@sandfordheisler.com>, "sobus@proskauer.com" <sobus@proskauer.com>
**Subject: Jane Doe v. Proskauer Rose LLP**

Dear Counsel:

JAMS is in receipt of the subpoenas and Emergency Motion served in the above-referenced
matter. This matter has been referred to JAMS General Counsel for response. In the meantime,
neither JAMS nor the mediator will destroy any documents that are currently in our possession.

Thank you,
Elizabeth M. Carter, Esq.
JAMS
Vice President-East/Central Region
212-607-2737

1

H7SVDOEC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:

4   SUBPOENAS ISSUED TO JAMS, INC.
    AND CAROL A. WITTENBERG,
5
              Nonparty Respondents.
6
    ------------------------------x
7
    JANE DOE,
8
                   Plaintiff,
9
              v.                          17 MC 207 (DLC)
10
    PROSKAUER ROSE, LLP,
11
                   Defendant.            ARGUMENT
12
    ------------------------------x
13                                       New York, N.Y.
                                         July 28, 2017
14                                       2:33 p.m.

15  Before:

16                     HON. DENISE COTE,

17                                       District Judge

18                     APPEARANCES

19  CAPITAL LEGAL GROUP
         Attorneys for Nonparty Respondents
20  BY:  WILLIAM E. WALLACE III

21  SANFORD HEISLER SHARP
         Attorneys for Plaintiff
22  BY:  ANDREW MELZER
         ALEXANDRA HARWIN
23

24

25

H7SVDOEC

1           (Case called)

2           THE COURT:  Counsel, I'm prepared to rule on this

3    matter.  I should tell you that I know it really comes in two

4    components.  There is a motion to transfer or an application to

5    transfer and an argument on the merits.

6           As you know, pursuant to Rule 45(f), I may transfer a

7    motion if there's consent.  There is not consent here.  Or if I

8    find exceptional circumstances under the advisory committee

9    notes, judges are advised that it may be helpful to consult

10   with the judge supervising the principal litigation.  I have

11   undertaken those consultations.  I do not find there are

12   exceptional circumstances and I will be addressing the merits.

13          So does anyone wish to add anything to your briefing

14   with respect to the issue on the merits?

15          MR. WALLACE:  If I may, your Honor, just one very

16   small point.

17          In the response, in the opposition to the motion, the

18   attorneys for the plaintiff in the underlying litigation

19   submitted as Exhibit A to the affidavit of Mr. Sanford an order

20   dated May 18, 2017.  In fact, the order that they provided the

21   Court is not the order of record.  The order of record has, in

22   fact, been vacated, and that is reflected in the record.  It

23   was vacated on May 25th, more than a month before they

24   submitted the vacated order.

25          I would like to just hand up to the Court the current

**A124**

3

H7SVDOEC

1    order that should have been submitted, if I may.

2            THE COURT:  Certainly.

3            Thank you.

4            Obviously, since it's an order of the Court and on the

5    electronic record in the case, plaintiff's counsel has a copy,

6    but do you have another copy for them?

7            MR. WALLACE:  I provided it to them, yes, your Honor.

8    It is of public record, of course, and it was served on them as

9    well electronically.

10           THE COURT:  Thank you.

11           MR. WALLACE:  I think this goes to our request of

12   fees, your Honor.

13           THE COURT:  Thank you.

14           So let me ask you, Mr. Melzer, did you have anything

15   you wanted to add to your papers?

16           MR. MELZER:  Yes, your Honor.

17           First I'd like to address the issue that counsel for

18   JAMS just raised.

19           The order was vacated solely because it was deemed

20   moot.  The reason it was deemed moot was because after the

21   order came down, JAMS represented that it would preserve the

22   documents voluntarily.  But the reason that we submitted the

23   order is because of what the judge said about the order, and

24   that was that she was not making any finding as to whether the

25   documents were relevant or admissible, but was requiring them

4

H7SVDOEC

1    to be preserved so that such issues can be ruled upon based

2    upon a full record at the appropriate time.

3          So the Court does intend to address these issues.

4          A decision that would declare the mediation off limits

5    from discovery would essentially deny the plaintiff an

6    opportunity to take meaningful discovery on the retaliation

7    claim arising from an unlawful act that occurred at the

8    mediation.  A decision of that import would intrude on the

9    province of the trial court in D.C. where the action is

10    pending.

11          So we would suggest that the Court should enforce the

12    subpoena.  All it would entail would be that the documents be

13    provided to us; the district court in D.C. would then rule upon

14    whether they can be used and would be admissible in the

15    litigation.  It would continue, the Court's same approach of

16    preserving the documents and addressing the issues as they

17    arise in the context of the litigation.  We are willing to

18    enter an appropriate confidentiality order that would

19    involve -- that we would only use the documents in the context

20    of the litigation and not otherwise, not disclose publicly

21    outside of the litigation.

22          Another thing that I'd like to address is something in

23    their reply brief.  It rests on the mixed characterization of

24    plaintiff's position.

25          Proskauer did not make so-called incriminating

5

1    statements or "admissions" at the mediation.  This is a

2    strawman.  What it did was commit an unlawful retaliatory act

3    independent from plaintiff's underlying discrimination claims.

4    That act is what was unforeseeable to us and our client.  What

5    they said, in effect, was, You pissed off the firm and you're

6    going to be fired.  This act is no less illegal because it

7    occurred in the context of a mediation and is very similar to

8    if someone in the context of a mediation had committed a

9    physical assault.

10         Mediations, whether governed by mediation rules and

11   statutes or by confidentiality agreements, cannot be used to

12   cover up this kind of illegal retaliatory conduct.  There is a

13   paramount public policy directive that overcomes any type of

14   confidentiality here and it wouldn't affect the general rule

15   about the ordinary course of mediations.

16         Thank you, your Honor.

17         THE COURT:  Thank you.  Thank you, all.

18         So let's move to the heart of the matter here, and

19   that is this application to quash.

20         The starting point or one of the starting points is,

21   of course, the law of retaliation itself.  The elements of a

22   retaliation claim are not in dispute and I just lay them

23   quickly on the record.

24         A retaliation claim can be brought where plaintiff has

25   participated in protected activity, the defendant has knowledge

6

H7SVDOEC

1    of that protected activity, there is an adverse employment

2    action taken, and a causal connection between the protected

3    activity and the adverse employment action.

4           It is my understanding that the plaintiff seeks this

5    discovery in order to pursue a retaliation claim in its lawsuit

6    in the District of Columbia.

7           So this is an issue about the scope of discovery in

8    the context of bringing such a claim.  One starting point for

9    that analysis is Rule 45, which governs discovery of third

10   parties.  It provides protection for privileged matter and for

11   confidential information.  The parties have both cited to the

12   elements of that rule.  They've also indicated that they are

13   well aware of the broad discretion granted to a court when

14   supervising discovery as provided in Rule 26 and in case law

15   pursuant to Rule 26.

16          I do not know that I need to resolve at all the

17   question of whether statements made by the defendant or

18   allegedly made by the defendant or its representatives in a

19   mediation session are discoverable here, because the issue

20   presented is not to take discovery of the defendant, but to

21   take discovery of the mediator.

22          There are strong public policy issues that protect the

23   confidentiality of mediation.  The Second Circuit has described

24   those in the *Teligent* case, 640 F.3d at 58, and, of course, its

25   discussion is in line with the law of many other circuits.

H7SVDOEC

1          In addition, there is Rule 408, which provides a

2     standard for protection of settlement discussions.

3          Now, there's also an extensive body of law in the

4     circuits and elsewhere that describe exceptions to the

5     principles of confidentiality and Rule 408.  One of them is in

6     the D.C. Circuit, it's an important decision, the *Carney*

7     decision, 151 F.3d 1090.

8          To the extent that evidence developed from settlement

9     or mediation discussions could establish an independent

10    violation of the law, in this case the plaintiff argues it will

11    or may, a retaliation claim, then it is possible that discovery

12    can be allowed despite the general confidentiality principles

13    for mediation and Rule 408.  But, again, I don't believe I need

14    to reach those issues.

15         What is sought here is not discovery of the defendant

16    or the plaintiff seeking to offer at trial statements from the

17    mediation that the plaintiff heard the defendant say allegedly.

18    What is sought here is discovery of the mediator itself.

19         Now, this is a case in which the plaintiff entered

20    into a mediation agreement.  It's part of the parties' papers.

21    And let me quote from one statement in that agreement.  It is

22    in Section 4:

23         "Each party agrees to make no attempt to compel the

24    mediators or any JAMS employees' testimony, nor to compel the

25    mediator or any JAMS employee to produce any document provided

H7SVDOEC

1    by the other party or to the mediator or to JAMS."

2              Of course, a mediation agreement is a type of

3    contract.  Where the language of the contract is clear and

4    unambiguous, as it is here, its terms are to be given effect.

5    And, of course, the issue of ambiguity is for the Court to

6    decide.  There is no argument here that the agreement is in any

7    way ambiguous.

8              Where does this leave me?

9              I am going to quash the subpoena.  I find that the

10   agreement itself, the contract, the plaintiff, a sophisticated

11   party, represented by counsel executed, supports that decision.

12   But there are strong public policy reasons also supporting the

13   decision to quash the subpoena.

14             The idea that mediators or those serving in the role

15   of mediators to be compelled to provide testimony and

16   documentary evidence in connection with the parties'

17   unsuccessfully mediated dispute is a serious proposition.  It

18   would make mediation and settlement discussions far more

19   expensive for one and all.  It will be for the trial court who

20   is presiding over this litigation to decide whether or not the

21   plaintiff can present her own evidence of what transpired in

22   the mediation and whether or not the plaintiff has a right to

23   compel discovery of the defendant for statements made in the

24   mediation.

25             I do not trench upon that decision at all; that is for

H7SVDOEC

1  the district court presiding over this litigation to make.  All

2  I'm deciding is that for strong public policy reasons and as

3  recognized and supported, in effect, by the contract the

4  plaintiff entered, this motion is quashed.

5         So there will be no deposition of the mediator, which

6  is discussed to some extent in the parties' papers.  There will

7  be no requirement that the mediator produce documents.  I don't

8  even think there is a requirement to preserve documents other

9  than the requirement to impose in the normal course, either by

10  JAMS' rules or the mediators's own course of practice.

11         Now, there is a request for sanctions here.  I'm going

12  to deny that request for sanctions.

13         I think that ends all the open matters that I need to

14  address.

15         Mr. Wallace, have I missed any issue that you've

16  raised?

17         MR. WALLACE:  You have not, your Honor.  Thank you.

18         THE COURT:  Mr. Melzer, have I missed any application

19  you've raised?

20         MR. MELZER:  No, your Honor.

21         THE COURT:  Thank you so much.

22                           *    *    *

23

24

25

```
----------------------------------------X
                                        :
In re: Subpoenas Issued to JAMS, Inc.   :
and Carol A. Wittenberg,                :
                                        :
            Nonparty Respondents,       :       17mc207  (DLC)
                                        :
--------------------------------------- :        ORDER
                                        :
JANE DOE,                               :
                                        :
                Plaintiff,              :
                                        :
                -v-                     :
                                        :
PROSKAUER ROSE, LLP,                    :
                                        :
                Defendants,             :
                                        :
----------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/28/17

DENISE COTE, District Judge:

    IT IS HEREBY ORDERED that for the reasons stated on the

record during the July 28, 2017 conference:

    1)    The motion to transfer is denied.

    2)    The motion to quash the subpoenas served on JAMS, Inc.

          and Mediator Carol A. Wittenberg is granted.

    3)    The motion for sanctions is denied.

SO ORDERED.

Dated:    New York, New York
          July 28, 2017

                              _____
                                      DENISE COTE
                              United States District Judge

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE SUBPOENAS ISSUED TO JAMS, INC. AND CAROL A. WITTENBERG,** | Miscellaneous Docket No. 1:17-mc-00207-P1 |
| **NON-PARTY RESPONDENTS** | |
| **JANE DOE,** | |
| **PLAINTIFF,** | **Case No. 1:17-cv-00901-ABJ** |
| **v.** | *Pending in the U.S. District Court for the District of Columbia* |
| **PROSKAUER ROSE LLP,** | |
| **DEFENDANT.** | |

### NOTICE OF APPEAL

Please take notice that Plaintiff Jane Doe hereby appeals to the United States Court of Appeals for the Second Circuit from an order and final judgment of the Hon. Judge Denise L. Cote of the Southern District of New York, quashing subpoenas served on JAMS, Inc. and Carol A. Wittenberg, entered in this action on July 28, 2017.

Please take further notice that Plaintiff appeals from the whole of said order and judgment and from each and every part thereof.

DATED: August 22, 2017

By: _____/s/ David Sanford_____
David Sanford, D.C. Bar No. 457933
SANFORD HEISLER SHARP, LLP
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009
Telephone: (202) 499-5201
Facsimile: (202) 499-5199
dsanford@sanfordheisler.com

Andrew Melzer (AM-7649)
Alexandra Harwin, D.C. Bar No. 1003018

SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5655
Facsimile: (646) 402-5651

Kevin Sharp, TN Bar No. 016287
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020

***Counsel for Plaintiff***

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                    :

In re: Subpoenas Issued to JAMS, Inc. and   :
Carol A. Wittenberg,                         :      **Miscellaneous Docket No.**
                                      :
     Nonparty Respondents           :      **1:17-mc-00207-P1**
_____:
                                      :

JANE DOE,                             :
                                      :
     Plaintiff,                       :      Civil No. 1:17-cv-00901-ABJ
                                      :      Pending in the United States
V.                                 :      District Court for the District of
                                      :      Columbia.
PROSKAUER ROSE LLP.           :
                                      :
     Defendant.                    :
_____:

## NOTICE OF CROSS-APPEAL

      Please take notice that the Non-party Respondents, Carol A. Wittenberg and JAMS, Inc.

hereby cross-appeals to the United States Court of Appeals for the Second Circuit from an order

and final judgment of the Hon. Judge Denise L. Cote of the Southern District of New York,

denying the request for an award of attorney's fees entered on July 28, 2017.

      DATED: September 5, 2017

                               Respectfully submitted,

                               /s/ William Wallace

                              _____
                               William E. Wallace III
                               NY Bar No.    4779518
                               Capital Legal Group (US) PLLC
                               1717 Pennsylvania Avenue, N.W. Suite 1025
                               Washington, D.C.  20004-2595
                               Telephone:  (202) 559-9185
                               Facsimile:  (202) 644-5227
                               Email:      WWallace@CapLegal.US
                               _Counsel for JAMS, Inc. and Carol A. Wittenberg_

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a copy of the foregoing Notice of Cross Appeal was served

by electronic mail' on this 5th day of September 2017, to:

        David Sanford, Esq.
        **SANFORD HEISLER SHARP, LLP**
        1666 Connecticut Avenue NW, Suite 300
        Washington, DC 20009
        dsanford@sanfordheisler.com

        Andrew Melzer
        **SANFORD HEISLER SHARP, LLP**
        1350 Avenue of the Americas, 31st Floor
        New York, New York 10019
        amelzer@sanfordheisler.com

        Kevin Sharp
        **SANFORD HEISLER SHARP, LLP**
        611 Commerce Street, Suite 3100
        Nashville, TN 37203
        ksharp@sanfordheisler.com


                /s/ William Wallace

                _____

                William E. Wallace III